UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 16-61511-CIV-WJZ

CAROL WILDING, ET AL.,              .
                                    .
            Plaintiffs,             . Fort Lauderdale, Florida
                                    . April 25, 2017
            v.                      . 1:24 p.m.
                                    .
DNC SERVICES CORP,  d/b/a,          .
DEMOCRATIC NATIONAL                 .
COMMITTEE, ET AL.,                  .
                                    .
            Defendants.             .
. . . . . . . . . . . . . . . .     .


                        -  -  -  -  -

              Transcript of Motion Hearing had

           before the Honorable William J. Zloch,

              United States District Judge.

                        -  -  -  -  -


Proceedings recorded by mechanical stenography, transcript
produced by computer.

```
APPEARANCES:

For the Plaintiffs:    Jared H. Beck, Esq.
                       Beverly Virues, Esq.
                       Beck & Lee, P.A.
                       12485 SW 137th Avenue
                       Suite 205
                       Miami, Florida  33186
                               and
                       Cullin O'Brien, Esq.
                       Cullin O'Brien Law, P.A.
                       6541 NE 21st Way
                       Fort Lauderdale, Florida  33308
                               and
                       Antonino G. Hernandez, Esq.
                       Law Office of Antonino G. Hernandez
                       4 SE First Street
                       Second Floor
                       Miami, Florida  33131

For the Defendants:    Bruce V. Spiva, Esq.
                       Mark R. Caramanica, Esq.
                       Thomas & LoCicero
                       601 South Boulevard
                       Tampa, Florida  33601

Court Reporter:        Francine C. Salopek, RMR, CRR
                       Official Court Reporter
                       United States District Court
                       299 E. Broward Blvd., Room 205F
                       Fort Lauderdale, Florida 33301
                       (954)769-5657/mjsfcs@aol.com

                        -   -   -   -   -
```

1       <u>**TUESDAY, APRIL 25, 2017, 1:24 P.M.**</u>

2       *(The Judge entered the courtroom)*

3       **THE COURT:**  Good afternoon.  Please be seated.

4       Calling Case Number 16-61511-Civil.

5       Counsel, would you note your appearances?

6       **MR. BECK:**  Good morning, your Honor.  Jared Beck on

7 behalf of the plaintiffs.

8       **MR. O'BRIEN:**  Your Honor, Cullin O'Brien on behalf of

9 the plaintiffs.

10      **MR. HERNANDEZ:**  Your Honor, Antonio Hernandez on

11 behalf of the plaintiffs.

12      **MS. VIRUES:**  Beverly Virues on behalf of the

13 plaintiffs.

14      **THE COURT:**  Good afternoon.

15      **MR. SPIVA:**  Good afternoon, your Honor.  Bruce Spiva

16 on behalf of the defendants.

17      **MR. CARAMANICA:**  And, your Honor, Mark Caramanica on

18 behalf of the defendants.

19      **THE COURT:**  Good afternoon.

20      We're here this afternoon for -- or upon the motion to

21 dismiss filed by the defense.

22      I have, obviously, questions for both sides.  And what

23 I'd like to do is, as we cover various technical issues, such

24 as standing, the pleadings, class action allegations, and so

25 forth, rather than hear from just one side, as we go through

```
 1   with individual questions, I'll hear from the defense, I'll

 2   hear from the plaintiff on that particular issue.  All right.

 3   And, again, these are technical issues that we will be dealing

 4   with.

 5         But let me just give a brief description of the case

 6   at this point.  The plaintiffs brought this suit as a putative

 7   class action against Defendants DNC Services Corp. and Deborah

 8   Wassermann Schultz.  According to their first-amended

 9   complaint, that is, Docket Entry Number 8, the plaintiffs are,

10   quote, "residents of 45 states and the District of Columbia."

11   They seek to represent three distinct classes:

12         One, all people or entities who contributed to the DNC

13   from January 1, 2015, through July 13, 2016, referred to as the

14   "DNC Donor Class."

15         Two, all people or entities who contributed to the

16   Bernie Sanders campaign from January 1, 2015, through July 13,

17   2016, known as the "Sanders Donor Class."

18         And, three, all registered members of the Democratic

19   Party, known as the "Democratic Party Class."

20         This case arises generally from the DNC's alleged bias

21   in favor of Hillary Clinton during the 2015-2016 Democratic

22   Presidential Primary, as well as the DNC's handling of donor

23   information, which was attacked by an online hacker.

24         Plaintiffs bring six causes of action, each germane to

25   particular proposed classes.
```

1          Count 1, fraud by the DNC Donor Class and the Sanders

2   Donor Class.

3          Count 2, negligent misrepresentation by the DNC Donor

4   Class and the Sanders Donor Class.

5          Three, violation of Section 28-3904 of the District of

6   Columbia code by the DNC Donor Class and the Sanders Donor

7   Class.

8          Count 4, unjust enrichment by the DNC Donor Class.

9          Count 5, breach of fiduciary duty by the Democratic

10  Party Class.

11         And Count 6, negligence by the DNC Donor Class.

12         The defendants have moved to dismiss the first-amended

13  complaint, Docket Entry Number 8.  The defendants' arguments

14  fall generally under three umbrellas.

15         First, the defendants argue that plaintiffs lack

16  standing to bring their claims.  Next, the defendants argue

17  that the first-amended complaint fails to state a claim.  And,

18  third, the defendants argue that the class action allegations

19  should be stricken.

20         Now, with that general description of the pleadings at

21  this stage -- well, let me do it this way.  Are there any

22  opening remarks that the defense would like to give?  And then

23  I'll hear from the plaintiff as well.  And then I'll go into my

24  questions.

25         **MR. SPIVA:**  Your Honor, I was prepared to give some

1  opening remarks, but if you would prefer to just ask questions,

2  I'm also happy to do it that way.

3       **THE COURT:**  Well, go ahead.  You can give your -- take

4  your time.  We have the whole afternoon.

5       **MR. SPIVA:**  Okay.

6       And mindful of what your Honor said about wanting to

7  take, you know, the issues kind of one at a time, maybe I'll

8  cover the -- I'll start with the issue of standing and whether

9  the Court has subject-matter jurisdiction first.  Because, of

10  course, if we are correct that there is no subject -- no

11  standing and no subject-matter jurisdiction, then the entire

12  complaint -- all of the claims should be dismissed, your Honor.

13       **THE COURT:**  So you were gonna go into your arguments.

14       **MR. SPIVA:**  Yes.  Well, why don't I do this.  Why

15  don't I -- I'll give you just some very brief overview opening

16  statement, and then I'll sit down, and the other side can do

17  the same.  And then we can --

18       **THE COURT:**  Then I'll begin with my questions.

19       **MR. SPIVA:**  Okay.

20       **THE COURT:**  Because we'll cover all of these technical

21  points.

22       **MR. SPIVA:**  Sure.  That makes sense, your Honor.

23       **THE COURT:**  All right.

24       **MR. SPIVA:**  Your Honor, just briefly, this is really

25  an action that was brought as a political weapon against the

1   DNC and its former chairperson, Congresswoman Debbie Wassermann

2   Schultz.  And it really threatens some serious First Amendment

3   injury to the defendants, because the crux of the plaintiffs'

4   claims here are that the DNC and Congresswoman Schultz

5   purportedly breached an internal rule of the party in saying on

6   the one hand that the party would remain neutral between the

7   two candidates and on the other hand not doing that behind the

8   scenes.  That's the allegation.

9          And I think really what runs through all of these

10  questions, your Honor, the questions that the Court would have

11  to address to resolve that claim that really demonstrate why

12  there is no subject-matter jurisdiction, why this can't be

13  resolved as a class action, and why there's a failure to state

14  a claim, and that is, your Honor, the Court would have to

15  resolve such issues as what was the meaning of the Democratic

16  Party's internal rule and how should it be enforced.

17         **THE COURT:**  You're talking about the DNC's charter

18  now.

19         **MR. SPIVA:**  Yes, their bylaws, which is where this

20  purported obligation arises to remain neutral as between the

21  candidates.

22         **THE COURT:**  Article V, Section 4.

23         **MR. SPIVA:**  Correct, your Honor.

24         **THE COURT:**  Go ahead.

25         **MR. SPIVA:**  And the Court would have to basically tell

 1    the party that it couldn't change that rule, even though it's a

 2    discretionary rule that it didn't need to adopt to begin with.

 3         The Court would have to find that these individuals

 4    were induced to give money to Representative Sanders --

 5    sorry -- Senator Sanders on the basis that there would be this

 6    neutrality that there purportedly was not, and that they

 7    wouldn't have -- they relied on that, and that they wouldn't

 8    have given that money otherwise.

 9         And same with DNC members.  The Court would have to

10    define who is a member of the Democratic Party nationwide.

11    There is no national registration for either of the major

12    parties.  And so, this Court would have to determine what it

13    means to be a Democrat and then determine whether the class

14    that the Court defined was injured in some way by the

15    allegations.

16         I think through each of these questions, your Honor --

17    and there are more -- they are not justiciable, because they

18    are political questions that courts have repeatedly said

19    they -- that they are not the province of the civil courts.

20    It's not redressable, because if the Court were to seek to

21    answer those questions and impose burdens upon the party, it

22    would violate the First Amendment rights of the party for free

23    association.  And so it's not redressable.

24         And, really, I think there's an impossible showing of

25    causation.  I mean the Court would have to find that people who

1     fervently supported Bernie Sanders and who purportedly didn't

2     know that this favoritism was going on would have not given to

3     Mr. Sanders, to Senator Sanders, if they had known that there

4     was this purported favoritism.

5           And, of course, there are lots of other underlying

6     factual determinations that this Court would have to make in

7     terms of whether there was such favoritism, and how it affected

8     the race, that also raise similar types of questions that

9     really are without -- it's outside the province of the Court.

10          I think this really runs through all of these issues,

11     your Honor.  I think it also shows why this can't be determined

12     on a class basis, because every single person who was

13     determined to be a member of one of these three subclasses

14     would need to be deposed and would need to testify at trial

15     about issues such as reliance.

16          And so, I think those questions really, your Honor,

17     are at the heart of why this case should be dismissed for lack

18     of subject-matter jurisdiction, why there's a failure to state

19     a claim, and why the class action allegations should be

20     stricken.

21          Thank you.

22     **THE COURT:**  Thank you, Counsel.

23     **MR. BECK:**  Thank you, your Honor.

24     **THE COURT:**  Good afternoon.

25     **MR. BECK:**  Good afternoon.

1          And thank you, Counsel.

2          Your Honor, we've been accused just now of wielding a

3   political weapon.  We've been accused of posing a threat to the

4   First Amendment.  But, in fact, the First Amendment is not

5   absolute, and the Supreme Court recognizes that again and

6   again.  And, in fact, the First Amendment yields on many

7   occasions to more ancient common-law rights that precede even

8   the founding of this republic.

9          Freedom of speech and freedom of association are very,

10  very important, but we also have a right not to be defrauded.

11  We also have a right not to be taken advantage of by a

12  fiduciary.  We have a right not to be deceived.  There's no

13  exception to those rights just because the fraudulent speech or

14  the fraudulent conduct involved takes place in a political

15  context.  But that's what the defendants want you to conclude

16  in this case.  But if you concluded that, your Honor, you would

17  be in direct contravention of what the Supreme Court has said

18  time and again.

19          *Virginia State Board of Pharmacy*, quote:

20          "Untruthful speech, commercial or otherwise, has

21      never been protected for its own sake."

22          The famous *Gertz* opinion, one of the seminal First

23  Amendment cases, quote:

24          "There is no constitutional value in false

25      statements of fact.  Neither the intentional lie nor

1    the careless error materially advances society's

2    interest in uninhibited, robust, and wide-open debate

3    on public issues."

4        And more recently in *Madigan vs. Illinois*, a 2006

5    opinion from the Supreme Court, the Court held:

6        "Consistent with our precedent and the First

7    Amendment, states may maintain fraud actions when

8    fundraisers make false or misleading representations

9    designed to deceive donors about how their donations

10    are used."

11        I think it's very clear that there is no real First

12    Amendment issue involved here, simply because we are talking

13    about speech which occurred in the political context.  The

14    First Amendment or the common-law admits no exception to the

15    rights not to be defrauded, not to be deceived, just because

16    speech was involved.  That's very central to our system of

17    justice.

18        And as to standing, which is the means by which a

19    litigant enters court, standing here is a very, very basic

20    question -- or a very basic issue.  And I think it's readily

21    decided in this case, because we are talking primarily about

22    the loss of money.  And federal courts have recognized again

23    and again that loss of money is a valid injury to confer

24    Article III standing.

25        Just because that money was paid as part of a

1   political process, again, we get back to the First Amendment,

2   we get back to all those cases that the Supreme Court has

3   decided.  There's no protection of fraudulent speech that comes

4   under the rubric of freedom of speech or freedom of

5   association.

6          This is not a case about enforcing political promises.

7   They want you to think that, I believe, because they want to

8   paint this case in a line of cases that have been filed

9   throughout the years where candidates may make political

10   promises, and then disappointed voters bring lawsuits to

11   enforce those promises or seek damages in one form or another.

12   But that's not what this case is about.  We're not talking

13   about campaign rhetoric.  We're not talking about a campaign

14   platform of any kind.

15          What we're talking about here is the very core of what

16   our democracy runs on, the very basis for our democracy, which

17   is the conduct of free and fair elections.  That's the basis,

18   that's the bedrock on which the claims of this case take off,

19   because the election -- the elections -- as American history

20   has developed, the conduct of those elections, for better or

21   worse, has come under the domain of the two major political

22   parties in this country.

23          And in our case, in getting into the allegations of

24   our case, what we are alleging and what we are very, I think,

25   clearly alleging and specifically alleging in this complaint is

```
 1   that people paid money in reliance on the understanding that

 2   the primary elections for the Democratic nominee -- nominating

 3   process in 2016 were fair and impartial.  And that's not just a

 4   bedrock assumption that we would assume just by virtue of the

 5   fact that we live in a democracy, and we assume that our

 6   elections are run in a fair and impartial manner.  But that's

 7   what the Democratic National Committee's own charter says.  It

 8   says it in black and white.  And they can't deny that.

 9           THE COURT:  Let me just interrupt you.

10           MR. BECK:  Oh, sure.

11           THE COURT:  And I apologize.  This is not your

12   problem.

13           MR. BECK:  Okay.

14           THE COURT:  But for those of you who are here as

15   spectators -- and there's at least one individual and maybe

16   two -- you are distracting the Court with your show of

17   exuberance in support of counsel's arguments.  You might as

18   well be doing somersaults or backflips in support of counsel's

19   argument.  So, you are distracting me.  So, if you want to help

20   the side that you're here to support, let me listen to the

21   lawyer, and please stop distracting me.

22           Counsel, go right ahead.

23           MR. BECK:  Thank you, your Honor.

24           I was talking about the charter, because I was making

25   the point that we're not just talking about a bedrock
```

1    assumption of what it means to live in a democracy and what

2    formed the bedrock understanding of the plaintiffs in this

3    lawsuit, but it's also in the charter itself, which --

4         **THE COURT:**  Article IV -- or -- excuse me --

5    Article V, Section 4.

6         **MR. BECK:**  Correct.

7         Which requires the DNC and its chairperson to act in

8    an even and impartial manner with respect to the presidential

9    nominating process.

10        **THE COURT:**  Which is in paragraph 159 of your

11   first-amended complaint.

12        **MR. BECK:**  Correct.

13        And not only is it in the charter, but it was stated

14   over and over again in the media by the Democratic National

15   Committee's employees, including Congresswoman Wassermann

16   Schultz, that they were, in fact, acting in compliance with the

17   charter.  And they said it again and again, and we've cited

18   several instances of that in the case.

19        So, getting back to the question of standing, when you

20   have money -- in this case, it's in the form of political

21   donations, but, again, I don't think the political context

22   makes any difference -- but when you have money that's paid in

23   reliance on a false understanding and a false -- or a false

24   belief that is created by the defendant, then you have all of

25   the elements of Article III satisfied.

```
 1            You have an injury in fact.  You have a causal

 2   connection, because the money, which is the injury in fact --

 3   and there's no denying the case law on that -- the money was

 4   paid in reliance on the false understanding.  And then in terms

 5   of judicial redress, the principal relief we're asking for in

 6   this case is damages.

 7            So, I think -- personally I think standing is -- in

 8   spite of the defendants' efforts to muddy the waters and try to

 9   turn this into -- and try to paint us with a political brush,

10   like we're, you know, fighting some political battle, which is

11   just totally not true, you know, I think standing's an easy

12   question.

13            We may represent people that gave to Bernie Sanders,

14   but that doesn't mean that this has -- and -- this lawsuit has

15   any connection whatsoever to the political campaign that Bernie

16   Sanders fought in 2016, which is now over.  And in terms of the

17   relief we're seeking, the principal relief we're seeking is

18   damages.

19            Now, in terms of the complaint and in terms of the

20   allegations of the complaint, and specifically what the DNC did

21   wrong, I just think the context of when this complaint was

22   drafted is important.  We drafted this complaint and filed it

23   in June of 2016, which was before the DNC primary -- or the DNC

24   convention occurred in July.  And, at the time, the evidence

25   that we had access to consisted of this set of documents that
```

1    your Honor referenced in your prefatory remarks that were

2    released by a figure named Guccifer 2.0.

3            And the core document that was released by that

4    individual on that website purports to be an internal DNC

5    memorandum, which outlines a strategy for advancing Hillary

6    Clinton to the nomination of the Democratic Party before the

7    primaries had even really gotten off the ground.  And this was

8    at a time -- you know, Bernie Sanders I believe had announced

9    for about a month before this particular memo came out.  But we

10   think that's clear evidence of what the DNC's intent was

11   throughout the primary process.  It was to leverage their

12   connections with the media in order to advance Hillary

13   Clinton's candidacy at the expense of everybody else.

14           Subsequent to this memorandum being released into the

15   public by Guccifer 2.0, many more documents have come into the

16   public domain.  We have a wealth of information that was

17   released by WikiLeaks that comes from e-mails from officials of

18   the DNC, as well as the Hillary Clinton campaign, which really,

19   I think, flesh out and fill in the detail of this really

20   seminal internal document that Guccifer released and which is

21   pled in our complaint.

22           These additional leaks have shown that DNC officials

23   participated in creating and disseminating media narratives to

24   undermine Bernie Sanders and advance Hillary Clinton.

25           It shows former DNC Chair Donna Brazile giving debate

1   questions in advance to Hillary Clinton during the primaries.

2          It shows the DNC at one point changing its donor

3   policies specifically to favor Hillary Clinton.

4          It shows the scheduling of debates to favor Hillary

5   Clinton over Bernie Sanders.

6          It shows, in general, the DNC pouring its considerable

7   resources and relationships into propelling Hillary Clinton to

8   the nomination.

9          It shows the creation of an aura of inevitability of

10  Hillary Clinton's candidacy that the DNC pushed into the media

11  and, essentially, in our view, crushed the Bernie Sanders

12  campaign.

13         It shows the DNC coordinating and taking direction

14  from Hillary Clinton's campaign operatives, making hiring

15  decisions based on what Hillary Clinton's campaign was telling

16  them, picking sides in the disputes between the candidates.

17         I mean, there's one famous example of an alleged

18  chair-throwing incident in Nevada, where instead of acting in

19  an even and impartial manner, Debbie Wassermann Schultz

20  immediately sided with the Hillary Clinton campaign.

21         And all of this, you know, comes out of documents that

22  have been released into the public domain subsequent to the

23  drafting of this complaint, based on the Guccifer 2.0 leaks.

24  But we're not even getting into at this point -- we're not even

25  getting into the question of widespread reports of

1    irregularities at polling locations in various states relating

2    to the actual voting in the primary.  There's widespread

3    reports of voting machine irregularities, voter suppression,

4    strange purging of the rolls.

5         I mean, your Honor, I think when all of this is seen

6    together, it's really hard to deny that the DNC was not acting

7    in accordance with its own charter and not acting in accordance

8    with its role and, quite frankly, its duty as a custodian of

9    this country's democracy.  But, again, this is not a case about

10    abstract political principles.

11         This is a case -- and I have to make this point again

12    and again, because I think this really gets back to the

13    technical issues that your Honor identified at the outset,

14    which is that we have standing here because there was payment

15    of money in reliance on a false understanding that was created

16    by these defendants.

17         And I do want to say that I think we have a second

18    basis for standing that goes beyond money.  And I don't want to

19    forget this, but there's a whole line of cases which talks

20    about the invasion of established common-law rights as a valid

21    basis for standing.  And I don't want to lose sight of that,

22    because I don't think money is the only basis for standing.  I

23    think this especially -- is of special relevance for the

24    Democratic Party Class, and specifically the breach of

25    fiduciary duty count, which doesn't necessarily rely on the

1    payment of money.

2         Now, they've said in their opening remarks,

3    essentially, that there's no such thing as the Democratic

4    Party, or we can't ascertain who's in the Democratic Party.  I

5    mean, to me, you know, that's -- that -- I think that would be

6    a surprising proposition to most people in this country.  I

7    think we can figure out who's a democrat and who's not.  But I

8    think those are factual issues anyway.

9         Perhaps those -- you know, perhaps they have arguments

10   that can be made at a summary judgment stage or something, but

11   here we're talking about the pleadings, we're talking about

12   what we've alleged, and I think we've pled enough to state a

13   valid breach of fiduciary duty claim.  The D.C. law that we've

14   cited I think is, uhm -- recognizes a sufficiently flexible

15   definition of what a fiduciary duty means in order to encompass

16   the relationship between a party or the head of a party and its

17   members.

18         In fact, there's a whole line of cases -- and I know

19   it's not the D.C. cases, it's New York cases -- but under

20   New York fiduciary law, a whole line of cases which recognize

21   such a duty.  So, I don't really think it's a stretch at all to

22   say that, number one, there is a Democratic Party; and,

23   number two, that the party owes a fiduciary duty to its

24   members.  And if the party's not -- and if the party doesn't

25   owe such a duty to its members, then who does it owe a duty to?

1    Well, you know, I think in some ways that's what this case may

2    be about.

3            I just want to finish up with a few points, and then I

4    know your Honor has a number of questions, so I want to make

5    sure to leave sufficient time for that.

6            I think the argument under Rule 12(g)(2) that the

7    defendants have waived their right to bring a 12(b)(6) motion

8    is a strong argument.  I recognize that there's some tension in

9    the case law on that.  By no means does it seem to be a settled

10   question.  But the rule does specifically have an exemption for

11   challenges to subject-matter jurisdiction, which I think makes

12   sense, given what subject-matter jurisdiction entails.  But

13   it -- I think it's *(sic)* very specifically says that if you

14   bring a motion under 12(b), and then you bring a subsequent

15   motion, unless you bring the arguments in the first motion,

16   you've waived them.

17           And they filed a motion to dismiss based on service of

18   process.  They could have stated those arguments at that time.

19   They chose not to.  I think under the plain reading of

20   Rule 12(g)(2), they've waived everything except their challenge

21   to subject-matter jurisdiction.

22           I think they have -- they take the position that we

23   haven't pled enough in our complaint to -- we haven't pled our

24   claims for fraud and negligent misrepresentation with

25   sufficient specificity.  I think we've gone into very

1    considerable detail about the public statements of the DNC, the

2    content of its charter.  And I think we very specifically pled

3    that what the folks who are serving as plaintiffs in this case

4    did in reliance on those representations, which is that they

5    paid donations to a political campaign in some cases, or to the

6    DNC in others, it's certainly been sufficient to put the DNC on

7    notice of what the claims against them are.  I don't think they

8    have any mystery about what our theory of the case is.  So, I

9    think we've satisfied the pleading requirements.

10        We have specific allegations there related to

11   Congresswoman Wassermann Schultz, specifically what she said in

12   the media, what her role is in the organization, and, uhm, I

13   think -- and her title is referenced in the charter.  So I

14   don't think it's any mystery as to what the allegations are

15   against her personally.

16        A couple final points.  The CPPA, which is the D.C.

17   consumer statute that we've pled as one of the claims, I do

18   think that the statute is worded in a broad enough fashion to

19   cover the claims in this case.  Its whole purpose is to protect

20   consumers of goods and services.  And many of, if not the vast

21   majority of the Bernie donor class (*sic*), are people that used

22   an online or service or application called ActBlue, which

23   charges a 3.95 percent processing fee in connection with every

24   donation.  So, that's a service.

25        Now, we haven't sued ActBlue.  But I don't think we

1    need privity under the D.C. cases that I've looked at and which

2    we've cited to the Court.  I think that the -- well, a couple

3    of those cases specifically say that anyone involved in the

4    chain of supply is appropriate as a defendant in an action

5    under that statute.  And the DNC and its chairwoman were the

6    entity and the person responsible that this election was going

7    to be fair and evenhanded -- or the primary process was going

8    to be fair and evenhanded, as they promise in their charters.

9         So, I think that under the statute, and bearing in

10   mind that it's a broad consumer statute, I think we have a

11   viable claim, and we've pled a claim there.

12        And, finally, I just want to close with a couple words

13   on the negligence claim.  Because the negligence claim

14   specifically related to the data breach and the loss of the

15   donors' data.  Again, there is a difference of opinion in the

16   case law specifically on this issue.  We recognize that the

17   Ninth Circuit and the Seventh Circuit have taken the position

18   that the data doesn't actually have to be misused in order to

19   have a valid claim based on a defendant's loss of private data.

20   The Third Circuit has taken the other view.

21        I personally think that the Ninth Circuit and the

22   Seventh Circuit have the issue right.  And I think that the

23   DNC's own donors were harmed the moment their sensitive

24   personal data was released into the public domain, because the

25   DNC failed to take sufficient steps to protect it.

1          So, I think that covers all the issues that I wanted

2    to address in my opening statement.  And I'll be happy to

3    answer any questions the Court has.

4          **THE COURT:**  All right.  Thank you, Counsel.

5          Well, let me start with the defense.  And I've got

6    some questions regarding the operation of the DNC.

7          What does the DNC do as the head of the Democratic

8    Party?

9          **MR. SPIVA:**  I mean, the DNC coordinates with state and

10   local parties.  It supports the activities of candidates,

11   democratic candidates.  It has a role in the presidential

12   primary process in terms of coordinating those elections.  It

13   is -- essentially provides leadership for -- in support of

14   electing democratic candidates up and down the ballot

15   nationwide.

16         **THE COURT:**  What type of involvement does the DNC have

17   in primaries at the state level?

18         **MR. SPIVA:**  The -- it -- the DNC -- those are

19   primarily dealt with by state parties, state and local party

20   committees, your Honor.  There's some coordination between the

21   DNC and those parties.  The DNC also obviously runs the

22   convention, the nominating convention, and there are certain

23   rules about how delegates get seated and the like.  But as a

24   general matter, does not run the state-level primaries, if that

25   gets to your Honor's question.

1      **THE COURT:**  Does the DNC help to fund the state

2   primaries?

3      **MR. SPIVA:**  Uhm, you mean literally, the mechanics of

4   the primaries, your Honor, the actual holding of the election,

5   the primary election?

6      **THE COURT:**  Does the DNC, with the money that it

7   raises, use some of that money to help fund the states put on

8   their individual state primaries?

9      **MR. SPIVA:**  I don't believe so, your Honor.  No.

10      **THE COURT:**  But you don't know.

11      **MR. SPIVA:**  I'm 90 percent on that, your Honor, but I

12   don't believe that's the case.  I believe that's generally

13   state funded.  In my experience -- and I have had experience

14   with a number of these -- the funds for actually having the

15   election is -- they're state funds.

16      **THE COURT:**  Well, you've said several times that the

17   DNC helps coordinate.  What do you mean by that?

18      **MR. SPIVA:**  Well, the DNC sometimes works to sponsor

19   debates and then get out a general democratic message, offers

20   certain data services to candidates for the presidency, for

21   instance, and for other offices as well.  It collects data

22   about voting behavior and other kinds of data.  It obviously

23   raises money.  So, those are some of the activities that I was

24   alluding to.

25      **THE COURT:**  And what type of involvement does the DNC

```
 1   have with the state democratic parties?

 2        MR. SPIVA:  It coordinates with state democratic

 3   parties to try to help elect democratic candidates really up

 4   and down the ballot.

 5        THE COURT:  And does the DNC give its preference to

 6   the state democratic parties as to any particular candidate?

 7        MR. SPIVA:  No, not in -- certainly not in the

 8   presidential elections, they don't set forth a preference, no.

 9        THE COURT:  What about the primaries, the democratic

10   primaries?

11        MR. SPIVA:  I'm sorry, I thought that was what you

12   were referring to, your Honor.

13        No, the DNC does not take sides in the state

14   primaries, presidential primaries.

15        THE COURT:  What type of strategic support does the

16   DNC provide to the state democratic parties?

17        MR. SPIVA:  Well, I mean I actually -- I don't know --

18   I can't answer that in detail, your Honor, but, you know,

19   certainly support in terms of issues, you know, addressing

20   issues, I think funding support, and the like.

21        THE COURT:  But I mean in light of the plaintiffs'

22   allegations, you see the thrust of my questions.

23        MR. SPIVA:  I -- I'm actually -- I see the thrust,

24   your Honor, but I'm actually not sure where your Honor is going

25   with this line, to be honest.  I'm sorry, I may just be
```

1   being --

2        **THE COURT:**  Well, the plaintiff is alleging that the

3   DNC, on its own -- and I'm gonna paraphrase -- but basically

4   favored Hillary Clinton over Bernie Sanders.  And so, I'm

5   asking you, that preference that the plaintiff alleges about

6   the DNC, did that work its way down to the democratic state

7   primaries?

8        **MR. SPIVA:**  Well, I mean our position, your Honor, is

9   there was no such preference, and certainly there was no -- the

10  Democratic National Committee did not, you know, tell the state

11  parties that it supported one candidate over the other.

12       So, if that answers your question.  I mean, of course,

13  stepping back and kind of going to our subject-matter

14  jurisdiction issue, I mean, the litany of things that counsel

15  referred to, to suggest that there was this favoritism, I think

16  clearly illustrates the types of issues that the courts really

17  don't wade into as an Article III matter.  I mean these are

18  what -- I believe it was the *Wymbs*, the Republican State

19  Executive Committee case in the Eleventh Circuit referred to as

20  political squabbles that courts are -- you know, really can't

21  take a position on.

22       And so here you have a charter that says you have to

23  be -- where the party has adopted a principle of

24  evenhandedness, and just to get the language exactly right,

25  that they would be evenhanded and impartial, I believe, is the

1  exact language.  And, you know, that's not self-defining, your

2  Honor.  I mean that's kind of like, you know, saying, Who's a

3  Baptist?  You know, I mean, for your Honor to wade into that,

4  you would really have to -- whether the party was evenhanded or

5  not, whether they gave each side equal debate time, and whether

6  their hiring decisions reflected in some measure a bias towards

7  Secretary Clinton, these are all issues that courts -- really

8  would drag this Court right into the political squabbles, and

9  really there'd be no way constitutionally to offer redress

10  for -- even for what they are claiming.

11         THE COURT:  So, are you suggesting that this is just

12  part of the business, so to speak, that it's not unusual for,

13  let's say, the DNC, the RNC to take sides with respect to any

14  particular candidate and to support that candidate over

15  another?

16         MR. SPIVA:  Well, I'm not suggesting that that is par

17  for the course, your Honor.  But what I am suggesting is to

18  have those kinds of allegations is the rough and tumble of

19  politics.  I mean, you know, certainly in the *Wymbs* case, if

20  anything, that was a case which involved something that was

21  maybe more concrete, where the issue was how the party decided

22  who was gonna go to the convention as a delegate and who could

23  speak for the party in the state, in Florida, in terms of how

24  they selected delegates to the state party.

25         And, you know, there, there was a numeric component to

```
 1    it, because it was -- the challenge was based on one person/one
 2    vote, and the district court in that case actually said, Well,
 3    you know, we should do this kind of like a Reynolds v. Sims,
 4    and it should be based on one republican/one vote.  So,
 5    plausibly there, there's some kind of standard that maybe a
 6    Court could look to.  And even there, the Eleventh Circuit
 7    said, No, that's internal party politics.
 8          The party has the freedom of association to decide how
 9    it's gonna select its representatives to the convention and to
10    the state party.  And, as a matter of fact -- and that case was
11    decided in the early '80s, the Republican Party in Florida was
12    a minority party.  So they said, Well, it might not make sense
13    to the party to have one republican/one vote as a matter of
14    committee representation, because we have to attract the votes
15    of democrats.
16          And so -- but that's for the party to decide.  The
17    Court's not gonna get into that.  Here, you have something far
18    more inchoate, your Honor, which is this purported -- this
19    claim that the party acted without evenhandedness and
20    impartiality.  That -- even to define what constitutes
21    evenhandedness and impartiality really would already drag the
22    Court well into a political question and a question of how the
23    party runs its own affairs.
24          The party could have favored a candidate.  I'll put it
25    that way.  Maybe that's a better way of answering your Honor's
```

1    original question.  Even if it were true, that's the business

2    of the party, and it's not justiciable.

3             **THE COURT:**  All right.  Thank you, Counsel.

4             **MR. SPIVA:**  Thank you.  And I'm happy to answer --

5             **THE COURT:**  Oh, no, I've got more questions.

6             **MR. SPIVA:**  But on that issue --

7             **THE COURT:**  I'm gonna give the plaintiff an

8    opportunity.

9             **MR. SPIVA:**  Okay.  Great.  Thanks, your Honor.

10            Yeah, people sometimes say that the lawyers will be

11   more prepared than the judges they appear before.  I think your

12   Honor has disproved that today.  But I do want to address

13   whatever questions the Court has with respect to any of these

14   issues.

15            **THE COURT:**  Well, we're gonna go through standing, and

16   the pleadings, and class actions allegations.  Don't worry,

17   we're going to cover the full breadth of it.

18            **MR. SPIVA:**  Thank you, your Honor.

19            **THE COURT:**  What does the plaintiff say on the

20   operational aspect of the DNC?

21            **MR. BECK:**  Well, your Honor, I'm shocked to hear that

22   we can't define what it means to be evenhanded and impartial.

23   If that were the case, we couldn't have courts.  I mean, that's

24   what courts do every day, is decide disputes in an evenhanded

25   and impartial manner.

1          So, to me, it's not a difficult question at all what

2    it means to be evenhanded and impartial.  It doesn't mean

3    having to wade in to a political dispute about how the party

4    conducts its affairs, because that's what the party represented

5    in its charter, that's what the party represented over and over

6    again in the media, that's, frankly, what I think is at the

7    bedrock of what it means to live in a democratic society.  I

8    think that's why the Democratic National Committee has it in

9    its charter, because if you don't have the organization that is

10   responsible for organizing in this very large sense the

11   nominating process for president, which entails multiple

12   elections in every state of the union, if you're not evenhanded

13   and impartial, then you don't have a democratic process.  I

14   think it's that simple.

15          And I think what it means is the Democratic National

16   Committee should not be putting any resources into one

17   candidate at the expense of another.

18          I think it means that it should not be assisting the

19   media in crafting narratives that hurt one candidate at the

20   expense of another.

21          I think it means that when there's a dispute that

22   comes up in one of the primaries, say, in Nevada, where there

23   are allegations of misbehavior during a primary or an event, I

24   think it means that the DNC should not be picking sides and

25   should be adjudicating those disputes in a fair and evenhanded

```
 1   manner.
 2            I think this is not a difficult thing at all to
 3   decide.  I think the language speaks for itself in many ways.
 4   And so, again -- and I'll just say it again -- they keep citing
 5   cases where plaintiffs have brought grievances that are
 6   political in nature.  And now they're starting to use this
 7   defense of justiciability, which, interestingly, I don't think
 8   that particular defense, as phrased, appeared anywhere in their
 9   papers.  I may be missing something, but I don't see how this
10   is a political question.
11            We're not asking this Court to infringe on the
12   province of another branch of this government or to get
13   involved in the conduct of Congress or the conduct of the
14   Office of President.  We're asking this Court to determine
15   whether representations and omissions were false and
16   misleading, and whether money was paid on the basis of those
17   representations, whether folks were injured in a financial
18   sense as a result of those representations, and whether duties
19   to the class members were breached, including fiduciary duties.
20            I think those -- courts do those types of things all
21   the time.  There's nothing inherently political about those
22   determinations.  And I -- again, I think this gets back to this
23   theme that they keep putting in front of the Court that there's
24   some type of immunity that comes out of the First Amendment,
25   because we're talking about politics and sort of anything goes
```

32

1  as far as political speech is concerned.  I think that's kind

2  of what their theory boils down to.

3      And I would just emphasize that, again, we are talking

4  about the payment of money.  And once money is involved, once

5  people are paying money based on false understandings, clearly,

6  there is standing, and I don't see the political question or a

7  justiciability issue.

8      **THE COURT:**  All right.  Thank you, Counsel.

9      **MR. BECK:**  Okay.  Thank you.

10     **THE COURT:**  All right.  Let me ask the defense --

11  we're going to go into the issue of standing now at this point.

12     Let me ask counsel.  If a person is fraudulently

13  induced to donate to a charitable organization, does he have

14  standing to sue the person who induced the donation?

15     **MR. SPIVA:**  I think, your Honor, if the circumstance

16  were such that the organization promised that it was going to

17  abide by some general principle, and the donee -- or donor,

18  rather, ultimately sued, because they said, Well, we don't

19  think you're living up to that general principle, we don't

20  think you're, you know, serving kids adequately, we think your

21  program is -- the way you're running your program is not

22  adequate, you know, you're not doing it well enough, that

23  that -- that they would not have standing in that circumstance.

24     I think if somebody -- a charitable organization were

25  to solicit funds and say, Hey, we're gonna spend this money on

1   after-school programs for kids, and the executive director

2   actually put the money in their pocket and went down the street

3   and bought a Mercedes-Benz, I think in that circumstance, they

4   would have standing.

5        I think this circumstance is even one step further

6   towards the no standing side of that, because here we're

7   talking about a political party and political principles and

8   debate.  And that's an area where there's a wealth of doctrine

9   and case law about how that -- just simply giving money does

10  not give one standing to direct how the party conducts its

11  affairs, or to complain about the outcomes, or whether or not

12  the party is abiding by its own internal rules.

13        And I should say, your Honor, I just want to be clear,

14  because I know it may sometimes sound like I am somehow

15  suggesting that I think the party did not -- you know, the

16  party's position is that it has not violated in the least this

17  provision of its charter.

18        **THE COURT:**  I understand.

19        **MR. SPIVA:**  So I just want to get that out there.  But

20  to even determine -- to make that determination would require

21  the Court to wade into this political thicket.  And -- you

22  know, which would invade its First Amendment interests, and

23  also, I think, would raise issues -- standing issues along all

24  three prongs of the standing test.

25        Causation.  Did -- the thrust of plaintiffs'

```
 1   allegations appears to be that some -- that one of the
 2   subclasses gave money to the Sanders campaign, because they
 3   thought the party was living up to this idea.  They don't
 4   actually allege that any particular plaintiff, by the way, knew
 5   about this charter commitment or that they relied upon it in
 6   giving money to Sanders.  But even if they had, showing the
 7   causation there, I think, is not something that can be done.
 8   And it's something that would require, again, the Court to wade
 9   into the political thicket.
10        Similarly, they purport to speak on behalf of this DNC
11   Donor Class.  Most, most of the class that they purport to
12   speak on behalf of, you know, disagrees with them.  And so, the
13   Court would have to wade into that to establish causation.  And
14   it really can't -- it can't be done.
15        The other part of their injury here appears to be that
16   Mr. Sanders -- Senator Sanders would have done better had the
17   party supposedly been more evenhanded than it was.
18        Well, that -- there's all kinds of alternative factors
19   for why Secretary Clinton actually got more votes in the end
20   and won.  And as everybody knows, Senator Sanders endorsed her
21   and campaigned for her.  And so, there's a causation problem.
22   And there are other issues that we discuss in our brief -- I
23   won't repeat them -- with causation.
24        There is certainly a redressability problem, which I
25   think I've already covered in my previous remarks.  I won't go
```

1    over that, again unless your Honor has other questions.

2         And then in terms of concrete injury, which was really

3    the first prong, that, again, is problematic, because -- and

4    this goes back to your Honor's question -- there is no right

5    to -- just by virtue of making a donation, to enforce the

6    parties' internal rules.  And there's no right to not have your

7    candidate disadvantaged or have another candidate advantaged.

8    There's no contractual obligation here.

9         Nor is there a fiduciary obligation, although I know

10   we're gonna get to that later.  But there's -- it's not a

11   situation where a promise has been made that is an enforceable

12   promise.  And I think that goes both to the concrete injury

13   prong and the redressability prong.

14        **THE COURT:**  And then one other question on the issue

15   of standing for the defense.  Is there a difference between a

16   campaign promise made by a political candidate and a promise

17   that pertains to the integrity of the primary process itself?

18        In other words, President George H.W. Bush's --

19        **MR. SPIVA:**  "Read my lips."

20        **THE COURT:**  -- promise -- "read my lips, no new

21   taxes," and then he raised taxes.  Well, he could not be sued

22   for raising taxes.  But with respect to the DNC charter,

23   Article V, Section 4, is there a difference between the two?

24        **MR. SPIVA:**  Not one -- there's obviously a difference

25   in degree.  I think your Honor -- I'm not gonna -- I don't want

```
 1    to overreach and say that there's no difference.  But I don't
 2    think there's a difference that's material in terms of how the
 3    Court should decide the question before it in terms of
 4    standing, in that this, again, goes to how the party runs
 5    itself, how it decides who it's going to associate with, how it
 6    decides how it's going to choose its standard bearer
 7    ultimately.  In case after case, from O'Brien, to Wymbs, to
 8    Wisconsin v. LaFollette, Cousins v. Wigoda, the Supreme Court
 9    and other courts have affirmed the party's right to make that
10    determination.  Those are internal issues that the party gets
11    to decide basically without interference from the courts.
12          And the fact that money has -- I know that my
13    distinguished colleague on the other side has several times
14    said that, Well, money makes this different, and it really
15    doesn't in this context.  You know, again, if you had a charity
16    where somebody said, Hey, I'm gonna take this money and use it
17    for a specific purpose, X, and they pocketed it and stole the
18    money, of course that's different.  But here, where you have a
19    party that's saying, We're gonna, you know, choose our standard
20    bearer, and we're gonna follow these general rules of the road,
21    which we are voluntarily deciding, we could have -- and we
22    could have voluntarily decided that, Look, we're gonna go into
23    back rooms like they used to and smoke cigars and pick the
24    candidate that way.  That's not the way it was done.  But they
25    could have.  And that would have also been their right, and it
```

1   would drag the Court well into party politics, internal party

2   politics to answer those questions.

3           **THE COURT:**  All right.  Thank you, Counsel.

4           **MR. SPIVA:**  Thank you, your Honor.

5           **THE COURT:**  Let me have the plaintiff respond to those

6   two questions of the defense.  And then I have questions for

7   the plaintiff regarding standing, and I'll let the defense

8   respond to those --

9           **MR. BECK:**  Okay.

10          **THE COURT:**  -- to those answers.

11          **MR. BECK:**  Uhm --

12          **THE COURT:**  First, your response to their answers.

13          **MR. BECK:**  Yes.  And I'll take the last part first,

14  which was the question your Honor had posed, is there -- and

15  I'm paraphrasing it, but is there a material difference between

16  a campaign promise, such as "read my lips, no new taxes," and

17  representations that are made in the DNC's own charter?

18          And, quite frankly, if what defendant -- or what the

19  DNC has just said is true -- and I really hope it's not true,

20  but if what he said is true, then I think it's a really sad day

21  for democracy in this country.  Because what essentially the

22  DNC has now stated in a court of law is that it believes that

23  there is no enforceable obligation to run the primary elections

24  of this country's democracy in a fair and impartial manner.

25          And if that's the case -- and I think counsel just

1    said it himself -- then really, you know, the sky's the limit

2    in terms of what the DNC and any party, for that matter, can

3    do.

4            **THE COURT:**  Can go around doing.

5            **MR. BECK:**  And I'm -- I hope that's not the case, but

6    I don't think it is the case under the law.  Because I think

7    these are enforceable obligations.  Because, again, money is

8    involved, number one, payment of money based on false

9    understandings that have been created by the defendants.  That

10   is textbook Article III standing, and the Supreme Court has

11   settled that question.  And it's settled that question in a

12   context that's, I think, very close to the situation we have in

13   the case pending before the Court.

14           And, specifically, I'm referring to

15   *Madigan vs. Illinois* -- or *Illinois vs. Madigan*, which was a

16   case about charitable fundraising and the state's right to

17   enforce laws against fraud and misrepresentation in the context

18   of solicitations of charitable contributions.

19           And I think this gets back to the Court's first

20   question that was posed to counsel, which is, is there standing

21   in this situation where false representations are made, and

22   those representations or omissions cause people to donate money

23   to a cause?  In this case, not a political cause but a

24   charitable cause.

25           And -- now, the Supreme Court says -- and I'm reading

1    from *Illinois vs. Madigan* at page -- starting at page 623:

2         "Our decisions have repeatedly recognized the

3    legitimacy of government efforts to enable donors to

4    make informed choices about their charitable

5    contributions."

6         And then it goes on further down:

7         "Just as government may seek to inform the public

8    and prevent fraud through such disclosure

9    requirements, so it may, quote, vigorously enforce

10   antifraud laws to prohibit professional fundraisers

11   from obtaining money on false pretenses or by making

12   false statements."

13        Well, this is a case that involves political

14   contributions as opposed to charitable contributions.  But,

15   again -- and I think I've discussed the reasons I think this is

16   so, but I don't think that the political context of the speech

17   involved here or the money that was paid makes any difference

18   to the Court's analysis, whether that analysis is cast in terms

19   of First Amendment grounds, because the First Amendment has

20   always recognized a right not to be defrauded or to be

21   deceived, because those are common-law rights that precede the

22   First Amendment, and the First Amendment is a very important

23   right, but it by no means protects the rights of any

24   organization to make false representations.

25        And in this case, I think that besides the First

1   Amendment question, there's also implicit in *Madigan* and other

2   cases that we've cited in the briefs, that, of course, there is

3   standing when money is paid.  That's the essence -- one of the

4   essences of Article III is that financial industry -- injury

5   gives rise to standing.

6          I submit that there's a second line of cases which

7   also talks about invasion of common-law rights.  I think that

8   we have standing on behalf of all three of the classes based on

9   both of those principles.

10         And I know your Honor said --

11     **THE COURT:**  I have questions.

12     **MR. BECK:**  -- you had questions.

13     **THE COURT:**  All right.  Thank you.

14     **MR. BECK:**  So I'll be happy to take those.

15     **THE COURT:**  With respect to the issue of standing

16  on -- you stated earlier that the plaintiff is seeking damages.

17  Damages in the sense of return of the contributions or over and

18  above that?

19     **MR. BECK:**  Yes.  The basis for the economic damages

20  are the contributions themselves that were paid.

21     **THE COURT:**  Okay.  And what imminent future injury do

22  the plaintiffs allege?

23     **MR. BECK:**  Well, I think that the imminent future

24  injury -- and this has -- sort of, I think, become apparent

25  perhaps in the course of today's hearing, but the imminent

1  future injury is that elections occur on a cyclical basis.  And

2  so, unless the Court -- if we prove our claims, and unless the

3  Court issues a remedy to prevent the --

4       **THE COURT:**  DNC.

5       **MR. BECK:**  -- the DNC from engaging in this type of

6  conduct in future elections, then there's nothing that's going

7  to be stopping them.

8       **THE COURT:**  Is it the donor plaintiffs' position that

9  they would not have donated to the DNC or the Bernie Sanders

10  campaign if they believed the statements described in paragraph

11  number 160 -- 1-6-0 -- of the first-amended complaint to be

12  false?

13       **MR. BECK:**  Oh, thank you.

14       **THE COURT:**  And if so, which allegations support that

15  position?

16       **MR. BECK:**  Yes.  That is our position.  And the

17  allegations that support that position can be found in

18  paragraph 188, paragraph 195... yes, those are the two

19  paragraphs where we allege reliance.

20       **THE COURT:**  All right.  What injury have the DNC donor

21  plaintiffs suffered as a result of the DNC's alleged negligence

22  as set forth in Count 6?

23       **MR. BECK:**  Yes.  Our position as to Count 6, which is

24  the data breach count, is that the release of the donor's

25  sensitive data into the public domain itself constitutes the

1    injury.

2         Now, we recognize that there's a circuit split on that

3    issue.  We think that the Ninth Circuit and Seventh Circuit

4    cases that we cited in our brief, which agree that that's a

5    sufficient allegation, we think that has the better reasoning.

6    But there's also an opinion out of the Third Circuit, which

7    takes the view that the -- you actually have to allege that the

8    data's been misused, which we haven't alleged.

9         So -- and to my knowledge, the Eleventh Circuit has

10   not come down on one side or the other on that issue.

11        **THE COURT:**  All right.  Then my last question for the

12   plaintiff on the issue of standing is, how -- excuse me -- how

13   have all registered members of the Democratic Party suffered a

14   concrete and particularized injury as a result of the

15   allegations in the first-amended complaint?

16        **MR. BECK:**  Yes.  So, this is, uhm, an issue that comes

17   up specifically with respect to the breach of fiduciary duty

18   count.  And our -- what we rely on with respect to that count

19   specifically is that the breach of a fiduciary duty to folks

20   that join the Democratic Party, were registered members of the

21   Democratic Party, but saw the party that they chose to

22   affiliate with, they saw that party violate the terms of its

23   own internal charter, that breach is itself a breach of a

24   common-law right, a recognized common-law right that itself is

25   sufficiently concrete and particularized to satisfy

1    Article III.

2              **THE COURT:**  All right.  Thank you, Counsel.

3         **MR. BECK:**  Thank you.

4              **THE COURT:**  Any other comments before I hear from the

5    defense?

6         **MR. BECK:**  Not at this time, your Honor.  Thank you.

7              **THE COURT:**  All right.  Thank you.

8              All right.  What does the defense say in response to

9    those answers?

10        **MR. SPIVA:**  Thank you, your Honor.

11             First, I just want to say -- because in response to my

12   hypothetical that the party could choose its nominees in a

13   smoke-filled room, I want to just reiterate that the party ran

14   the process fair and impartially, and does not do that and

15   doesn't plan to do that.  But these, again, are political

16   choices that either party is free to make and are not

17   enforceable in a court of law.

18             In terms of -- I want to start from where the

19   gentleman on the other side left off, the --

20        **THE COURT:**  That was regarding the question of a

21   concrete or particularized injury.

22        **MR. SPIVA:**  Yes, your Honor.  And I think the last

23   question was, how have all members of the Democratic Party

24   suffered a concrete injury?

25             And there really isn't an allegation in the complaint

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

1    that explains that.  You know, in terms of the donor class, you

2    know, clearly many of the people who they purport to represent

3    agree with the DNC and support -- and continue to support it.

4    With respect to the individuals who they are putative class

5    representatives, they haven't actually alleged specific injury.

6    They've just said that they donated money.

7         And although we are not relying on this for our

8    standing argument, this kind of goes to plausibility.  There

9    are statements in the public by some of these class

10   representatives that show that there was no reliance and no

11   injury.  Some of them even gave money in order to participate

12   in this lawsuit.

13        And so, again, even if your Honor disregards that as

14   being outside the pleadings, and your Honor can go outside the

15   pleadings on a 12(b)(1) motion, but even if you disregard it, I

16   think it just illustrates the implausibility that every single

17   member of the Democratic Party has suffered a concrete injury.

18        In terms of the data breach, there is no allegation in

19   the complaint, your Honor, that any of the named plaintiffs

20   have actually even had their data breached, let alone that

21   they've suffered an injury.  And that is certainly required

22   along with a plausible allegation of injury.  And I would refer

23   to the -- I believe it was the *Case v. Miami* -- your Honor's

24   indulgence.

25             **THE COURT:**  That's all right.  Take your time.  We

1   have all afternoon.

2            **MR. SPIVA:**  Okay.

3            *Case v. Miami Beach Healthcare Group*, a decision from

4   this district, which we cite in our briefs, that you need to

5   have not only an allegation that your data was actually

6   breached, but that, you know, something was actually done with

7   it.

8            And counsel referred to -- in response to your Honor's

9   questions about whether the donors' position was that they

10  would not have donated to the Sanders campaign or the DNC

11  campaign if they knew or believed that the charter statements

12  and the other public statements regarding neutrality were

13  false, and counsel referred to paragraphs 188 and 195 of the

14  first-amended complaint.  These are broad, general claims of

15  reliance.  There are no specific allegations with respect to

16  the named plaintiffs of even knowledge of these statements, let

17  alone reliance.  And like I said, there are statements out in

18  the public domain that show that that is not plausible.  In

19  fact, it's false.  And, again, of course, I think illustrates

20  that this can't be -- A, this case shouldn't proceed in any

21  procedural form, but it certainly couldn't proceed as a class

22  action.

23            Reliance is really the third rail of class actions,

24  because you can't prove predominance.  And even in terms of

25  ascertainability, who's in the class, who's in these

1    subclasses, I think would pose an impossible task for the Court

2    to do, and one that would require, really, in-depth inquiry

3    into the parties', you know, files and membership and lists of

4    voters, all these things that *NAACP vs. Button* and other cases

5    have said the courts can't do that under the First Amendment.

6    And it would require an invasion of Senator Sanders' campaign,

7    frankly, to find out about how his supporters feel about this.

8         Counsel said that the plaintiffs are seeking an

9    injunction to prevent the DNC from engaging in future conduct

10   in future elections of this type.  Again, very vague

11   allegations of what the conduct at issue is.  You know, no real

12   answer to how a federal court can tell a party how it should

13   conduct its affairs going forward.

14        And, by the way, your Honor asked whether the damages

15   that were being sought were the return of the contributions.

16   That is the case, but they also seek punitive damages,

17   exemplary damages.  And so it's -- and the complaint actually

18   says in order to make an example of them.  And I would suggest,

19   your Honor, that that is all the proof you need of the chilling

20   of the First Amendment activities that this complaint seeks.

21        Just back to the -- whether money makes it different.

22   Does the fact that money was given create standing for the

23   failure to live up to a promise by the party, an alleged

24   failure in the primary?  Someone said, We're gonna build a

25   wall, and Mexico is gonna pay for it during the primaries.  If

1    their theory holds that money creates standing, the donation of

2    money, that means that anybody could sue President Trump or the

3    Trump campaign for statements that were made that -- where the

4    promise was not kept in the context of the primary.

5            I think I have covered everything that counsel covered

6    in the last discussion.  And so if your Honor has questions

7    about any of the other claims or anything else, I'm happy to

8    answer.

9            **THE COURT:**  I have more questions, but not on that

10   point.

11           **MR. SPIVA:**  Okay.

12           **THE COURT:**  We're gonna go into the pleadings and then

13   into the class action allegations.

14           But I think what we'll do is, to give the court

15   reporter a break, we'll take a short recess.  And then we'll

16   come back and conclude with my questions into those areas, and

17   then any additional comments that either side wishes to bring

18   to the Court's attention.

19           **MR. SPIVA:**  Great.  Thank you, your Honor.

20           **THE COURT:**  All right.  Let's have everyone back in

21   here at, let's say, five after by the courtroom clock.

22           Court's in recess.

23           **COURTROOM SECURITY OFFICER:**  All rise.

24           *(The Judge exited the courtroom)*

25           *(Recess taken at 2:50 p.m. until 3:06 p.m.)*

```
1              (The Judge entered the courtroom)

2              THE COURT:  Please be seated.

3              We have two remaining areas to cover -- the pleadings

4    and then the class action allegations.  And some of the

5    comments that you've already made will have already touched

6    upon some of the questions that I'm going to ask, but I want to

7    ask them in any event so that we have a complete record.

8              And for the defense.

9              MR. SPIVA:  Okay.

10             THE COURT:  Having filed a previous Rule 12(b) motion,

11   does Rule 12(g) bar the defense from filing a successive

12   Rule 12(b) motion?

13             MR. SPIVA:  No, your Honor, for a couple of reasons.

14             THE COURT:  And take your time.  There's no rush,

15   there's no rush.

16             MR. SPIVA:  Okay.  Thank you.

17             First of all, 12(g)(2), your Honor, Rule 12(g)(2),

18   which is the rule that plaintiffs cite for waiver here, doesn't

19   apply to a 12(b)(1) motion.  I think they concede that, the

20   subject-matter jurisdiction.

21             With respect to the 12(b)(6) motion, it actually

22   doesn't apply to that either.  It -- you know, it refers to

23   12(b)(2) through (5).

24             And here, we asked for more time to raise 12(b)(6)

25   issues in the motion to quash that we filed, and the plaintiffs
```

1  raised no objection at that time that we would have waived the

2  12(b)(6) motion based on a failure to state a claim.  And

3  there's really, I think, no question that we could raise the

4  same arguments in a 12(c) motion for judgment after the answer.

5  And so, I think this would -- even if the rule did apply here,

6  this would be one of those cases -- and I think one of the

7  cases we cited was *Carelogistics* and some other cases in our

8  brief -- where it really wouldn't make any sense.  I mean it

9  kind of cuts against the purpose of the rule, which is where

10  you're trying to prevent piecemeal litigation of defenses.

11  After the defendant loses one, they bring another.

12        That's not what has happened here, your Honor.  You

13  know, we weren't properly served.  We offered to accept service

14  of process.  The plaintiffs refused to do that.  And so we were

15  forced to file the motion.  We actually won the motion.  They

16  refiled.  And here, you know, really, this is the first kind

17  of, I think, first time at bat, if you will, your Honor, in

18  terms of the 12(b)(6) merits-type issues.

19        And given that we could raise those in a 12(c) motion,

20  it really doesn't seem like it would serve any kind of judicial

21  efficiency interests to not consider those arguments if the

22  Court gets to them.  I mean, of course, our position is that

23  because there's no subject-matter jurisdiction, the Court won't

24  need to reach those issues.

25        **THE COURT:**  If the Court concludes that Rule 12(g)

1    prevents the defense from making their failure to state a claim

2    arguments in the motion to dismiss, does the defense anticipate

3    that they will file a Rule 12(c) motion?

4         **MR. SPIVA:**  Yes, your Honor.  I mean assuming that the

5    Court didn't dismiss everything based on the 12(1) -- 12(b)(1)

6    portion of the motion.

7         **THE COURT:**  All right.  Thank you.

8         Any comments from the plaintiff?  Take your time.

9         **MR. BECK:**  Thank you, your Honor.

10        I think in response to the Court's questions on the

11   effect of Rule 12(g)(2), I think for us it's really a simple

12   question of what the rule states.  And when you look at

13   12(g)(2), it -- the Court -- it clearly permits them to raise

14   subject-matter jurisdiction in a successive motion under

15   Rule 12, but it states that you may not raise other issues,

16   including Rule 12(b)(6) issues, if you fail to raise those in

17   your original motion.

18        I'm not sure why the defendant making a request for

19   additional time to raise such issues in connection with its

20   original motion would do anything to alter the plain language

21   and the plain effect of the rule.  I think the rule makes a lot

22   of sense, and it gives the defendant an option, which it's

23   already said it's planning to take -- avail itself of, should

24   the Court -- were the Court find the rule to preclude them from

25   raising these issues now, but it gives them an option to file a

1  motion for judgment on the pleadings, which is I think -- I

2  think makes perfect sense.

3       These are very significant issues that have been

4  placed in front of the Court.  The law surrounding these issues

5  is not uncomplex.  And so, I think when you put so many big

6  picture arguments in one motion at one time, and you're trying

7  to argue subject-matter jurisdiction, and at the same time

8  you're arguing failure to state a cause of action, at the same

9  time you're arguing motion to strike class certification, you

10  know, it makes -- it perhaps doesn't crystallize the issues as

11  well as they could be.

12       So, if the defendants had wanted to bring these issues

13  with the Rule 12 motion, they had every opportunity when they

14  filed their motion to dismiss based on service of process.

15  They failed to do so.  The rule is very clear what happens in

16  that circumstance.  It allows them to raise subject-matter

17  jurisdiction issues, but it doesn't allow them to raise

18  12(b)(6) issues.  And it gives them an option to do so in the

19  context of a motion for judgment on the pleadings.  And based

20  on what the rule says, we think that's what ought to happen.

21       Thank you.

22       **THE COURT:**  All right.  Let me ask the plaintiff, with

23  respect to questions regarding the pleadings, as you've just

24  stated, the plaintiffs contend that the defendants' failure to

25  state a claim arguments are barred by Rule 12(g)'s

1    consolidation requirements.

2            If the defendants may simply raise these arguments

3    again in a Rule 12(c) motion, what is the expedience of

4    avoiding those issues now?

5            **MR. BECK:**  Well, I don't think it's just a matter -- I

6    don't know that expedience is the only consideration behind

7    that rule.  Certainly that's always a value and a consideration

8    that ought to be taken into account in judicial labor.  And we

9    understand that.

10           But a motion for judgment on the pleadings is

11   predicated on them answering to the allegations in the

12   complaint.  And so, should they go ahead and file a motion for

13   judgment on the pleadings, as the rule specifically directs

14   that they do, the Court will have a fundamentally different

15   record in front of it.  It will have not just the first-amended

16   complaint, but it will also have, presumably, an answer and

17   affirmative defenses.

18           And without knowing how the DNC and the congresswoman

19   are going to answer the allegations in the complaint, I think

20   it may be a little difficult to foresee how the issues might

21   come up, differently in a judgment on the pleadings, but they

22   certainly could.  And because that's what the rule specifically

23   refers to, I have to think that there's some intent behind how

24   that rule's written to promote a value that's not just

25   expediency, but having a fuller record in front of the Court,

1    when, in fact, the defendants could have raised those arguments

2    on their first motion, and they chose not to.

3            **THE COURT:**  If the Court proceeds to consider the

4    defense's failure to state a claim arguments, how would the

5    plaintiff be prejudiced at this time?

6            **MR. BECK:**  Well, I don't think that we would be

7    specifically prejudiced at this time.  I think the only issue

8    would be that the rule states what it states.  But as to -- I

9    think we've -- I feel comfortable that we've briefed the issues

10   in a way that doesn't prejudice us and that we've had certainly

11   a hearing today on the issues.  So, I don't think we would take

12   the position that we're prejudiced.

13           **THE COURT:**  All right.

14           With respect to paragraph numbers 188 and 195 of your

15   first-amended complaint -- and, again, take your time --

16           **MR. BECK:**  Yeah.  Yes, I've got them in front of me.

17           **THE COURT:**  -- what factual allegations support the

18   legal conclusions set forth in those paragraphs --

19           **MR. BECK:**  Right.

20           **THE COURT:**  -- that the plaintiffs relied on various

21   statements made by the defendants?

22           **MR. BECK:**  All right.  So, in terms of the factual

23   allegations that are incorporated into each of those counts --

24           **THE COURT:**  And, again -- and I apologize for

25   interrupting you -- but without reading them into the record.

54

1   We are all mindful of the Rule 9(b) pleading requirements.

2          **MR. BECK:**  Understood.

3          **THE COURT:**  Go ahead, Counsel.

4          **MR. BECK:**  Understood, your Honor.

5          I think that the allegations that support reliance in

6   this case are the only allegations in the complaint, which

7   pertain to the plaintiffs, really the only activities in the

8   complaint that they're alleged to have done, which is to have

9   contributed money to a presidential campaign.

10          So, my first -- the first part of my response would be

11   to direct the Court to paragraphs 2 through 109, which in each

12   of those paragraphs, the plaintiff is named, their residence is

13   given, and then the only activity that any of these plaintiffs

14   is alleged to have done is stated, which is the contribution of

15   a specified amount of money either to the Bernie Sanders

16   campaign or to the DNC.

17          So, that can only be the activity that the plaintiffs

18   undertook as part of the reliance element in those two counts,

19   because it's their only activity in the complaint.  And I think

20   the only fair reading of the complaint is that those -- that is

21   the activity.

22          In terms of what the plaintiffs relied on in paying

23   those sums of money, I would direct the Court to the paragraphs

24   starting with paragraph 159, which describes the DNC's charter

25   and quotes it, and then goes on to describe the various

1   specific statements in the media that were made by various

2   officials of the DNC, including the congresswoman, which repeat

3   what the charter says in terms of the DNC's commitment by its

4   own charter to running the process in a fair and evenhanded

5   manner.

6         And, again, there are no other -- there is no other

7   category of misrepresentations that's alleged in the complaint.

8   And we've also alleged that the deception occurred by way of

9   omission.

10        So, we don't believe that we have to prove that any

11  particular plaintiff relied on the specific statements cited,

12  but because this was conduct occurring behind the scenes, not

13  publicly disclosed by the DNC until their computers were

14  accessed or information leaked out into the public domain, and

15  it became known how the DNC was actually running the nominating

16  process contrary to its charter, contrary to its public

17  statements, that is a -- what we believe is an adequate -- to

18  be an adequately alleged omission that the plaintiffs relied

19  on.

20        In other words, the failure to state that the

21  democratic process was not, in fact, democratic, but biased and

22  predetermined from the beginning for Hillary Clinton over

23  Bernie Sanders.

24        **THE COURT:**  Where does the complaint allege that the

25  defendants intended to gain as a result of their alleged fraud?

1     **MR. BECK:**  I think the first paragraph which alleges

2   that is paragraph 187, which is that the defendants intended

3   that the false statements and omissions would induce the DNC

4   Donor Class plaintiffs and Sanders Donor Class plaintiffs to

5   rely on them.  And that allegation is substantially repeated in

6   paragraph 194 under the negligent misrepresentation count.

7         I think we've also alleged that in connection with

8   other counts what we've alleged in paragraph 204, that the

9   conduct was intentional, willful, wanton, and malicious.

10        We've done the same in paragraph 210 of the complaint

11  under the unjust enrichment count.

12        We've also alleged substantially the same in

13  paragraph 216 for the breach of fiduciary duty count.

14        **THE COURT:**  You're saying that those paragraphs that

15  you have just referenced to the Court support the legal

16  conclusions in paragraphs 187 and 194.

17        **MR. BECK:**  I think they do support those.

18        I would also direct the Court back into the factual

19  corpus of the complaint.

20        **THE COURT:**  Because that was gonna be my next

21  question.  Well, let me just ask --

22        **MR. BECK:**  Yes.

23        **THE COURT:**  -- the question.

24        What factual allegations support the legal conclusions

25  in paragraph numbers 187 and 194 of the first-amended complaint

1    that the defendants intentionally induced plaintiffs to donate

2    to the Sanders campaign and to the DNC?

3         **MR. BECK:**  Right.  I think that those allegations are

4    supported starting at paragraph 161 and going on through

5    paragraph 171.  And these are getting to the issues and the

6    allegations of what exactly the DNC did in violation of the

7    charter and the commitment to neutrality.

8         And, essentially, these paragraphs set forth that the

9    DNC was biased in favor of one candidate, that the DNC was

10   devoted to supporting Clinton's candidacy over everybody else's

11   candidacy, including Senator Sanders, and that the DNC actively

12   concealed its bias from its own donors, as well as the donors

13   to the Sanders campaign.

14        And I think the concealment comes from the public

15   statements that were made by the congresswoman and other

16   officials of the DNC, which created a media narrative that the

17   DNC was following the terms of its charter, when, in fact, this

18   was not the case.

19        And so, in terms of the allegations of, you know,

20   whether -- the intentionality here, I think the intentionality

21   is an inference from the fact of the support for

22   Senator Clinton.

23        In other words, that the DNC was going to do... I'm

24   sorry.  The DNC was going to do whatever it could to advance

25   and predetermine the nomination for Hillary Clinton, while at

```
 1   the same time maintaining the fiction that it was operating in

 2   a fair and evenhanded manner.

 3        If I could just take one moment and confer with

 4   counsel?

 5        THE COURT:  Go right ahead.

 6        MR. BECK:  Okay.  Thank you.

 7        THE COURT:  Take your time.  Feel free to do so.

 8        MR. BECK:  Thank you.

 9        (Discussion had off the record between counsel)

10        THE COURT:  Take your time.

11        MR. BECK:  So, I think those allegations going to what

12   exactly the DNC was doing for the Hillary Clinton campaign

13   behind the scenes, how it was working with the Hillary Clinton

14   campaign, this was all part of a preset strategy that was set

15   down in various internal documents that have come to light

16   through Guccifer, which, obviously, that's the basis for our

17   complaint.  There have been leaks that have come out since the

18   complaint was put on file.  But I think they all show the same

19   thing, which is an intentional, predetermined strategy to

20   advance Hillary Clinton's candidacy to the nomination.

21        And in terms of satisfying the element of intent for

22   these claims, I think those allegations support that.

23        THE COURT:  All right.  Thank you.

24        My next question is:  How is donating to a political

25   campaign considered a consumer transaction under the District
```

1    of Columbia law?

2         **MR. BECK:**   Your Honor, the District of Columbia law in

3    question is a broad consumer statute, which defines its terms

4    in a very broad manner to protect individuals in the purchase

5    of goods and services.

6         To quote one recent case from the D.C. Superior Court:

7         "The purpose of the D.C. Consumer Protection

8         Procedures Act is to protect consumers from a broad

9         spectrum of unscrupulous practices by merchant.

10        Therefore, the statute should be read broadly to

11        assure that the purposes are carried out."

12        Now, in terms of who may file suit under the CPPA,

13   that is specified in the D.C. code at Section 28-3905, Sub (k),

14   which defines "consumer" to include any person who, quote,

15   "would purchase or receive consumer goods or services."  And

16   "goods or services" is defined to mean, quote, "any and all

17   parts of the economic output of society at any stage or related

18   or necessary point in the economic process."  And it includes

19   consumer credit, franchises, business opportunities, real

20   estate transactions, and consumer services of all types.  All

21   types.

22        And that's found in Sections 28-3901, Sub (a)(2), and

23   Section 28-3091, Sub (a), Sub (7) of the D.C. code.

24        So, the plaintiffs who made their donation payments

25   through this company called ActBlue, which we've specifically

1   described in the complaint, those plaintiffs are -- do qualify

2   as consumers, we believe, and we believe they're entitled to

3   bring suit under the CPPA.  Because, as we've alleged, ActBlue

4   charges a 3.95 percent fee for processing services on each

5   donation.  So, in essence, when somebody donates through

6   ActBlue, maybe they do it on their iPhone or their computer or

7   what have you, they are paying this percentage fee for

8   processing.  And under the terms of the statute, that makes

9   them consumers.

10          So, then the next question becomes, if the plaintiffs

11  are consumers, who do they have a cause of action against?  And

12  I think that in their papers, the defendants take the position

13  that you need to have privity -- some sort of privity of

14  contract between the plaintiff and the defendant in order to

15  support a cause of action under the statute.  And I don't think

16  the statute, in fact, has that requirement.

17          Obviously, we're not suing ActBlue.  We're suing the

18  DNC and Congressman Wassermann Schultz *(sic)*, because those are

19  the -- that's the entity and the person that were responsible

20  for running these primary elections, leading the process from

21  the top.

22          And when you look into the D.C. law on this issue --

23  and I'm specifically referring to the case we've cited in our

24  brief -- *Calvetti vs. Antcliff* out of the District of Columbia

25  Circuit, 2004, which states that:

1          "The CPPA liability extends to, quote, any person

2     connected with the supply side of a consumer

3     transaction."

4          That's really quite broad language -- "any person

5     connected."  I would say that if the transaction is deemed to

6     be the moment when the plaintiff donates a specified sum

7     through ActBlue, either to the Sanders campaign or the DNC, and

8     gets charged that 3.95 percent fee, making them a consumer, the

9     entity that's running the election, which encompasses the

10    candidate to which they're donating to, is a person connected

11    with the supply side of the consumer transaction.  Because

12    they're essentially responsible for the ultimate -- it's not a

13    product, it's not a commercial transaction, but it is the end

14    result of the money that people are paying.

15         The supply is the political campaign.  And the

16    political campaign is ultimately under the auspices of this

17    organization that purports to be fair and impartial.

18         So, I know that's sort of a long answer to a short

19    question, but I think a fair reading of the statute allows us

20    to plead a claim for those reasons.

21         **THE COURT:**  And you may have just answered my next

22    question, but what services have the DNC donors purchased from

23    the DNC?

24         **MR. BECK:**  Right.  I wouldn't -- I would not say that

25    they've purchased don -- services from the DNC.  I would say

1    that the service that's being purchased is the processing fee

2    that is being offered by ActBlue to consummate this political

3    contribution transaction.  So, there is -- I would not go so

4    far as to say that there's a purchasing of services in the way

5    that the statute means.  But the fact that they haven't

6    purchased services doesn't mean that the DNC and Debbie

7    Wassermann Schultz are not persons connected with the supply

8    side of the transaction.  And for that reason, we think there's

9    a valid cause of action under the statute.

10            **THE COURT:**  My next question for the plaintiff is:

11   What is the DNC's "special relationship" with registered

12   members of the Democratic Party?

13            **MR. BECK:**  Well, I think the "special relationship"

14   comes down to the fact that this organization is the face of

15   the leadership of the political party that these particular

16   proposed plaintiffs, the Democratic Party Class have joined.

17   That's the special relationship.

18            I think that the New York cases that we cited show

19   that courts have no hesitation, at least in those cases, of

20   finding that there's a responsibility owed from a party to its

21   members, and it finds that this duty is sufficient to form a

22   fiduciary duty.  Admittedly, those are New York cases.  They're

23   decided under New York law.

24            I think it's premature to engage in choice of law

25   analysis at this stage.  I'm not sure that the record is fully

1   complete.  But I do think that on the face of it, this is a

2   D.C. corporation that's based in D.C.  It would seem to me that

3   D.C. law would apply to the question of whether a -- of what,

4   if any, fiduciary duty is owed by the DNC to its members -- the

5   leadership of the party to the party's members.

6          And the D.C. law on this question is, as just to quote

7   *Kemp vs. Eiland*, which is a 2015 case from the District of

8   Columbia circuit:

9          "District of Columbia law has deliberately left

10      the definition of fiduciary relationship flexible so

11      that the relationship may change to fit new

12      circumstances in which a special relationship of

13      trust may be properly implied."

14         In a situation like this, the trust, I think, is that

15  folks have joined the Democratic Party believing that the

16  Democratic Party is a custodian of a fair and impartial

17  election process, as it states in the DNC's own charter and as

18  the DNC has repeatedly -- or did repeatedly state in public,

19  according to our complaint.

20         And I think pursuant to this particular definition of

21  D.C. law, which I think applies here, because we're talking

22  about a D.C. organization.  This is the organization that's

23  entrusted with the process.  This is the organization that

24  folks have registered based on the assumption that this is a

25  democratic process that's being carried out.  So, I mean, at

1   least at the pleading stage, it seems to me to be a clear

2   case -- that we've alleged enough, just based on who the DNC

3   is, who the members of the class are, to support the existence

4   of a fiduciary relationship given the case law that we've

5   cited.

6        **THE COURT:**  And maybe you've already answered my next

7   question, at least to a certain extent.  But how is it that an

8   entity can owe the same fiduciary duty to millions of people at

9   the same time?

10       **MR. BECK:**  Well, I think that actually -- it's perhaps

11  not as unusual as it first sounds, when you think that in the

12  context -- when you consider that in the context of private

13  corporations in the commercial world, companies have duties to

14  their shareholders, and that's a rather uncontroversial

15  proposition.  And there's a concept that when you become a

16  shareholder of a company, you become part of an enterprise, and

17  the folks at the top have a duty to you when they -- in terms

18  of running the company.

19       And I mean in this case, I don't think it's that much

20  of a stretch of an analogy.  I mean this may be a different

21  market we're talking about.  We're not talking about economics,

22  we're talking about politics.  But, again, I think as the

23  discussion has developed today, we strenuously take the

24  position that just because we're talking about politics doesn't

25  mean that the rights that exist at common law and under the

1    D.C. statute are vitiated.

2          And so I would say that, in answer to your question,

3    in this case, we are talking about the political realm.  But if

4    the members of the Democratic Party are considered to be

5    shareholders in that entity, in that political enterprise, then

6    it seems perfectly reasonable that there would be a fiduciary

7    duty to run the party according to what the charter itself

8    says.  That would not be unlike a situation one finds all the

9    time with public corporations in the economic domain.

10         **THE COURT:**  If registered democrats are actually

11   members of state Democratic parties, not the DNC itself, how is

12   it that the DNC owes those registered democrats a fiduciary

13   duty?

14         **MR. BECK:**  Again, I think this gets into some --

15   perhaps some factual issues that aren't quite encompassed by

16   the complaint at this stage.  But -- in terms of how the DNC

17   exercises its command over the party, and that command trickles

18   down through all the state parties.

19         It seems to me that exactly how that happens, I think

20   we -- there was some discussion of it earlier between counsel

21   for the DNC and your Honor relating to funding.  But I think

22   the DNC does much more than that.  I think it -- at the end of

23   the day, I don't think anyone is really under any illusion that

24   the DNC runs the show in terms of the overall policy that the

25   Democratic Party pursues at a national level.  I mean in this

1    case, we're talking about a national election.

2          In terms of -- perhaps the best analogy is that a

3    board of directors of a corporation owes a duty to the

4    shareholders.  The shareholders are members of a company.

5    They're not members of the board of directors.  But it's the

6    board of directors that's running the show, so the duty does

7    run down, because that's who's calling the shots.  And I think

8    we've pled enough in this complaint to -- for one to reasonably

9    infer that the DNC is, in fact, calling the shots when it comes

10   to the Democratic Party, if that is defined to mean all of the

11   constituent state Democratic parties.

12          **THE COURT:**  And then my last question for the

13   plaintiff is:  What is Deborah Wassermann Schultz's connection

14   with the data breach described in the first-amended complaint?

15          **MR. BECK:**  With respect to that specific allegation

16   and the claim associated with that allegation, our position is

17   that the congresswoman is the -- at the time of the events

18   alleged, was the leader of the DNC.  It was up to her

19   ultimately to implement policies that reasonably protected the

20   information of the DNC's own donors.  And by virtue of the data

21   breaches occurring, she clearly failed in that responsibility.

22          **THE COURT:**  All right, Counsel.  Thank you very much.

23          **MR. BECK:**  Thank you.

24          **THE COURT:**  And I'll hear from the defense with

25   respect to those questions and answers.

1          **MR. SPIVA:**  All rightee.

2          **THE COURT:**  Take your time.

3          **MR. SPIVA:**  Thank you, your Honor.  I'm just trying to

4   find my place.

5          So, I'll start back at the beginning of your Honor's

6   last line of questions.  And I think the first one, your Honor

7   asked what the factual support was for paragraphs 188 and 195

8   of the first-amended complaint, which set forth fraud and

9   negligent misrepresentation allegations.  And I think, quite

10  rightly, your Honor noted that Rule 9(b) applies here, which

11  is -- you know, requires a detailed pleading, particular

12  pleading specificity.  As one of the cases says, the who, the

13  how, the what, the where, the when of the alleged fraud.  And

14  there's no allegation, really, with respect to any of these

15  individual plaintiffs, your Honor, about, you know, who made a

16  statement to them, how it defrauded them.

17         If you look through the paragraphs that counsel

18  directed your Honor to, paragraphs 2 through 109, all it says

19  is that these individual plaintiffs gave money and where they

20  live.  And it doesn't say that they received these statements,

21  knew about these statements, relied upon these statements.  And

22  we know that with respect to many of them, it couldn't,

23  consistent with Rule 11.

24         And that's a big deal, your Honor.  It's not just a

25  simple minor pleading defect.  This is a fraud allegation.

```
 1    And, as your Honor noted, there's a reason why Rule 9(b)

 2    requires specificity -- excuse me -- specificity.

 3         And opposing counsel said that he didn't believe that

 4    they had to prove that a particular plaintiff relied on a

 5    specific statement.  But that, in fact, is exactly what they

 6    would have to prove and I think, again, shows why this

 7    certainly couldn't work as a class action.

 8         Your Honor asked where in the complaint did they

 9    allege -- did the plaintiffs allege that the defendants

10    intended to gain as a result of the alleged fraud?  And my

11    response would be really nowhere, your Honor.  The vague and

12    generalized allegations in paragraphs 187 and 194 don't say

13    that, that the defendants intended to gain by doing this.

14         And in terms of plausibility, your Honor, under the

15    Iqbal and Twombly standards, some of this, frankly, just

16    doesn't really make logical sense, I mean that the party tried

17    to induce -- was -- favored Secretary Clinton and so induced

18    many members of the party to give to Senator Sanders.  It just

19    doesn't -- that just doesn't make logical sense, your Honor.

20    And there really isn't any allegation that defendants intended

21    to gain as a result of the alleged fraud.

22         I think your Honor's next question was:  How is

23    donating to a political campaign a consumer transaction under

24    the D.C. Consumer Procedure Protection Act (sic), an act which

25    I have some familiarity with.
```

1          First of all, you know, as -- we quoted the language

2     in our brief that the D.C. CPPA defines a consumer as "a person

3     who, other than for purposes of resale, does or would purchase,

4     lease, or receive consumer goods or services, including as a

5     co-obligor or surety, or does or would otherwise provide the

6     economic demand for a trade practice," clearly doesn't apply to

7     donating money to a political campaign.

8          The act goes on to define a consumer good or service

9     as something that "is used primarily for personal or household

10    use."  Clearly, donating, again, to a political campaign is

11    not -- first of all, there is no service or good that is being

12    purchased; and, second of all, certainly, even if one could

13    somehow characterize it as a service being purchased, it's

14    certainly not for household -- primarily for household or

15    personal use.

16         In addition, plaintiffs tried to link this to

17    ActBlue's commission on donations.  That also doesn't really

18    make any sense, your Honor.  You know, ActBlue is not a

19    defendant here.  Certainly the DNC and certainly

20    Congresswoman Wassermann Schultz is not a merchant under the

21    definitions of the act.  And the fact that ActBlue charges a

22    commission doesn't convert either of them to a merchant, and

23    certainly you can't sue the defendants that are present in this

24    case for something that ActBlue -- it's unclear what -- but

25    ActBlue allegedly has done wrong.

1         And keeping in mind, of course, that the plaintiffs

2    are seeking the return of all of the donations.  They're not

3    just asking for the commission that ActBlue charges.  They're

4    asking for a complete return of all of the donations.

5         So, this act just does not apply to the donations at

6    issue here.

7         The other issue, your Honor -- and this kind of goes

8    back to class certification -- is they're trying to apply this

9    D.C. statute nationwide to anybody in the country, no matter

10   what state they reside in.  And that also is not proper to do.

11        It wouldn't take a complicated choice of law analysis

12   to say you can't apply a local state law, even if there were a

13   consumer transaction here or a merchant involved under the act,

14   to consumers all over the country.  We don't have consumers

15   here, but if we did, that -- there's no basis to do that.

16        Your Honor asked:  What services have the DNC donors

17   purchased from the DNC?  I think I just addressed that.

18        And then moving on to the fiduciary duty, your Honor

19   asked:  What is DNC's special relationship with the members of

20   the party?  And I would just note that the plaintiffs' position

21   on what law applies here has kind of shifted.  I mean at first,

22   we -- the complaint doesn't really apprise the defendants of

23   what law is being asserted here.  I think we thought it was

24   Florida law, and we addressed that in their briefing, and then

25   in their response, I think they said it was D.C. law.  And now

1    counsel said it's too early to do that kind of a choice of law

2    analysis.

3        But, regardless, the -- it would not be appropriate to

4    find a fiduciary duty here.  You know, it's kind of a misnomer

5    even to speak in terms of members of the DNC.  There is no

6    national registration.  Some states don't even have party

7    registration.  Many states, in fact.  I mean Virginia, when you

8    register to vote, you don't register as a democrat or a

9    republican or whatever.  So, as far as the party's concerned,

10   they are trying to encourage people to vote for democratic

11   candidates and to support democratic policies and values.  But

12   that's not a class of people that can be defined by the Court.

13   And that changes with every election and possibly, and

14   probably, more frequently than that.

15       That's not a situation that's akin to a shareholder of

16   a corporation.  It certainly can't, I think under, really, any

17   state's law, be the basis of some kind of a special

18   relationship of the type that would create a fiduciary

19   obligation.

20       Counsel cited a D.C. Circuit case.  I'll just briefly

21   note that the D.C. Circuit actually is not the authoritative

22   source for D.C. state law.  D.C. is not a state, obviously, but

23   there are local D.C. courts that actually are the authoritative

24   source for what a fiduciary relationship would be under D.C.

25   law, and the same would apply to the D.C. Consumer Procedure

1    Protection Act.

2         Your Honor asked:  How can one entity owe fiduciary

3    duty to millions at the same time?  And I think -- you know, my

4    earlier comments, I think, went to that.  I really don't think

5    it is possible, your Honor, with such a nebulous, changing

6    relationship, to say that there's a fiduciary duty created

7    between the party and people who believe in democratic -- you

8    know, the values of the Democratic Party or who vote for

9    democratic candidates.

10        And I would note, because counsel for the plaintiffs

11   said many times, Well, it should be reasonable, I think this or

12   that about the DNC, and I just want to note that it is the

13   plaintiffs' burden here to establish that there is a fiduciary

14   duty, and what the basis of that fiduciary duty would apply,

15   and what law would the Court look to, to determine that.  And

16   if they can't do that, then they can't state a claim.  And they

17   haven't.

18        In all, I think what I just said would apply even more

19   strongly to Congresswoman Deborah Wassermann Schultz.  I keep

20   forgetting to say each time that I'm speaking for both, your

21   Honor, but I certainly am.  And what reminded me of that is

22   your Honor's next question is:  What is Congresswoman

23   Wassermann Schultz's connection to the data breach described in

24   the complaint?  And really there's no allegation of her

25   connection to that data breach.  She is mentioned in three

1    paragraphs of the complaint, none of which address a data

2    breach, frankly, none of which could support any of the claims

3    that have been brought against her.

4         Counsel said that as the leader of the DNC, she's

5    essentially responsible for what happened on her watch.  But

6    that would be a strict liability standard, your Honor, and

7    that's certainly not the case with respect to a data breach or

8    these types of tort claims, or contract claims, for that

9    matter, that you could say that the head of an organization, or

10   the CEO of a corporation, for that matter, is -- can be held

11   liable for everything that happens within that organization or

12   allegedly due to the actions of the organization, without

13   specific allegations of what that person actually did to cause

14   the alleged harm.

15        Thank you, your Honor.

16        **THE COURT:**  All right.  Thank you.

17        I have some questions for the defense.

18        **MR. SPIVA:**  Okay.

19        **THE COURT:**  We'll go into the class action allegations

20   at this point.

21        With respect to the class action allegations, we'll

22   keep in mind, obviously without reading them into the record,

23   the threshold requirement that is required for the plaintiff to

24   meet, and then assuming that the threshold is met, then

25   Rule 23(a) and 23(b) come into play.

1          But with those requirements in mind, assuming that the

2     Court rejects the defendants' standing arguments, why should

3     the Court address the class issues now rather than waiting for

4     a motion for class certification?

5          **MR. SPIVA:**  Well, I think this is the appropriate time

6     in this case, your Honor, for a few reasons.  First, even to

7     define really any of the three classes, but particular --

8     subclasses, but particularly with respect to the Democratic

9     Party Class, your Honor, the Court would have to invade the

10    party's associational rights and define what it means to

11    actually be a member of the Democratic Party.

12          And that would also entail discovery that would invade

13    the party's rights and the rights of the Sanders and the

14    Clinton campaigns.  Of course, the campaigns aren't themselves

15    corporations, they're third parties.  They're not parties to

16    this litigation, but there would be discovery of both of those

17    campaigns.

18          And all of this would invade the First Amendment.  And

19    I think it really highlights that the class really is not

20    ascertainable, your Honor.  And so, the Court should strike the

21    allegations at this stage to save a huge amount of resources on

22    behalf of both the parties and the Court in terms of fighting

23    those motions and the discovery that would come with that.

24          In addition, there are problems with standing with

25    respect to individual members of the putative class.  And so,

```
1    even if your Honor rejects our overarching standing argument,

2    we would still have the right, your Honor, to challenge each

3    class member's standing.  Did they rely on statements of the

4    DNC?  Did they even know about them?  Would they have not given

5    if they had known?  Same with the Sanders subclass.  Same with

6    the third subclass.

7            And so, millions of people have no injury.  And it

8    would require both invasive, expensive, you know, thousands, if

9    not millions, of essentially depositions and, of course, a

10   minitrial on each individual standing alone.  The same issues,

11   I think, come up with respect to predominance and typicality

12   and probably several other of the requirements under 23(b).

13           And so, we submit, your Honor, that now is the

14   appropriate time to avoid that thicket, which would, I think,

15   enmesh the Court in a lot of political issues, would invade the

16   First Amendment interests of certainly the defendants here.

17           And at the end of the day, your Honor, this is a class

18   that is not certifiable.  It -- you know, the reliance -- and

19   that's not the only problem, but reliance, again, is the third

20   rail of class certification.  And they can't prove that on a

21   class-wide basis without individualized proof from every single

22   class member, which destroys any usefulness of the class device

23   here.

24           THE COURT:  All right.  And, again, understanding that

25   if -- or assuming arguendo that the Court were to reject the
```

1   defendants' standing arguments, if the Court strikes the class

2   allegations, will the Court have jurisdiction over the claims

3   in the first-amended complaint?

4           **MR. SPIVA:**  So I'm assuming the Court has rejected our

5   standing arguments, but struck the class allegations.

6           **THE COURT:**  Allegations.

7           **MR. SPIVA:**  I mean, there's --

8           **THE COURT:**  Let's do it this way.

9           **MR. SPIVA:**  Okay.

10          **THE COURT:**  If I did what I suggested --

11          **MR. SPIVA:**  Right.

12          **THE COURT:**  -- the jurisdiction for the remaining

13  claims would be based on what?

14          **MR. SPIVA:**  Well, I would submit, your Honor, that

15  there would be no jurisdiction for all the reasons that there

16  is no standing.  The reason I'm having difficulty is, if I

17  assume you're rejecting the standing arguments with respect

18  to --

19          **THE COURT:**  Well, would it be based on diversity?

20          **MR. SPIVA:**  Oh, that is what plaintiffs have alleged,

21  that there's diversity jurisdiction here.

22          **THE COURT:**  So the question is:  If I struck the class

23  allegations, would I still have jurisdiction over the claims in

24  the first-amended complaint?

25          **MR. SPIVA:**  And, again, I'm putting standing to one

1    side.

2             **THE COURT:**  Sure.

3             **MR. SPIVA:**  My first answer would be no because of

4    standing.  But -- but I -- I'm not sure, your Honor, and this

5    is the reason.  I believe that what gets them into diversity

6    with the class allegations is CAFA.  And I'm not positive,

7    standing here at this moment -- I can check -- whether every

8    single one of those putative class representatives lives

9    outside of Florida -- I'm sorry -- lives outside of D.C.

10   Because, of course, if one of the plaintiffs --

11            **THE COURT:**  Well, the DNC is registered in the

12   district.

13            **MR. SPIVA:**  Right.  Right.  The District of Columbia.

14            **THE COURT:**  And has its principal place of business in

15   the district.

16            **MR. SPIVA:**  Right.  To be clear, whether every single

17   one of the named plaintiffs -- putative named plaintiffs lives

18   outside of the District of Columbia.  Because I believe that if

19   there is one -- and I believe there is at least one -- that

20   lives in the District of Columbia, that would destroy complete

21   diversity, and the Court would not have jurisdiction.

22            **THE COURT:**  All right.  Go ahead.  That's all right.

23            **MR. SPIVA:**  Okay.

24            **THE COURT:**  I've got a chart here somewhere.

25            **MR. SPIVA:**  And I can take a quick look when I next --

1       **THE COURT:**  No, that's all right.  That's all right.

2       Your argument is that if one lives in the district,

3  the Court would not have diversity jurisdiction.  That's all

4  right.

5       **MR. SPIVA:**  That's right.

6       **THE COURT:**  Okay.

7       **MR. SPIVA:**  That's right, your Honor.

8       The other thing that I -- I'm not sure they could meet

9  the amount in controversy, but I -- but I'm -- yeah, I'm not

10  sure that they could meet it even collectively.  I mean there

11  are a lot of -- maybe they could, because there are about a

12  hundred-some people on the list.  But I'm -- but if one lives

13  in the District of Columbia, that would destroy complete

14  diversity.

15       **THE COURT:**  All right.  Thank you.

16       **MR. SPIVA:**  Thank you, your Honor.

17       **THE COURT:**  I'll hear from the plaintiff.

18       **MR. BECK:**  Your Honor, on the issue of their motion as

19  it pertains to the class action allegations, this is

20  alternative relief that they sought by way of their -- what

21  they styled their motion to dismiss.  And the last sentence of

22  the defendants' -- the first paragraph in their motion states,

23  quote:

24       "In the alternative, to the extent any portion of

25    the complaint survives, the Court should strike the

1        allegations which are facially unsustainable."

2            They don't cite a specific provision of Rule 12 in

3   making that request to the Court.  But the one provision of

4   Rule 12 that deals with anything relating to a motion to strike

5   or a request to strike allegations is 12(f).

6            And because of that, I think my first point on this

7   line of questions from the Court is that I do believe we get

8   back to 12(g)(2) and the argument that they've waived these

9   arguments, for the same reason that we discussed in connection

10  with their 12(b)(6) motion or the aspect of their motion

11  relating to whether we state a cause of action.  But I would

12  add a proviso, and getting back to the Court's previous

13  question when we were addressing 12(b)(6), the Court asked how

14  would it prejudice us to decide those issues now, and our

15  answer was, with respect to 12(b)(6), we don't suggest there is

16  any prejudice.

17           I think the situation is somewhat different with

18  respect to the class act allegations.  I think that the

19  12(g)(2) still applies, but with the addition that there is

20  prejudice to entertaining a motion to strike class action

21  allegations at this stage, and that this prejudice has been

22  articulated in the case law.

23           And we cited some cases, including cases from this

24  district, *Martorella vs. Deutsch Bank*, which is a Southern

25  District case from 2013, which states that the question of

1   class certification is generally not addressed on a motion to

2   dismiss.

3          There's also *Gill Samuel (phonetic)* from 2014 --

4   again, appearing on page 2 -- page 18 of our brief -- which

5   holds that "an order on a motion to strike class action

6   allegations would, by its very nature, carry more finality and

7   less prospective flexibility than the typical order on a

8   class -- on motion for class certification."

9          And for that reason, the Court deemed that these types

10  of motions are contrary to the spirit of Rule 23, which allows

11  for some flexibility, and also contemplates that there would

12  have been an opportunity to conduct some discovery in

13  connection with the class certification determination.

14         So, we would submit that based on -- again, based on

15  12(g)(2), based on the cases from this district, which disfavor

16  ruling on a class certification motion -- or defer ruling on a

17  motion to strike class certification allegations outside of a

18  formal motion for class certification, we submit, then, in view

19  of those two sources of authority, that it's premature to even

20  consider the defendants' arguments at this time.

21         That said, just to quickly address some of the points

22  they've made.  They suggest that it's impossible for us to

23  maintain a class action in this case, because we've pled

24  reliance, and we've pled reliance on false statements.  There's

25  a whole line of cases that certify class actions in the context

1    of uniform omissions.  And I think that ultimately this is a

2    case that's more about omissions than specific statements of

3    fact.  Because as I think we've addressed more than a couple

4    times throughout this hearing, the essence of the claims in

5    this case is that folks made contributions to a political

6    candidate and a political party's governing body, based on the

7    assumption that the primary process was fair and evenhanded,

8    and the true facts were concealed from them, because behind the

9    scenes, the DNC was being anything but fair and evenhanded in

10   connection with the primary.

11          So, in that sense, I think we have more than enough

12   material for a uniform omissions theory of class certification.

13   But, again, I submit that it's premature to even be discussing

14   those issues at these stages.

15          And the Court asked the question about jurisdiction.

16   I recently dealt with that issue, but it was in the Ninth

17   Circuit.  And if my recollection serves me well, the question

18   of jurisdiction is determined at the time that the complaint is

19   filed and makes the allegations that invoke CAFA jurisdiction,

20   which is what we've done in this case.  So -- and this was in

21   the context of a Court then subsequently denying class

22   certification in a written order, and at the same time

23   recognizing that the case still had jurisdiction under CAFA in

24   that court, notwithstanding the class certification motion

25   having been denied.

1           So, if that principle also holds in the Eleventh

2   Circuit, and I haven't looked at that issue, then I would

3   submit that the Court still would have jurisdiction, regardless

4   of where the particular plaintiffs live, because CAFA

5   jurisdiction was properly invoked in the original complaint.

6           And, finally, there's a thread that runs throughout

7   the defendants' arguments, which suggests that by conducting

8   this as a class action, there will be rampant violations of

9   people's rights to association, because they -- by virtue of

10  how the classes are defined, they will be swept into a lawsuit

11  that alleges claims which either they disagree with or for

12  whatever reason, they may not want to have any part of it.

13          Rule 23, as this Court knows well, is a very -- it

14  has -- is a very flexible rule that contains mechanisms for

15  addressing just those types of issues that someone doesn't have

16  to be dragged into a lawsuit that they want no part of.  There

17  are opt-out mechanisms.  There are notification mechanisms.

18  There are issues relating to how the class could be defined.

19  There are issues relating to the formation of subclasses.  In

20  connection with some of the choice of law issues that we've

21  discussed, those can be handled through those Rule 23

22  mechanisms.  So I just don't think those are valid concerns

23  that the defendant has raised.

24          But, again, I would stress that I really think that

25  the Court would -- and the parties would benefit most by having

1    a chance to conduct discovery and fully brief a formal motion

2    for class certification before any of the issues that have been

3    raised by defendant in connection with this aspect of their

4    motion are decided by the Court.

5         **THE COURT:**  All right.  Thank you, Counsel.

6              Now, I have some questions for the plaintiffs

7    regarding the class action allegations.  And you've answered

8    one of them already, regarding what were to happen if the Court

9    were to strike the class allegations.

10             My next question -- well, actually, my first question

11   for the plaintiff is:  Are each of the plaintiffs diverse in

12   citizenship from each of the defendants?

13        **MR. BECK:**  Your Honor, I'm just going to grab a copy

14   of the complaint.

15        **THE COURT:**  No, no, take your time.  Take your time.

16   And consult if you need to.

17        **MR. BECK:**  If I may.

18        **THE COURT:**  We're not going anywhere.

19        *(Discussion had off the record between counsel)*

20        **MR. SPIVA:**  I definitely don't mean to interrupt, your

21   Honor, but I actually have the answer to this now, if --

22        **THE COURT:**  Well, you can step over and talk with

23   counsel.  I mean that's....

24        **MR. BECK:**  Sure.

25        *(Discussion had off the record between counsel)*

1          **MR. BECK:**  Yes.  Counsel has informed me -- and it is,

2     indeed, the case -- that paragraphs 55 and 87 are -- they're

3     related to plaintiffs who live in the district.  So, those

4     plaintiffs would not be diverse, because I -- because the DNC

5     is a member -- or a resident of the district.

6          **THE COURT:**  And where might the Court find the

7     allegation of citizenship for Deborah Wassermann Schultz?

8          *(Discussion had off the record between counsel)*

9          **MR. BECK:**  Paragraph 154 is the paragraph which speaks

10    to the congresswoman and specifies that she maintains offices

11    in Pembroke Pines and the District of Columbia.  However, I'm

12    looking at this now, and it doesn't appear to contain an

13    allegation relating to her.

14         **THE COURT:**  Citizenship.

15         **MR. BECK:**  Correct.  I would agree with that.

16         **THE COURT:**  That's fine.  That's all right.

17         My next question for the plaintiff is:  Are there

18    Bernie Sanders donors who would not have standing to

19    participate in this lawsuit?

20         **MR. BECK:**  I can't think, as I sit here now, why any

21    Bernie Sanders donor would not have standing to participate.

22         **THE COURT:**  All right.  Would a Bernie Sanders

23    supporter who donated to Senator Sanders' campaign because of

24    the DNC's alleged bias have standing?

25         **MR. BECK:**  A Bernie Sanders donor who donated to the

1   Bernie Sanders campaign.

2            **THE COURT:**  Campaign.

3            **MR. BECK:**  Yes, they would have standing -- to the

4   Bernie Sanders campaign, yes, they would have standing -- oh,

5   the question is, because of the DNC's alleged bias.

6            I think this gets into some issues in terms of how the

7   defendant has framed our allegations, and, of course, they have

8   this footnote in -- first of all, I don't see how a donor to

9   the Bernie Sanders campaign could -- would be in a position to

10  have the knowledge that the DNC was predetermining the outcome

11  for Hillary Clinton in the way that the complaint alleges.

12           I think that certainly there was campaign rhetoric

13  throughout the campaign.  And I would not deny this, that there

14  was a sense and a feeling, through the process, that it was

15  unfair and that it was slanted.

16           That said, I think there were orders of magnitude at

17  issue in this case, which take this out of the realm of -- you

18  know, I just don't see how a Bernie Sanders campaign -- a

19  Bernie Sanders donor would have the knowledge to know that the

20  DNC had predetermined the result for Hillary Clinton,

21  number one.

22           And, number two, it just doesn't make sense to me why

23  somebody would participate in a political process by paying

24  money into the process, when they knew that that process was

25  rigged from the start, which is what we're alleging.  I mean

1     that's what we're alleging in this complaint.

2               **THE COURT:**  Sure.

3          **MR. BECK:**  It just doesn't seem like a plausible

4     position to be in at the same time we're having this exchange

5     in the context of not having conducted discovery and just on

6     the basis of the four corners of a complaint, as I think is

7     called for given the motion that the defendants have filed.

8               So, it -- I just don't know that -- I guess it's hard

9     to imagine that situation given the state of the record at this

10    point.

11              *(Discussion had off the record between counsel)*

12              **THE COURT:**  Are there DNC donors who would not have

13    standing to participate in this lawsuit?

14         **MR. BECK:**  Again, I think that -- I think,

15    fundamentally, people give money to candidates and can -- and

16    political parties, because they believe that we have a fair

17    democratic process.  And I think that that's a baseline

18    assumption whenever a donation is made.

19              I think if it's proven that the process is not what

20    people believe it to be, then I think we've alleged standing on

21    the basis of a false understanding that's been created by the

22    defendants.

23              And so, again, I would think that all DNC donors have

24    standing, because I believe that people -- when people

25    participate in the process in this way, and they actually write

```
1    a check to a party or to a candidate, they believe that the

2    process is fundamentally fair and democratic.

3         THE COURT:  Would a person who donated to the DNC

4    without reading the DNC's charter or hearing the statements

5    described in paragraph 160 of the first-amended complaint have

6    standing?

7         MR. BECK:  Yes.  I think that a person in that

8    situation would have standing.  I think -- again, I think that

9    this is a case that ultimately and probably for many and many

10   people in the classes, as we've defined them in this complaint,

11   this is a case of omission and concealment of what was actually

12   going on behind the scenes at the DNC.  And so, I don't think a

13   person necessarily has to read a news article where the DNC is

14   specifically proclaiming its neutrality, or I don't think a

15   person has to read the charter itself.

16        I think that there's a fundamental understanding in

17   this country that's taught from a very early age, certainly I

18   remember it, that we live in a democracy.  And I think a

19   fundamental part of what a democracy means is that elections

20   are not conducted in this biased and predetermined way.  And I

21   think that everybody who seeks to participate in the political

22   process, especially when they're going to the trouble of

23   cutting a check to a candidate that they support or a party

24   that they support, they believe that those candidates and

25   entities are taking place in a process that is fair and
```

1  impartial, because they believe in a process that's democratic.

2          So, I don't think someone necessarily needs to read

3  the articles we've cited or the charter to be in the class of

4  people that have been defrauded or deceived or unjustly treated

5  in terms of the unjust enrichment claim by the DNC's conduct.

6          **THE COURT:**  Are there registered members of the

7  Democratic Party who would not have standing to participate in

8  this lawsuit?  And maybe your last answer would be the same.

9          **MR. BECK:**  Yeah, I think that's a similar answer to

10  the previous question.  I think, again, if there is, indeed, a

11  fiduciary duty owed from the leadership of a party to the

12  party's members, as we maintain in this case, then the DNC

13  doesn't just abuse that relationship when it favors -- it

14  doesn't just abuse its relationship with its members who are

15  Bernie Sanders supporters, it abuses the relationship with all

16  of its members, because it's ultimately not acting according to

17  what its charter requires it to do and, I would submit,

18  according to what its position in this society as a trustee of

19  our democratic institutions requires it to do.

20          And so, I think in the long run, it hurts everybody in

21  the party.  And, you know, that may involve some factual issues

22  that are not appropriately at issue before the Court right now.

23  But I do think it's something that can be demonstrated.

24          **THE COURT:**  If there are persons who meet the

25  plaintiffs' proposed class definitions who would not have

1   standing, how could this Court certify the class?

2          **MR. BECK:**  Well, I think -- again, I think that the

3   definitions as we've set them forth in our complaint describe

4   people who do have standing for the reasons discussed.

5          That said -- and, again, this is why I think in some

6   ways these issues merit a full class certification process and

7   discovery and briefing and so forth, as opposed to an

8   alternative relief sought in a Rule 12 motion.

9          But that aside, I think that the rule, Rule 23

10  specifically, is flexible enough for courts to change class

11  definitions, certify subclasses, and so forth.  So, I think

12  it's -- I don't think it would be the first time that a

13  class -- you know, if that were to happen, if that

14  determination were made, I don't think it would be the first

15  time that a Court had determined that perhaps a class was

16  overbroad or whatnot and needed to be refined.  But, again, I

17  think those determinations are best made in the course of a

18  Rule 23 motion for class certification.

19         **THE COURT:**  Is it possible to narrow the class

20  definitions in such a way that class members are readily

21  ascertainable by objective criteria while persons who do not

22  have standing are excluded?

23         **MR. BECK:**  Well, again, I don't think I'm -- I would

24  concede the point that, as defined in the context of our

25  allegations and claims, that anybody -- that any of these

1    plaintiffs don't have standing, or any of the people who would

2    be compassed within the class definitions don't have standing.

3    That said, if it's just a matter that -- of people -- I mean

4    there are mechanisms by which people can opt out of class

5    actions.  And class definitions can also be revised throughout

6    the course of a litigation and frequently are.

7          So, it seems to me that that could be a possibility as

8    well.  But, again, I don't think that there's anything about

9    this particular class action that makes it any less susceptible

10   to being managed by the flexible tools that are available under

11   Rule 23 and at the Court's disposal.  And, again, just because

12   it happens to deal with politics as opposed to a securities

13   class action or something that's more commonly seen in

14   lawsuits.

15         **THE COURT:**  Given the nature of plaintiffs' claims,

16   will individualized issues predominate over common issues?

17         **MR. BECK:**  I don't think that's the case -- I don't

18   think that would be the case, your Honor.  Again, and I think

19   this gets back to the point that the predominant rung here is

20   the defendants' acting behind the scenes to rig a primary

21   process and not disclosing that to the public.  And, in fact,

22   making -- taking actions to conceal that from the public.

23         So because it's more an issue of what was concealed as

24   opposed to what was specifically stated, to me, that has the

25   badge of a uniform omissions case.  And my understanding of the

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

1    law in this district and the Eleventh Circuit is that cases,

2    even fraud cases, can be certified when a pattern of uniform

3    omissions is established.  And that analysis I would think

4    would apply to the fraud and negligent misrepresentation claims

5    that we've asserted.

6         **THE COURT:**  What law will the Court be applying with

7    respect to Counts 1, 2, 4, 5, and 6?

8         **MR. BECK:**  Let me confer with counsel.

9         **THE COURT:**  Go right ahead.  Take your time.  Take

10   your time.

11        *(Discussion had off the record between counsel)*

12        **THE COURT:**  Take your time.

13        *(Discussion had off the record between counsel)*

14        **MR. BECK:**  My cocounsel wanted me to correct something

15   that I stated to the Court earlier --

16        **THE COURT:**  That's all right.  Go right ahead.

17        **MR. BECK:**  -- in regards to the residence of Debbie

18   Wassermann Schultz.

19        **THE COURT:**  Citizenship.

20        **MR. BECK:**  Yes, the citizenship.  My impression is

21   that we had -- that was the only paragraph that we had

22   referenced her.  But my counsel's alerted me to the fact that

23   in paragraph 1, we specifically state that Deborah Wassermann

24   Schultz resides in and is as congresswoman representing

25   portions of this district, meaning the Southern District of

1    Florida.  So, I think that is probably sufficient to establish

2    her as a citizen of Florida.

3          But to get to the question posed by the Court just

4    now, which is what law should the Court apply to those

5    specified counts?  You know, our brief assumed Florida law or

6    D.C. law.  Again, I just -- I don't know that the record is

7    well-developed enough to make a choice of law now.  So

8    certainly I don't think it was fully briefed in the papers.

9          And my understanding is that in the course of a class

10   action, oftentimes subclasses are created which correspond to

11   the various laws invoked specifically to the various plaintiffs

12   based on their citizenship, if, in fact, that's a factor that

13   determines the choice of law analysis.  And I'm not sure,

14   again, that that issue is really before the Court now.

15         We cited, I think, one case in our brief which

16   suggested that courts ought to await a more fully developed

17   factual record before engaging in those determinations.  So, I

18   guess at this stage, we would rest on the position in our

19   briefs to assume that Florida or D.C. law applies to those

20   counts, but without waiving any argument that other laws may

21   not apply to those class members as well.

22         **THE COURT:**  If my count is accurate, taking it -- that

23   count coming from the first-amended complaint, assuming

24   arguendo that the Court must apply 46 different jurisdictions'

25   laws to this case, would a class action be manageable?

1    **MR. BECK:**  I think there are cases that address that

2    issue in the class certification analysis.  And oftentimes it

3    depends on the -- whether or not there are material differences

4    in the various laws being applied such that manageability

5    becomes a problem.

6         I guess without delving into the -- what may be the

7    material differences for those counts -- and I don't know that

8    there are any -- but, again, that's a -- you know, I think

9    that's an issue that comes up on Rule 23 -- in the context of a

10   Rule 23 motion.  And I think, you know, in making that

11   determination, the Court is probably best -- would benefit most

12   from having full briefing and discovery on those specific

13   issues as they relate to class certification.

14        **THE COURT:**  And, again, assuming arguendo that the

15   Court must apply 46 different jurisdictions' laws to this case,

16   are there questions of law common to all members of each class?

17        **MR. BECK:**  Yes, I do think that regardless of

18   whether -- how many states' laws would ultimately apply, the

19   issues of law -- I mean, it would surprise me that there is --

20   that if the law of fraud, the law of negligent

21   misrepresentation, the law of unjust enrichment, the law of

22   negligence as it applies to the data breach claim -- I mean it

23   would surprise me if the elements of those laws varied so

24   considerably from state to state that they presented issues

25   that threatened commonality in a Rule 23 analysis.

1          But, again, I would state that I think we can -- I

2     think that question would probably benefit most from a class

3     certification brief that directly addressed those issues and

4     analyzed whatever differences there are between the state laws

5     at issue, because I don't know that there are material enough

6     differences to create a manageability issue in this case.

7          **THE COURT:**  And then, finally, what evidence do the

8     plaintiffs anticipate discovery would yield regarding

9     certification of each of the proposed classes?

10         **MR. BECK:**  Well, I think that discovery in terms of

11    the class certification issues would proceed -- I mean I think

12    it would address each of the class 23 elements that we'd need

13    to prove to prevail on a motion for class certification.  So, I

14    think we would be addressing issues of commonality, typicality,

15    predominance, superiority, manageability, all of the standards

16    issues.  I think that we would be creating a -- obviously, I

17    mean I wouldn't be surprised if the defendants would be

18    conducting discovery of our class representatives -- usually

19    they do something like that from their end.  So I think that

20    would be part of the process.

21         But from our end, we would be taking document

22    discovery that we at this point anticipate would fill in the

23    details of what we've already alleged in the complaint, which

24    is that there was a systematic, unified, and overarching effort

25    to work behind the scenes to advance Hillary Clinton's

1  candidacy to the nomination.  And so, from the perspective of

2  commonality, from the perspective of whether any of those

3  common issues predominate in the analysis, which ultimately we

4  would have to show on a Rule 23, those would be the issues that

5  would be addressed in the discovery process.

6          **THE COURT:**  All right, Counsel.  Thank you very much.

7  I appreciate your answers.

8          **MR. BECK:**  Thank you, your Honor.

9          **THE COURT:**  All right.  Let me hear from the defense.

10         **MR. SPIVA:**  All rightee.

11  Thank you, your Honor.

12         I'll just kind of quickly go through the questions.

13         **THE COURT:**  Take your time.

14         **MR. SPIVA:**  All right.

15         **THE COURT:**  We're not going anywhere.

16         **MR. SPIVA:**  So, I think you already got an answer to

17  the question about whether all the plaintiffs are diverse from

18  each defendant; they are not.

19         And then, are there Bernie Sanders donors who would

20  not have standing, was I think the first question after that

21  your Honor asked.  And clearly there are.  I mean -- and

22  clearly the only way to find out would be to do an

23  individualized inquiry of each of them.  Because here, where

24  we're talking about reliance, we're talking about knowledge,

25  we're talking about motive, not only the defendants' alleged

```
 1    motive, but the motive of these individuals.  I mean, Bernie
 2    Sanders himself endorsed, voted for, campaigned for Hillary
 3    Clinton.  And so, presumably, he donated to his own campaign,
 4    and I assume he wouldn't -- would not consider himself to be a
 5    member of this class.  And there are other donors.  There are
 6    millions of Bernie Sanders donors and voters who voted for
 7    Hillary Clinton.  And so, those people would not have standing
 8    to bring this suit.  They would have no injury.
 9           There are many Bernie Sanders donors who gave because
10    they thought the system was rigged, to use Donald Trump's
11    phrase, or that it was an unfair system and they wouldn't have
12    standing.
13           So, I think clearly there would.  And the greater
14    problem, your Honor, is that the only way to find out would be
15    to invade -- you know, to query each one of them and invade
16    their privacy and First Amendment rights and, on the other
17    hand, invade the privacy -- rather, the First Amendment rights
18    of the party.  And we heard again and again --
19           THE COURT:  Just slow down a little bit for the --
20           MR. SPIVA:  Sure.
21           We heard again and again that certain questions could
22    be potentially resolved through discovery, and one can only
23    imagine how burdensome this discovery would be.  Counsel didn't
24    actually specify what types of information that counsel thought
25    he would discover.  But, clearly, there's a contemplation of
```

1  going through the files of the DNC and trying to explore what

2  the strategy and internal workings of the party was.  Clearly,

3  protected by the First Amendment.

4        And, of course, we would need to seek discovery of the

5  Sanders campaign and the individuals who gave to

6  Senator Sanders and individuals who gave to the DNC, and they

7  have a First Amendment right not to be questioned in that way.

8        So, to answer your Honor's second question, a Bernie

9  Sanders supporter who donated to the campaign because of a

10 perceived bias also would not have standing.

11       There was also a phrase that kind of pervaded

12 counsel's last presentation about -- it's kind of shifted from

13 the allegations in the complaint, which is that the DNC and

14 Congresswoman Wassermann Schultz deviated from the bylaws in

15 showing impartiality and evenhandedness to a focus on the

16 results being predetermined.

17       There's really no allegation in the complaint that the

18 results were predetermined, nor could there be.  I mean

19 millions more people voted for Secretary Clinton than voted for

20 Senator Sanders.  And those individuals certainly wouldn't have

21 standing, even though they would fall within one of the

22 subclasses that have been articulated.

23       And one of the answers to that question that your

24 Honor was given, was that it's not plausible that someone would

25 give to the Sanders campaign if they viewed the system as

```
1    rigged.  But I think actually the opposite conclusion is more
2    logical and certainly apparent, that you would to try to beat
3    the system, if you viewed it as rigged.
4          Your Honor asked whether there are DNC donors who
5    would not have standing.  And, clearly, there would be.  I
6    mean, clearly, there are millions of people who voted for
7    Secretary Clinton and gave to the DNC in both the primary and
8    the general, and they would not have standing, because they
9    haven't been injured.  And they don't agree with the point of
10   view of the plaintiffs in the lawsuit.
11         You asked whether a person who gave to the DNC without
12   having read the DNC's charter were -- any of the allegations
13   where the DNC was alleged to have made statements about
14   neutrality, would that person have standing?  Well, there
15   couldn't be reliance if they didn't have any knowledge of the
16   statement.  So that person would also not have standing.
17         And then your Honor asked that if there are members of
18   the plaintiffs' proposed classes that would not have standing,
19   how can the Court certify the class?  And, again, the answer
20   was discovery, your Honor.  But I think the answer is actually
21   that really wouldn't be proper to certify a class where certain
22   members of the proposed class don't have standing, and where
23   the only way to determine whether they do is to actually, you
24   know, take discovery from each individual.
25         And that's not gonna change.  That's the thing.  If
```

```
 1   they're allowed to amend again, that is always going to be the

 2   case, that there are gonna be some people in these classes as

 3   proposed who do not have standing, and the only way to

 4   determine that is to ask them individually.

 5          And that goes to the next question your Honor asked,

 6   which is potentially changing the class definitions.  And I

 7   think counsel had said that it's not infrequent that class

 8   definitions get narrowed or defined, and that is not -- it's

 9   not that it doesn't ever happen, for sure, but at the same

10   time, it's still the plaintiffs' burden to identify an

11   ascertainable class, one that's manageable, that -- where

12   common issues predominate.  And none of that's the case here,

13   your Honor.

14          And answering your Honor's next question, it really

15   isn't possible to narrow these class definitions so that the

16   class is ascertainable by objective criteria.  All of the

17   allegations in the complaint, and certainly all the statements

18   made today, are shot through with subjective determinations,

19   which can only be resolved through individualized discovery and

20   trial.

21          There was an analogy to securities class actions,

22   which I'd submit, your Honor, is wildly different from the

23   political realm here with the First Amendment issues that

24   we've -- that I talked about, where it's potentially the only

25   place where you have a notion of fraud on the market, you know,
```

1   such that reliance can, in certain circumstances, be presumed

2   totally different and inapplicable and an inapt analogy to this

3   situation.

4        Your Honor asked whether individual issues would

5   predominate over common issues.  I think the answer is clearly

6   yes.  I've kind of covered that, so I won't go over that again.

7        Your Honor asked about choice of law, and what law the

8   Court would apply to Counts 1, 2, 4, and 6.

9        **THE COURT:**  Five.

10       **MR. SPIVA:**  And five, thank you.

11       And -- that's the breach of fiduciary duty count, yes.

12  I think that's not clear at this point.

13       And I think the answer that I heard, your Honor, was

14  basically that the plaintiffs sued the defendants, but they're

15  not gonna tell the defendants until later what law they're

16  alleged to have violated.  Because, of course, if you're not

17  saying what state's fiduciary duty law they've alleged to have

18  violated, or what state's unjust enrichment law, et cetera,

19  then you're not even meeting the basic requirements under

20  Rule 8.  And, certainly, class certification is not the stage

21  at which to decide what law applies to the claims that they're

22  asserting.  It destroys commonality; it destroys predominance.

23       And I don't think there's a case that I've ever

24  seen -- and none has been cited -- where a Court has said that

25  through the discovery process, a class with 46 states

 1    represented could -- you know, through the discovery process,

 2    we could discover what law applies.  That would be totally

 3    unmanageable, your Honor.  And I submit it would have to be a

 4    violation of due process for the defendant to have to respond

 5    to that and the types of massive discovery that that would

 6    entail.

 7           And it's really their burden to figure this out in

 8    advance and put it in their complaint.  It's not something to

 9    be resolved either through class certification or through

10    discovery.

11           Your Honor asked, assuming that the Court must apply

12    the laws of 46 states, would the class action be manageable?

13    And I submit, your Honor, the question almost answers itself.

14    I mean, you know, no.  It would be, I think, an impossible

15    management problem.  It would -- there'd be no commonality, no

16    predominance.

17           And one of the answers was, it would surprise me if

18    elements of these various causes of action varied so

19    considerably as among states.  But, again, this is the

20    plaintiffs' burden to figure out at the outset.  I mean that's

21    very rare where a federal court is going to say, Well, we're

22    gonna apply a nationwide standard of contract, breach of

23    contract, for instance -- I'm just using that as an example --

24    because a breach is a breach wherever you are.  That's very

25    rare.  But, certainly, at the very least, the plaintiffs have

1   to identify those causes of action for which the law doesn't

2   vary significantly, and why they could meet the class

3   certification standards, and why it would be manageable.  It's

4   not for the Court to assume or for the plaintiffs to assume and

5   we get to it later.  That's just not proper.

6        Your Honor asked what evidence did the plaintiffs

7   anticipate discovery would yield regarding certification of

8   each of the proposed classes.  And I didn't really hear a

9   definite answer other than anything going to the various

10  Rule 23 elements, document discovery, which would fill in the

11  details.  And, again, that -- the only kind of document

12  discovery that could even conceivably be relevant to the types

13  of claims being made here would totally invade the province of

14  the party's strategizing, their internal workings, and,

15  similarly, Congresswoman Wassermann Schultz's First Amendment

16  rights as well.

17       And so -- and I think, frankly, your Honor, even if

18  that weren't an issue, there really isn't discovery that can

19  fix these problems other than individualized discovery of every

20  single plaintiff.  And so, I don't think that that's an

21  adequate answer to your Honor's question.  I don't think

22  there's discovery that can fix the problems with the complaint.

23       **THE COURT:**  All right.  Thank you.

24       Hold on for one second.

25       **MR. SPIVA:**  Thank you.

1     *(Discussion had off the record between the Court and*
2     *court reporter)*
3          **THE COURT:**  I'm gonna give the defense five minutes
4     for any additional comments, any clarification of any previous
5     answer or response, and then I'll give five minutes to the
6     plaintiff for the same.
7          **MR. SPIVA:**  Thank you, your Honor.
8          I will endeavor and I will not repeat what I've said.
9     But I think, starting with standing, this is a case where
10    plaintiffs have not met their burden to show causation of harm
11    here, that -- a particularized injury that is redressable by
12    the Court, and that that really should end the lawsuit right
13    there.
14         I think their state law claims, I guess I'll group
15    them -- the ones that focus on issues such as fiduciary duty
16    and the like, first, all suffer from the same problem, but also
17    are defective on the pleadings and would be totally
18    unmanageable in terms of a class certification.
19         And then I think what I would do, so as not to repeat,
20    because I have made these arguments, but I just want to
21    emphasize that there really is a body of case law here, I
22    think, that supports the notion that this is really not the
23    province of the courts.  This is the rough -- what we've heard
24    is the kind of thing -- you certainly heard on the Republican
25    side, you know, President Trump alleged that the Republican

1  primary was rigged.  He ended up getting more votes than the

2  other primary members and ultimately at least got more

3  electoral college votes and that's how our system works.

4      And so this is very common to have these kind of

5  inter/intraparty squabbles about doctrine, about policy, about

6  rules, about selection of delegates.  And the courts have said

7  from the *O'Brien* case to the *LaFollette* case, the *Berg v. Obama*

8  case, which I think is very -- has some very close similarities

9  to this one in terms of people saying they were duped by

10  certain statements about what the party stood for, the *Wymbs*

11  case in this circuit *vs. the Republican State Executive*

12  *Committee*, all of these cases I think come down to the same

13  thing, that really these are matters for the parties.  They are

14  private associations.  Yes, they play a big role in the

15  election of the president of the United States.  But they are

16  still private associations.  They still have a right to order

17  their own affairs.

18      If someone's not happy with the party that they've

19  been aligned with, their choice is to start another party, or

20  to give to the other party, or to give to a candidate that they

21  think will shake things up within the party.

22      But giving a donation gives no one the right to

23  succeed, to have their candidate win an election.  It doesn't

24  give them the right to tell the party how to conduct its

25  affairs or to, you know, rifle through the strategizing of the

1    party.

2          And I want to be clear, I know I've said this, but I,

3    you know -- because this has become somewhat of a public case,

4    that the defendants absolutely deny that there was any

5    unfairness here or impartiality.  But the allegations that have

6    been made are very common in terms of political process.  And

7    the courts have been clear that that is a matter for the

8    parties and for private associations, not for the courts.

9          And I think really that runs through -- that premise,

10   that precedent really runs through all of our arguments, and

11   that's the reason why there's no standing here, why there's a

12   failure to state a claim, and so why this case should be

13   dismissed with prejudice.

14         Thank you, your Honor.

15         **THE COURT:**  Thank you, Counsel.

16         **MR. BECK:**  Thank you, your Honor.  And I want to thank

17   the Court for hearing us today.

18         Counsel mentioned a concept that's familiar in the

19   context of securities actions known as fraud on the market.

20   And his suggestion was that this -- to paraphrase him -- that

21   this case is -- invokes principles that are wildly different to

22   fraud on the market cases that make that analogy inappropriate.

23         Well, I think that it's an extraordinarily appropriate

24   analogy.  We're talking about the political market here.  This

25   is fraud on the political market.  The DNC, by virtue of how

1  the democracy of this country has developed over history, is

2  one of two parties in a two-party democratic system that

3  essentially has custody over the market for how candidates are

4  chosen and elected and nominated and ultimately run in general

5  elections.

6       And the shareholders in this case are not people that

7  have purchased stock or purchased shares in a company, but

8  they've bought into this political process, because at bottom,

9  they believe in American democracy and that we live in a

10  democratic system.  And they bought into the process how?  By

11  donating their money to candidates.  In this case, they've

12  donated to Bernie Sanders' campaign.  But this is how people

13  participate in the political process these days aside from

14  voting.  And they've also registered as democrats, because that

15  was the party that they chose to align themselves.

16       And in making those decisions and undertaking those

17  actions, I submit that they're no different than people that

18  purchase shares of stock believing that the company is a good

19  investment.  I see no reason that somebody would take their

20  hard-earned money and throw it at a candidate in a democratic

21  primary knowing full well that the outcome was predetermined.

22       And I know my friend on the other side takes issue

23  with my use of the word "predetermined" to describe this

24  election, but I think it's entirely inappropriate *(sic)*,

25  because it captures the state of where we are as a country

1    today, which is to say that when you have one of the two major

2    political parties working hand in glove with all of the arrayed

3    media outlets that are in the position of disseminating

4    information to the American public, and they are engaged in a

5    concerted effort to advance one candidate at the expense of the

6    other candidates in the field, I submit that that outcome is

7    nothing other than predetermined.  And to say anything less is

8    to undersell the power of politics and media in this country.

9         It may be that we've reached a dire state of affairs

10   in this country politically.  When I heard counsel state that

11   it would be more likely for somebody to donate to a candidate

12   if they thought the process was rigged, that made me really

13   sad, actually.  I mean I'm somebody that's donated to political

14   campaigns.  I know a lot of people who have donated to

15   political campaigns.  And when I made those donations, I never

16   suspected or believed that the process was rigged in the way

17   that we allege that this process was rigged in the complaint.

18        If it's the case that an entity, the DNC, its

19   chairperson can rig an election, and there's no remedy at law

20   for people who've made financial contributions on the basis of

21   what they've omitted to tell the public, well, I submit that

22   that's a really dire road for this country to be on.  But what

23   gives me hope is that we have an ancient tradition of common

24   law in this country that goes back even well before the

25   founding of this republic and protects against fraud and

1  protects against deceit.  And it makes no exception for people

2  who are in the political realm.  And it doesn't offer blanket

3  immunity for people to make misrepresentations simply because

4  those representations are made in the context of a political

5  campaign.

6       **THE COURT:**  One minute.

7       **MR. BECK:**  And they've said that -- and, again, I

8  think all of their arguments as to why -- against us having the

9  right to conduct discovery fall back on this First Amendment

10 argument, which I submit to the Court is a fiction.

11      And I just want to close with this.  We're not seeking

12 to undo the results of an election.  We're not seeking -- we're

13 not sitting here saying that Bernie Sanders should be the

14 nominee, and there should be a do-over.  We're not asking for

15 relief like that.  Our relief is confined to remedying the

16 injuries that we've identified in this complaint, which are

17 very concrete and tied to the payment of money and membership

18 in a political party, and are not tied to any of these voter

19 standing-type theories, which you see in all the cases, or many

20 of the cases that they've cited, where a person tries to

21 enforce a political promise or -- for instance, I think an

22 example was given of a promise made by President Trump.  None

23 of that is remotely at issue here.

24      We're talking specifically about people who bought in

25 to the political process by donating money, by registering as

1   democrats.  If there is no possibility of judicial or legal

2   relief for those individuals, then I submit that the prospects

3   for democracy in this country are dark indeed.

4            Thank you, your Honor.

5            **THE COURT:**  All right.  Thank you very much.

6            Well, I want to thank counsel for your responses to

7   the Court's questions.  They've been very helpful.  This is a

8   very interesting case, to say the least.  And counsel for the

9   plaintiffs spoke about whether or not our society -- these are

10  the Court's words, not his words, he did not use the word

11  "society" -- but whether society is in a dire situation.  And

12  so I leave the lawyers with this.  Democracy demands the truth

13  so people can make intelligent decisions.

14           Everyone have a safe trip back and I'll be putting

15  together an order based on the arguments presented here today.

16           I'll be candid with you, that's gonna take some time.

17  The legal issues are complex for the Court to consider and to

18  rule upon.

19           So everyone have a safe trip back and everyone have a

20  great week.

21           There being no further business, this session of the

22  court is adjourned.

23           **MR. SPIVA:**  Thank you, your Honor.

24           **THE COURT:**  Take care.

25           **MR. BECK:**  Thank you, your Honor.

1          **MR. O'BRIEN:**  Thank you, Judge.

2          **THE COURT:**  Go ahead.  Court's in recess.

3          *(The Judge exited the courtroom)*

4          *(Proceedings concluded at 5:20 p.m.)*

5                              -   -   -   -   -

6

7

8

9

10

11

12

13

14

15

16

17

18

19                    C E R T I F I C A T E

20    I certify that the foregoing is a correct transcript from

21    the record of proceedings in the above-entitled matter.

22

23
     ___/S/Francine C. Salopek_____        _____4-28-17_____
24    Francine C. Salopek, RMR-CRR           Date
      Official Court Reporter
25

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

'

**'80s [1]** 28/11
**'s [1]** 51/25

**/**

**/S/Francine [1]** 110/23

**1**

**1-6-0 [1]** 41/11
**109 [2]** 54/11 67/18
**11 [1]** 67/23
**12 [40]**
**12485 [1]** 2/3
**13 [2]** 4/13 4/16
**137th [1]** 2/3
**154 [1]** 84/9
**159 [2]** 14/10 54/24
**16-61511-CIV-WJZ [1]** 1/4
**160 [2]** 41/11 87/5
**161 [1]** 57/4
**17 [1]** 110/23
**171 [1]** 57/5
**18 [1]** 80/4
**187 [4]** 56/2 56/16 56/25 68/12
**188 [4]** 41/18 45/13 53/14 67/7
**194 [4]** 56/6 56/16 56/25 68/12
**195 [4]** 41/18 45/13 53/14 67/7
**1:24 [2]** 1/7 3/1

**2**

**2.0 [3]** 16/2 16/15 17/23
**2004 [1]** 60/25
**2006 [1]** 11/4
**2013 [1]** 79/25
**2014 [1]** 80/3
**2015 [3]** 4/13 4/16 63/7
**2015-2016 [1]** 4/21
**2016 [6]** 4/13 4/17 4/21 13/3 15/16
15/23
**2017 [2]** 1/7 3/1
**204 [1]** 56/8
**205 [1]** 2/4
**205F [1]** 2/15
**210 [1]** 56/10
**216 [1]** 56/13
**21st [1]** 2/6
**23 [15]** 73/25 73/25 75/12 80/10 82/13
82/21 89/9 89/18 90/11 93/9 93/10
93/25 94/12 95/4 102/10
**25 [2]** 1/7 3/1
**299 [1]** 2/15
**2:50 [1]** 47/25

**3**

**3.95 percent [3]** 21/23 60/4 61/8
**3091 [1]** 59/23
**33131 [1]** 2/10
**33186 [1]** 2/4
**33301 [1]** 2/10
**33308 [1]** 2/7
**33601 [1]** 2/13
**3901 [1]** 59/22
**3904 [1]** 5/5
**3905 [1]** 59/13
**3:06 [1]** 47/25

**4**

**4-28-17 [1]** 110/23

**45 [1]** 4/10
**46 [4]** 92/24 93/15 100/25 101/12

**5**

**55 [1]** 84/2
**5:20 [1]** 110/4

**6**

**601 [1]** 2/12
**623 [1]** 39/1
**6541 [1]** 2/6

**7**

**769-5657/mjsfcs [1]** 2/16

**8**

**87 [1]** 84/2

**9**

**90 percent [1]** 24/11
**954 [1]** 2/16

**A**

**abide [1]** 32/17
**abiding [1]** 33/12
**above [2]** 40/18 110/21
**above-entitled [1]** 110/21
**absolute [1]** 10/5
**absolutely [1]** 105/4
**abstract [1]** 18/10
**abuse [2]** 88/13 88/14
**abuses [1]** 88/15
**accept [1]** 49/13
**access [1]** 15/25
**accessed [1]** 55/14
**accordance [2]** 18/7 18/7
**according [5]** 4/8 63/19 65/7 88/16
88/18
**account [1]** 52/8
**accurate [1]** 92/22
**accused [2]** 10/2 10/3
**act [10]** 14/7 59/8 68/24 68/24 69/8
69/21 70/5 70/13 72/1 79/18
**ActBlue [1]** 21/22 21/25 59/25 60/3
60/6 60/17 61/7 62/2 69/18 69/21 69/24
69/25 70/3
**ActBlue's [1]** 69/17
**acted [1]** 28/19
**acting [6]** 14/16 17/18 18/6 18/7 88/16
90/20
**action [32]**
**actions [10]** 11/7 29/16 45/23 73/12
80/25 90/5 90/22 99/21 105/19 106/17
**actively [1]** 57/11
**activities [4]** 23/10 24/23 46/20 54/7
**activity [4]** 54/13 54/17 54/19 54/21
**add [1]** 79/12
**addition [3]** 69/16 74/24 79/19
**address [8]** 7/11 23/2 29/12 73/1 74/3
80/21 93/1 94/12
**addressed [6]** 70/17 70/24 80/1 81/3
94/3 95/5
**addressing [4]** 25/19 79/13 82/15
94/14
**adequate [3]** 32/22 55/17 102/21
**adequately [2]** 32/20 55/18
**adjourned [1]** 109/22
**adjudicating [1]** 30/25
**admits [1]** 11/14

**Admittedly [1]** 62/22
**adopt [1]** 8/2
**adopted [1]** 26/23
**advance [8]** 16/12 16/24 17/1 57/24
58/20 94/25 101/8 107/5
**advances [1]** 11/1
**advancing [1]** 16/5
**advantage [1]** 10/11
**advantaged [1]** 35/7
**affairs [7]** 28/23 30/4 33/11 46/13
104/17 104/25 107/9
**affected [1]** 9/7
**affiliate [1]** 42/22
**affirmative [1]** 52/17
**affirmed [1]** 36/9
**after-school [1]** 33/1
**afternoon [9]** 3/3 3/14 3/15 3/19 3/20
6/4 9/24 9/25 45/1
**age [1]** 87/17
**agree [4]** 42/4 84/3 84/15 98/9
**akin [1]** 71/15
**AL [2]** 1/5 1/9
**alerted [1]** 91/22
**align [1]** 106/15
**aligned [1]** 104/19
**allegation [16]** 7/8 42/5 43/25 44/18
44/22 45/5 56/5 66/15 66/16 67/14
67/25 68/20 72/24 84/7 84/13 97/17
**allegations [59]**
**allege [8]** 34/4 40/22 41/19 42/7 55/24
68/9 68/9 107/17
**alleged [33]**
**allegedly [2]** 69/25 73/12
**alleges [4]** 26/5 56/1 82/11 85/11
**alleging [6]** 12/24 12/25 12/25 26/2
85/25 86/1
**allow [1]** 51/17
**allowed [1]** 99/1
**allows [3]** 51/16 61/19 80/10
**alluding [1]** 24/24
**almost [1]** 101/13
**alone [3]** 44/20 45/17 75/10
**alter [1]** 50/20
**alternative [4]** 34/18 78/20 78/24 89/8
**although [2]** 35/9 44/7
**amend [1]** 99/1
**amended [16]** 4/8 5/12 5/17 14/11
41/11 42/15 45/14 52/15 53/15 56/5
66/14 67/8 76/3 76/24 87/5 92/23
**Amendment [28]**
**American [3]** 12/19 106/9 107/4
**amount [2]** 54/15 74/21 78/9
**analogy [6]** 64/20 66/2 99/21 100/2
105/22 105/24
**analysis [10]** 39/18 39/18 62/25 70/11
71/2 91/3 92/13 93/2 93/25 95/3
**analyzed [1]** 94/4
**ancient [2]** 10/7 107/23
**announced [1]** 16/8
**answer [26]**
**answers [9]** 26/12 37/10 37/12 43/9
66/25 95/7 97/23 101/13 101/17
**Antcliff [1]** 60/24
**anticipate [4]** 50/2 94/8 94/22 102/7
**antifraud [1]** 39/10
**Antonino [2]** 2/8 2/8
**Antonio [1]** 3/10
**aol.com [1]** 2/16
**apologize [2]** 13/11 53/24

## A

**apparent [2]** 40/24 98/2
**appearances [2]** 2/1 3/5
**application [1]** 21/22
**applied [1]** 93/4
**applies [8]** 63/21 67/10 70/21 79/19 92/19 93/22 100/21 101/2
**apply [20]** 48/19 48/22 49/5 63/3 69/6 70/5 70/8 70/12 71/25 72/14 72/18 91/4 92/4 92/21 92/24 93/15 93/18 100/8 101/11 101/22
**applying [1]** 91/6
**appreciate [1]** 95/7
**apprise [1]** 70/22
**appropriately [1]** 88/22
**April [2]** 1/7 3/1
**area [1]** 33/8
**areas [2]** 47/16 48/3
**aren't [2]** 65/15 74/14
**argue [4]** 5/15 5/16 5/18 51/7
**arguendo [3]** 75/25 92/24 93/14
**arguing [1]** 51/8 51/9
**argument [9]** 13/19 20/6 20/8 44/8 75/1 78/2 79/8 92/20 108/10
**arguments [25]**
**arises [2]** 4/20 7/20
**arrayed [1]** 107/2
**article [11]** 7/22 11/24 14/4 14/5 14/25 26/17 35/23 38/10 40/4 43/1 87/13
**Article III [6]** 11/24 14/25 26/17 38/10 40/4 43/1
**Article IV [1]** 14/4
**Article V [3]** 7/22 14/5 35/23
**articles [1]** 88/3
**articulated [2]** 79/22 97/22
**ascertain [1]** 19/4
**ascertainability [1]** 45/25
**ascertainable [4]** 74/20 89/21 99/11 99/16
**aspect [3]** 29/20 79/10 83/3
**asserted [2]** 70/23 91/5
**asserting [1]** 100/22
**assisting [1]** 30/18
**associate [1]** 36/5
**associated [1]** 66/16
**association [5]** 8/23 10/9 12/5 28/8 82/9
**associational [1]** 74/10
**associations [3]** 104/14 104/16 105/8
**assume [7]** 13/4 13/5 76/17 92/19 96/4 102/4 102/4
**assumed [1]** 92/5
**assuming [8]** 50/4 73/24 74/1 75/25 76/4 92/23 93/14 101/11
**assumption [5]** 13/4 14/1 63/24 81/7 86/18
**assure [1]** 59/11
**attacked [1]** 4/23
**attract [1]** 28/14
**aura [1]** 17/9
**auspices [1]** 61/16
**authoritative [2]** 71/21 71/23
**authority [1]** 80/19
**avail [1]** 50/23
**Avenue [1]** 2/3
**avoid [1]** 75/14
**avoiding [1]** 52/4
**await [1]** 92/16

## B

**backflips [1]** 13/18
**badge [1]** 90/25
**ballot [2]** 23/14 25/4
**Bank [1]** 79/24
**Baptist [1]** 27/3
**bar [1]** 48/11
**barred [1]** 51/25
**baseline [1]** 86/17
**basic [3]** 11/19 11/20 100/19
**basis [18]** 8/5 9/12 12/16 12/17 18/18 18/21 18/22 31/16 40/19 41/1 58/16 70/15 71/17 72/14 75/21 86/6 86/21 107/20
**bat [1]** 49/17
**battle [1]** 15/10
**Beach [1]** 45/3
**bearer [2]** 36/6 36/20
**bearing [1]** 22/9
**beat [1]** 98/2
**Beck [3]** 2/2 2/3 6
**becomes [2]** 60/10 93/5
**bedrock [5]** 12/18 13/4 13/25 14/2 30/7
**begin [2]** 6/18 8/2
**beginning [2]** 55/22 67/5
**behavior [1]** 24/22
**behind [9]** 7/7 52/6 52/23 55/12 58/13 81/8 87/12 90/20 94/25
**belief [1]** 14/24
**believe [25]**
**believed [3]** 41/10 45/11 107/16
**believes [1]** 37/22
**believing [2]** 63/15 106/18
**benefit [3]** 82/25 93/11 94/2
**Benz [1]** 33/3
**Berg [1]** 104/7
**Berg v. Obama [1]** 104/7
**Bernie [30]**
**besides [1]** 39/25
**Beverly [2]** 2/2 3/12
**beyond [1]** 18/18
**bias [4]** 4/20 27/6 57/12 84/24 85/5 97/10
**biased [3]** 55/21 57/9 87/20
**black [1]** 13/8
**blanket [1]** 108/2
**Blvd [1]** 2/15
**board [4]** 10/19 66/3 66/5 66/6
**body [2]** 81/6 103/21
**boils [1]** 32/2
**bottom [1]** 106/8
**bought [4]** 33/3 106/8 106/10 108/24
**Boulevard [1]** 2/12
**branch [1]** 31/12
**Brazile [1]** 16/25
**breach [21]** 5/9 18/24 19/13 22/14 41/24 42/17 42/19 42/23 42/23 44/18 56/13 66/14 72/23 72/25 73/2 73/7 93/22 100/11 101/22 101/24 101/24
**breached [4]** 7/5 31/19 44/20 45/6
**breaches [1]** 66/21
**breadth [1]** 29/17
**break [1]** 47/15
**brief [12]** 4/5 6/15 34/22 42/4 49/8 60/24 69/2 80/4 83/1 92/5 92/15 94/3
**briefed [2]** 53/9 92/8
**briefing [3]** 70/24 89/7 93/12
**briefs [3]** 40/2 45/4 92/19

## C

**broad [7]** 21/18 22/10 45/14 59/3 59/4 59/8 61/4
**broadly [1]** 59/10
**Broward [1]** 2/15
**Bruce [2]** 2/11 3/15
**brush [1]** 15/9
**build [1]** 46/24
**burden [5]** 72/13 99/10 101/7 101/20 103/10
**burdens [1]** 8/21
**burdensome [1]** 96/23
**Bush's [1]** 35/18
**business [5]** 27/12 29/1 59/19 77/14 109/21
**Button [1]** 46/4
**bylaws [2]** 7/19 97/14

## C

**CAFA [4]** 77/6 81/19 81/23 82/4
**called [3]** 21/22 59/25 86/7
**calling [3]** 3/4 66/7 66/9
**Calvetti [1]** 60/24
**Calvetti vs. Antcliff [1]** 60/24
**campaign [45]**
**campaigned [2]** 34/21 96/2
**campaigns [5]** 74/14 74/14 74/17 107/14 107/15
**candid [1]** 109/16
**candidacy [6]** 16/13 17/10 57/10 57/11 58/20 95/1
**candidate [21]** 25/6 26/11 27/14 27/14 28/24 30/17 30/19 35/7 35/7 35/16 36/24 57/9 61/10 81/6 87/1 87/23 104/20 104/23 106/20 107/5 107/11 104/20 104/23 106/20 107/5 107/11
**candidates [16]** 7/7 7/21 12/9 17/16 23/10 23/11 23/14 24/20 25/3 71/11 72/9 86/15 87/24 106/3 106/11 107/6
**captures [1]** 106/25
**Caramanica [2]** 2/11 3/17
**careless [1]** 11/1
**Carelogistics [1]** 49/7
**CAROL [1]** 1/5
**carried [2]** 59/11 63/25
**carry [1]** 80/6
**Case v [1]** 45/3
**Case v. Miami [1]** 44/23
**cast [1]** 39/18
**category [1]** 55/7
**causal [1]** 15/1
**causation [7]** 8/25 33/25 34/7 34/13 34/21 34/23 103/10
**cause [10]** 38/22 38/23 38/23 38/24 51/8 60/11 60/15 62/9 73/13 79/11
**causes [3]** 4/24 101/18 102/1
**central [1]** 11/16
**CEO [1]** 73/10
**certifiable [1]** 75/18
**certification [27]**
**certified [1]** 91/2
**certify [6]** 80/25 89/1 89/11 98/19 98/21 110/20
**cetera [1]** 100/18
**chain [1]** 22/4
**chair [2]** 16/25 17/18
**chair-throwing [1]** 17/18
**chairperson [3]** 7/1 14/7 107/19
**chairwoman [1]** 22/5
**challenge [3]** 20/20 28/1 75/2
**challenges [1]** 20/11

**C**

**chance [1]** 83/1
**characterize [1]** 69/13
**charged [1]** 61/8
**charges [4]** 21/23 60/4 69/21 70/3
**charitable [7]** 32/13 32/24 38/16 38/18
 38/24 39/4 39/14
**charity [1]** 36/15
**chart [1]** 77/24
**charter [31]**
**charters [1]** 22/8
**check [3]** 77/7 87/1 87/23
**chilling [1]** 46/19
**choice [8]** 62/24 70/11 71/1 82/20 92/7
 92/13 100/7 104/19
**choices [2]** 39/4 43/16
**choose [3]** 36/6 36/19 43/12
**chose [4]** 20/19 42/21 53/2 106/15
**chosen [1]** 106/4
**cigars [1]** 36/23
**circuit [20]** 22/17 22/17 22/20 22/21
 22/22 26/19 28/6 42/2 42/3 42/3 42/6
 42/9 60/25 63/8 71/20 71/21 81/17 82/2
 91/1 104/11
**circumstance [5]** 32/15 32/23 33/3
 33/5 51/16
**circumstances [2]** 63/12 100/1
**cite [3]** 45/4 48/18 79/2
**cited [16]** 14/17 19/14 22/2 40/2 42/4
 49/7 55/11 60/23 62/18 64/5 71/20
 79/23 88/3 92/15 100/24 108/20
**citing [1]** 31/4
**citizen [1]** 92/2
**citizenship [6]** 83/12 84/7 84/14 91/19
 91/20 92/12
**CIV [1]** 1/4
**civil [2]** 3/4 8/19
**claim [21]** 5/17 7/11 7/14 9/19 19/13
 22/11 22/11 22/13 22/13 22/19 28/19
 49/2 50/1 51/25 53/4 61/20 66/16 72/16
 88/5 93/22 105/12
**claiming [1]** 27/10
**claims [26]**
**clarification [1]** 103/4
**class [122]**
**class-wide [1]** 75/21
**classes [10]** 4/11 4/25 40/8 74/7 82/10
 87/10 94/9 98/18 99/2 102/8
**clear [9]** 11/11 16/10 33/13 51/15 64/1
 77/16 100/12 105/2 105/7
**Clinton [25]**
**Clinton's [7]** 16/13 17/10 17/14 17/15
 57/10 58/20 94/25
**clock [1]** 47/21
**close [4]** 22/12 38/12 104/8 108/11
**co [1]** 69/5
**co-obligor [1]** 69/5
**cocounsel [1]** 91/14
**code [3]** 5/6 59/13 59/23
**colleague [1]** 36/13
**collectively [1]** 78/10
**collects [1]** 24/21
**college [1]** 104/3
**Columbia [12]** 4/10 5/6 59/1 59/2 60/24
 63/8 63/9 77/13 77/18 77/20 78/13
 84/11
**comfortable [1]** 53/9
**command [2]** 65/17 65/17

**comments [6]** 43/4 47/17 48/5 50/8
 72/4 103/4
**commercial [3]** 10/20 61/13 64/13
**commission [3]** 69/17 69/22 70/3
**commitment [3]** 34/5 55/3 57/7
**committee [7]** 1/9 26/10 26/19 28/14
 30/8 30/16 104/12
**Committee's [2]** 13/7 14/15
**committees [1]** 23/20
**common [16]** 10/7 11/14 18/20 39/21
 40/7 42/24 42/24 64/25 90/16 93/16
 95/3 99/12 100/5 104/4 105/6 107/23
**common-law [7]** 10/7 11/14 18/20
 39/21 40/7 42/24 42/24
**commonality [5]** 93/25 94/14 95/2
 100/22 101/15
**commonly [1]** 90/13
**companies [1]** 64/13
**company [6]** 59/25 64/16 64/18 66/4
 106/7 106/18
**compassed [1]** 90/2
**complain [1]** 33/11
**complaint [66]**
**complete [5]** 48/7 63/1 70/4 77/20
 78/13
**complex [1]** 109/17
**compliance [1]** 14/16
**complicated [1]** 70/11
**component [1]** 27/25
**computer [2]** 1/25 60/6
**computers [1]** 55/13
**conceal [1]** 90/22
**concealed [3]** 57/12 81/8 90/23
**concealment [2]** 57/14 87/11
**concede [2]** 48/19 89/24
**conceivably [1]** 102/12
**concept [2]** 64/15 105/18
**concerned [2]** 32/1 71/9
**concerns [1]** 82/22
**concerted [1]** 107/5
**conclude [2]** 10/15 47/16
**concluded [2]** 10/16 110/4
**concludes [1]** 49/25
**conclusion [1]** 98/1
**conclusions [3]** 53/18 56/16 56/24
**concrete [9]** 27/21 35/2 35/12 42/14
 42/25 43/21 43/24 44/17 108/17
**conduct [16]** 10/14 12/17 12/20 31/13
 31/13 41/6 46/9 46/11 46/13 55/12 56/9
 80/12 83/1 88/5 104/24 108/9
**conducted [2]** 86/5 87/20
**conducting [2]** 82/7 94/18
**conducts [2]** 30/4 33/10
**confer [3]** 11/23 58/3 91/8
**confined [1]** 108/15
**Congress [1]** 31/13
**Congressman [1]** 60/18
**Congressman Wassermann [1]** 60/18
**congresswoman [15]** 7/1 7/4 14/15
 21/11 52/18 55/2 57/15 66/17 69/20
 72/19 72/22 84/10 91/24 97/14 102/15
**Congresswoman Deborah [1]** 72/19
**Congresswoman Schultz [1]** 7/4
**Congresswoman Wassermann [5]**
 14/15 21/11 69/20 97/14 102/15
**connected [4]** 61/2 61/5 61/10 62/7
**connection [13]** 15/2 15/15 21/23
 50/19 56/7 66/13 72/23 72/25 79/9
 80/13 81/10 82/20 83/3

**connections [1]** 16/12
**considerable [2]** 17/6 21/1
**considerably [2]** 93/24 101/19
**consideration [2]** 52/6 52/7
**consisted [1]** 15/25
**consistent [2]** 11/6 67/23
**consolidation [1]** 52/1
**constituent [1]** 66/11
**constitutes [2]** 28/20 41/25
**constitutional [1]** 10/24
**constitutionally [1]** 27/9
**consult [1]** 83/16
**consumer [19]** 21/17 22/10 58/25 59/3
 59/7 59/14 59/15 59/19 59/20 61/2 61/8
 61/11 68/23 68/24 69/2 69/4 69/8 70/13
 71/25
**consumers [7]** 21/20 59/8 60/2 60/9
 60/11 70/14 70/14
**consummate [1]** 62/2
**contain [1]** 84/12
**contains [1]** 82/14
**contemplates [1]** 80/11
**contemplation [1]** 96/25
**contend [1]** 51/24
**content [1]** 21/2
**context [19]** 10/15 11/13 14/21 15/21
 36/15 38/12 38/17 39/16 47/4 51/19
 64/12 64/12 80/25 81/21 86/5 89/24
 93/9 105/19 108/4
**contract [4]** 60/14 73/8 101/22 101/23
**contractual [1]** 35/8
**contrary [3]** 55/16 55/16 80/10
**contravention [1]** 10/17
**contributed [3]** 4/12 4/15 54/9
**contribution [2]** 54/14 62/3
**contributions [9]** 38/18 39/5 39/14
 39/14 40/17 40/20 46/15 81/5 107/20
**controversy [1]** 78/9
**convention [5]** 15/24 23/22 23/22
 27/22 28/9
**convert [1]** 69/22
**coordinate [1]** 24/17
**coordinates [2]** 23/9 25/2
**coordinating [2]** 17/13 23/12
**coordination [1]** 23/20
**copy [1]** 83/13
**core [2]** 12/15 16/3
**corners [1]** 86/6
**CORP [2]** 1/8 4/7
**corporation [4]** 63/2 66/3 71/16 73/10
**corporations [3]** 64/13 65/9 74/15
**corpus [1]** 56/19
**correspond [1]** 92/10
**counsel [47]**
**counsel's [4]** 13/17 13/18 91/22 97/12
**count [17]** 5/1 5/3 5/8 5/9 5/11 18/25
 41/22 41/23 41/24 42/18 42/18 56/6
 56/11 56/13 92/22 92/23 100/11
**Count 1 [1]** 5/1
**Count 2 [1]** 5/3
**Count 4 [1]** 5/8
**Count 5 [1]** 5/9
**Count 6 [3]** 5/11 41/22 41/23
**country [13]** 12/22 19/6 37/21 70/9
 70/14 87/17 106/1 106/25 107/8 107/10
 107/22 107/24 109/3
**country's [2]** 18/9 37/24
**counts [8]** 53/23 54/18 56/8 91/7 92/5
 92/20 93/7 100/8

**C**

Counts 1 [2]  91/7 100/8
court [118]
Court's [11]  28/17 38/19 39/18 47/18
 47/22 50/10 79/12 90/11 109/7 109/10
 110/2
courtroom [5]  3/2 47/21 47/24 48/1
 110/3
courts [20]  8/18 8/19 11/22 26/16
 26/20 27/7 29/23 29/24 31/20 36/9
 36/11 46/5 62/19 71/23 89/10 92/16
 103/23 104/6 105/7 105/8
Cousins [1]  36/8
Cousins v. Wigoda [1]  36/8
cover [6]  3/23 6/8 6/20 21/19 29/17
 48/3
covered [4]  34/25 47/5 47/5 100/6
covers [1]  23/1
CPPA [5]  21/16 59/12 60/3 61/1 69/2
crafting [1]  30/19
create [3]  46/22 71/18 94/6
created [7]  14/24 18/15 38/9 57/16
 72/6 86/21 92/10
creates [1]  47/1
creating [2]  16/23 94/16
creation [1]  17/9
credit [1]  59/19
criteria [2]  89/21 99/16
CRR [2]  2/14 110/24
crushed [1]  17/11
crux [1]  7/3
crystallize [1]  51/10
Cullin [3]  2/5 2/6 3/8
custodian [2]  18/8 63/16
custody [1]  106/3
cuts [1]  49/9
cutting [1]  87/23
cyclical [1]  41/1

**D**

D.C [27]
D.C. [3]  59/6 71/20 71/21
D.C. Circuit [2]  71/20 71/21
D.C. Superior [1]  59/6
d/b/a [1]  1/8
damages [9]  12/11 15/6 15/18 40/16
 40/17 40/19 46/14 46/16 46/17
dark [1]  109/3
data [20]  22/14 22/15 22/18 22/19
 22/24 24/20 24/21 24/22 41/24 41/25
 44/18 44/20 45/5 66/14 66/20 72/23
 72/25 73/1 73/7 93/22
data's [1]  42/8
Date [1]  110/24
dealt [2]  23/19 81/16
debate [4]  11/2 16/25 27/5 33/8
debates [2]  17/4 24/19
Debbie [4]  7/1 17/19 62/6 91/17
Deborah [5]  4/7 66/13 72/19 84/7 91/23
deceit [1]  108/1
deceive [1]  11/9
deceived [4]  10/12 11/15 39/21 88/4
deception [1]  55/8
decide [8]  28/8 28/16 29/24 31/3 36/3
 36/11 79/14 100/21
decided [7]  11/21 12/3 27/21 28/11
 36/22 62/23 83/4
decides [2]  36/5 36/6

decision [1]  45/3
decisions [5]  17/15 27/6 39/2 106/16
 109/13
deemed [2]  61/5 80/9
defect [1]  67/25
defective [1]  103/17
defendant [13]  14/24 22/4 37/18 49/11
 50/18 50/22 60/14 69/19 82/23 83/3
 85/7 95/18 101/4
defendant's [1]  22/19
defendants [35]
defendants' [10]  5/13 15/8 51/24 74/2
 76/1 78/22 80/20 82/7 90/20 95/25
defense [20]  3/21 4/1 5/22 23/5 31/7
 31/8 32/10 35/15 37/6 37/7 43/5 43/8
 48/8 48/11 50/1 50/2 66/24 73/17 95/9
 103/3
defense's [1]  53/4
defenses [2]  49/10 52/17
defer [1]  80/16
defined [9]  8/14 59/16 66/10 71/12
 82/10 82/18 87/10 89/24 99/8
definite [1]  102/9
definition [3]  19/15 63/10 63/20
definitions [10]  69/21 88/25 89/3 89/11
 89/20 90/2 90/5 99/6 99/8 99/15
defrauded [5]  10/10 11/15 39/20 67/16
 88/4
degree [1]  35/25
delegate [1]  27/22
delegates [3]  23/23 27/24 104/6
deliberately [1]  63/9
delving [1]  93/6
demand [1]  69/6
demands [1]  109/12
democracy [13]  12/16 12/16 13/5 14/1
 18/9 37/21 37/24 87/18 87/19 106/1
 106/9 109/3 109/12
democrat [3]  8/13 19/7 71/8
democratic [63]
democrats [5]  28/15 65/10 65/12
 106/14 109/1
demonstrate [1]  7/11
demonstrated [1]  88/23
denied [1]  81/25
deny [4]  13/8 18/6 85/13 105/4
denying [2]  15/3 81/21
depends [1]  93/3
deposed [1]  9/14
depositions [1]  75/9
depth [1]  46/2
describe [3]  54/25 89/3 106/23
described [5]  41/10 60/1 66/14 72/23
 87/5
describes [1]  54/24
description [2]  4/5 5/20
designed [1]  11/9
destroy [2]  77/20 78/13
destroys [3]  75/22 100/22 100/22
detail [3]  16/19 21/1 25/18
detailed [1]  67/11
details [2]  94/23 102/11
determination [5]  33/20 36/10 80/13
 89/14 93/11
determinations [5]  9/6 31/22 89/17
 92/17 99/18
determine [7]  12/8 13/31 31/14 33/20
 72/15 98/23 99/4
determined [4]  9/11 9/13 81/18 89/15

determines [1]  92/13
Deutsch [1]  79/24
developed [5]  12/20 64/23 92/7 92/16
 106/1
deviated [1]  97/14
device [1]  75/22
devoted [1]  57/10
difference [9]  14/22 22/15 35/15 35/23
 35/24 36/1 36/2 37/15 39/17
differences [4]  93/3 93/7 94/4 94/6
difficult [3]  31/2 52/20
difficulty [1]  76/16
dire [3]  107/9 107/22 109/11
direct [5]  10/17 33/10 54/11 54/23
 56/18
directed [1]  67/18
direction [1]  17/13
directly [1]  94/3
director [1]  33/1
directors [3]  66/3 66/5 66/6
directs [1]  52/13
disadvantaged [1]  35/7
disagree [1]  82/11
disagrees [1]  34/12
disappointed [1]  12/10
disclosed [1]  55/13
disclosing [1]  90/21
disclosure [1]  39/8
discover [2]  96/25 101/2
discovery [30]
discretionary [1]  8/2
discuss [1]  34/22
discussed [4]  39/15 79/9 82/21 89/4
discussing [1]  81/13
discussion [11]  47/6 58/9 64/23 65/20
 83/19 83/25 84/8 86/11 91/11 91/13
 103/1
disfavor [1]  80/15
dismiss [8]  3/21 5/12 20/17 50/2 50/5
 51/14 78/21 80/2
dismissed [3]  6/12 9/17 105/13
disposal [1]  90/11
disproved [1]  29/12
dispute [2]  30/3 30/21
disputes [3]  17/16 29/24 30/25
disregard [1]  44/15
disregards [1]  44/13
disseminating [2]  16/23 107/3
distinct [1]  4/11
distinguished [1]  36/13
distracting [3]  13/16 13/19 13/21
district [29]
diverse [3]  83/11 84/4 95/17
diversity [6]  76/19 76/21 77/5 77/21
 78/3 78/14
DIVISION [1]  1/3
DNC [122]
DNC Services [1]  4/7
DNC's [18]  4/20 4/22 7/17 16/10 22/23
 37/17 41/21 54/24 55/3 62/11 63/17
 66/20 70/19 84/24 85/5 87/4 88/5 98/12
do-over [1]  108/14
Docket [2]  4/9 5/13
doctrine [2]  33/8 104/5
document [5]  16/3 16/20 94/21 102/10
 102/11
documents [4]  15/25 16/15 17/21
 58/15
domain [8]  12/21 16/16 17/22 22/24

**D**

**domain... [4]** 41/25 45/18 55/14 65/9
**don [1]** 61/25
**Donald [1]** 96/10
**donate [4]** 32/13 38/22 57/1 107/11
**donated [11]** 41/9 44/6 45/10 84/23 84/25 87/3 96/3 97/9 106/12 107/13 107/14
**donates [2]** 60/5 61/6
**donating [7]** 58/24 61/10 68/23 69/7 69/10 106/11 108/25
**donation [8]** 21/24 32/14 35/5 47/1 59/24 60/5 86/18 104/22
**donations [8]** 11/9 14/21 21/5 69/17 70/2 70/4 70/5 107/15
**donee [1]** 32/17
**Donna [1]** 16/25
**donor's [1]** 41/24
**donor [24]**
**donors [16]** 11/9 22/23 39/3 57/12 57/12 61/22 66/20 70/16 84/18 86/12 86/23 95/19 96/5 96/6 96/9 98/4
**donors' [2]** 22/15 45/9
**drafted [2]** 15/22 15/22
**drafting [1]** 17/23
**drag [3]** 27/8 28/21 37/1
**dragged [1]** 82/16
**duped [1]** 104/9
**duties [3]** 31/18 31/19 64/13
**duty [31]**

**E**

**e-mails [1]** 16/17
**early [3]** 28/11 71/1 87/17
**earned [1]** 106/20
**easy [1]** 15/11
**economic [5]** 40/19 59/17 59/18 65/9 69/6
**economics [1]** 64/21
**effect [2]** 50/11 50/21
**efficiency [1]** 49/21
**effort [2]** 94/24 107/5
**efforts [2]** 15/8 39/3
**Eiland [1]** 63/7
**elect [1]** 25/3
**elected [1]** 106/4
**electing [1]** 23/14
**election [14]** 12/19 22/6 24/4 24/5 24/15 61/9 63/17 66/1 71/13 104/15 104/23 106/24 107/19 108/12
**elections [15]** 12/17 12/19 12/20 13/2 13/6 23/12 25/8 30/12 37/23 41/1 41/6 46/10 60/20 87/19 106/5
**electoral [1]** 104/3
**element [2]** 54/18 58/21
**elements [5]** 14/25 93/23 94/12 101/18 102/10
**Eleventh [5]** 26/19 28/6 42/9 82/1 91/1
**else's [1]** 57/10
**emphasize [2]** 32/3 103/21
**employees [1]** 14/15
**enable [1]** 39/3
**encompass [1]** 19/15
**encompassed [1]** 65/15
**encompasses [1]** 61/9
**encourage [1]** 71/10
**endeavor [1]** 103/8
**endorsed [2]** 34/20 96/2

**enforce [5]** 12/11 35/5 38/17 39/9 108/21
**enforceable [4]** 35/11 37/23 38/7 43/17
**enforced [1]** 7/16
**enforcing [1]** 12/6
**engage [1]** 62/24
**engaged [1]** 107/4
**engaging [3]** 41/5 46/9 92/17
**enmesh [1]** 75/15
**enrichment [5]** 5/8 56/11 88/5 93/21 100/18
**entail [2]** 74/12 101/6
**entails [2]** 20/12 30/11
**enterprise [2]** 64/16 65/5
**enters [1]** 11/19
**entertaining [1]** 79/20
**entirely [1]** 106/24
**entities [3]** 4/12 4/15 87/25
**entitled [2]** 60/2 110/21
**entity [7]** 22/6 60/19 61/9 64/8 65/5 72/2 107/18
**entrusted [1]** 63/23
**Entry [2]** 4/9 5/13
**equal [1]** 27/5
**error [1]** 11/1
**especially [2]** 18/23 87/22
**Esq [6]** 2/2 2/2 2/5 2/8 2/11 2/11
**essence [3]** 40/3 60/5 81/4
**essences [1]** 40/4
**essentially [9]** 17/11 19/3 23/13 37/21 57/8 61/12 73/5 75/9 106/3
**establish [3]** 34/13 72/13 92/1
**established [2]** 18/20 91/3
**estate [1]** 59/20
**et [3]** 1/5 1/9 100/18
**et cetera [1]** 100/18
**evenhanded [14]** 22/7 22/8 26/25 27/4 29/22 29/24 30/2 30/12 30/25 34/17 55/4 58/2 81/7 81/9
**evenhandedness [4]** 26/24 28/19 28/21 97/15
**event [2]** 30/23 48/7
**events [1]** 66/17
**everybody [5]** 16/13 34/20 57/10 87/21 88/20
**everyone [4]** 47/20 109/14 109/19 109/19
**evidence [4]** 15/24 16/10 94/7 102/6
**exception [3]** 10/13 11/14 108/1
**exchange [1]** 86/4
**excluded [1]** 89/22
**excuse [3]** 14/4 42/12 68/2
**executive [3]** 26/19 33/1 104/11
**exemplary [1]** 46/17
**exemption [1]** 20/10
**exercises [1]** 65/17
**exist [1]** 64/25
**existence [1]** 64/3
**exited [2]** 47/24 110/3
**expedience [2]** 52/3 52/6
**expediency [1]** 52/25
**expense [4]** 16/13 30/17 30/20 107/5
**expensive [1]** 75/8
**experience [2]** 24/13 24/13
**explains [1]** 44/1
**explore [1]** 97/1
**extends [1]** 61/1
**extent [2]** 64/7 78/24
**extraordinarily [1]** 105/23

**exuberance [1]** 13/17

**F**

**face [2]** 62/14 63/1
**facially [1]** 79/1
**fact [27]**
**factor [1]** 92/12
**factors [1]** 34/18
**facts [1]** 81/8
**factual [10]** 9/6 19/8 53/17 53/22 56/18 56/24 65/15 67/7 88/21 92/17
**fail [1]** 50/16
**failed [3]** 22/25 51/15 66/21
**fails [1]** 5/17
**failure [11]** 7/13 9/18 46/23 46/24 49/2 50/1 51/8 51/24 53/4 55/20 105/12
**fall [3]** 5/14 97/21 108/9
**false [20]** 10/24 11/8 14/23 14/23 14/23 15/4 18/15 31/15 32/5 38/8 38/21 39/11 39/12 39/24 41/12 45/13 45/19 56/3 80/24 86/21
**familiarity [1]** 68/25
**famous [2]** 10/22 17/17
**fashion [1]** 21/18
**favor [4]** 4/21 17/3 17/4 57/9
**favored [3]** 26/4 28/24 68/17
**favoritism [4]** 9/2 9/4 9/7 26/15
**favors [1]** 88/13
**federal [3]** 11/22 46/12 101/21
**fee [5]** 21/23 60/4 60/7 61/8 62/1
**fervently [1]** 9/1
**fiction [2]** 58/1 108/10
**fiduciary [31]**
**field [1]** 107/6
**fighting [2]** 15/10 74/22
**figure [4]** 16/2 19/7 101/7 101/20
**file [6]** 49/15 50/3 50/25 52/12 58/18 59/12
**filed [9]** 3/21 12/8 15/22 20/17 48/10 48/25 51/14 81/19 86/7
**files [2]** 46/3 97/1
**filing [1]** 48/11
**fill [3]** 16/19 94/22 102/10
**filled [1]** 43/13
**final [1]** 21/16
**finality [1]** 80/6
**finally [3]** 22/12 82/6 94/7
**financial [3]** 31/17 40/4 107/20
**fine [1]** 84/16
**finish [1]** 20/3
**first-amended [16]** 4/8 5/12 5/17 14/11 41/11 42/15 45/14 52/15 53/15 56/25 66/14 67/8 76/3 76/24 87/5 92/23
**fit [1]** 63/11
**fix [2]** 102/19 102/22
**flesh [1]** 16/19
**flexibility [2]** 80/7 80/11
**flexible [5]** 19/14 63/10 82/14 89/10 90/10
**Floor [1]** 2/9
**FLORIDA [15]** 1/2 1/6 2/4 2/7 2/10 2/13 2/16 27/23 28/11 70/24 77/9 92/1 92/2 92/5 92/19
**focus [2]** 97/15 103/15
**folks [7]** 21/3 31/17 42/19 63/15 63/24 64/17 81/5
**footnote [1]** 85/8
**forced [1]** 49/15
**foregoing [1]** 110/20

## F

**foresee [1]** 52/20
**forget [1]** 18/19
**forgetting [1]** 72/20
**form [4]** 12/11 14/20 45/21 62/21
**formal [2]** 80/18 83/1
**formation [1]** 82/19
**former [2]** 7/1 16/25
**FORT [4]** 1/3 1/6 2/7 2/16
**fought [1]** 15/16
**founding [2]** 10/8 107/25
**framed [1]** 85/7
**franchises [1]** 59/19
**Francine [3]** 2/14 110/23 110/24
**frankly [7]** 18/8 30/6 37/18 46/7 68/15
 73/2 102/17
**fraud [19]** 5/1 11/7 20/24 38/17 39/8
 55/25 67/8 67/13 67/25 68/10 68/21
 91/2 91/4 93/20 99/25 105/19 105/22
 105/25 107/25
**fraudulent [3]** 10/13 10/14 12/3
**fraudulently [1]** 32/12
**free [4]** 8/22 12/17 43/16 58/7
**freedom [5]** 10/9 10/9 12/4 12/4 28/8
**frequently [2]** 71/14 90/6
**friend [1]** 106/22
**front [5]** 31/23 51/4 52/15 52/25 53/16
**fuller [1]** 52/25
**fund [2]** 24/1 24/7
**fundamental [2]** 87/16 87/19
**fundamentally [3]** 52/14 86/15 87/2
**funded [1]** 24/13
**funding [2]** 25/20 65/21
**fundraisers [2]** 11/8 39/10
**fundraising [1]** 38/16
**funds [3]** 24/14 24/15 32/25

## G

**gain [4]** 55/25 68/10 68/13 68/21
**general [10]** 5/20 17/6 23/24 24/19
 32/17 32/19 36/20 45/14 98/8 106/4
**generalized [1]** 68/12
**gentleman [1]** 43/19
**George [1]** 35/18
**germane [1]** 4/24
**Gertz [1]** 10/22
**gets [11]** 18/12 23/25 31/22 36/10
 38/19 49/22 61/8 65/14 77/5 85/6 90/19
**Gill [1]** 80/3
**gives [6]** 40/5 50/22 50/25 51/18
 104/22 107/23
**glove [1]** 107/2
**gonna [24]**
**goods [5]** 21/20 59/5 59/15 59/16 69/4
**gotten [1]** 16/7
**governing [1]** 81/6
**government [3]** 31/12 39/3 39/7
**grab [1]** 83/13
**great [3]** 29/9 47/19 109/20
**greater [1]** 96/13
**grievances [1]** 31/5
**ground [1]** 16/7
**grounds [1]** 39/19
**group [2]** 45/3 103/14
**Guccifer [5]** 16/2 16/15 16/20 17/23
 58/16
**Guccifer 2.0 [3]** 16/2 16/15 17/23

## H

**H.W [1]** 35/18
**hacker [1]** 4/23
**hand [4]** 7/6 7/7 96/17 107/2
**handled [1]** 82/21
**handling [1]** 4/22
**happy [6]** 6/2 23/2 29/4 40/14 47/7
 104/18
**hard-earned [1]** 106/20
**harm [2]** 73/14 103/10
**harmed [1]** 22/23
**head [3]** 19/16 23/7 73/9
**Healthcare [1]** 45/3
**hear [10]** 3/25 4/1 4/2 5/23 29/21 43/4
 66/24 78/17 95/9 102/8
**heard [6]** 96/18 96/21 100/13 103/23
 103/24 107/10
**hearing [6]** 1/14 40/25 53/11 81/4 87/4
 105/17
**heart [1]** 9/17
**help [4]** 13/19 24/1 24/7 25/3
**helpful [1]** 109/7
**helps [1]** 24/17
**Hernandez [3]** 2/8 2/8 3/10
**hesitation [1]** 62/19
**Hey [2]** 32/25 36/16
**highlights [1]** 74/19
**Hillary [24]**
**hiring [2]** 17/14 27/6
**history [2]** 12/19 106/1
**Hold [1]** 102/24
**holding [1]** 24/4
**honest [1]** 25/25
**Honor [127]**
**Honor's [11]** 23/25 28/25 35/4 44/23
 45/8 67/5 68/22 72/22 97/8 99/14
 102/21
**Honorable [1]** 1/15
**hope [3]** 37/19 38/5 107/23
**household [3]** 69/9 69/14 69/14
**huge [1]** 74/21
**hundred [1]** 78/12
**hundred-some [1]** 78/12
**hurt [1]** 30/19
**hurts [1]** 88/20
**hypothetical [1]** 43/12

## I

**I'd [2]** 3/23 99/22
**I'll [24]**
**I'm [43]**
**I've [11]** 22/1 23/5 29/5 34/25 39/15
 53/16 77/24 100/6 100/23 103/8 105/2
**idea [1]** 34/3
**identified [2]** 18/13 108/16
**identify [2]** 99/10 102/1
**III [6]** 11/24 14/25 26/17 38/10 40/4
 43/1
**Illinois [4]** 11/4 38/15 38/15 39/1
**Illinois vs. Madigan [2]** 38/15 39/1
**illusion [1]** 65/23
**illustrates [2]** 26/16 44/16 45/19
**imagine [2]** 86/9 96/23
**immediately [1]** 17/20
**imminent [3]** 40/21 40/23 40/25
**immunity [2]** 31/24 108/3
**impartial [13]** 13/3 13/6 14/8 17/19
 26/25 29/22 29/25 30/2 30/13 37/24

 61/17 63/16 88/1
**impartiality [4]** 28/20 28/21 97/15
 105/5
**impartially [1]** 43/14
**implausibility [1]** 44/16
**implement [1]** 66/19
**implicit [1]** 40/1
**implied [1]** 63/13
**impose [1]** 8/21
**impossible [4]** 8/24 46/1 80/22 101/14
**impression [1]** 91/20
**in-depth [1]** 46/2
**inapplicable [1]** 100/2
**inappropriate [2]** 105/22 106/24
**inapt [1]** 100/2
**inchoate [1]** 28/18
**incident [1]** 17/18
**include [1]** 59/14
**includes [1]** 59/18
**including [7]** 14/15 31/19 50/16 55/2
 57/11 69/4 79/23
**incorporated [1]** 53/23
**indeed [3]** 84/2 88/10 109/3
**individual [10]** 4/1 13/15 16/4 24/8
 67/15 67/19 74/25 75/10 98/24 100/4
**individualized [5]** 75/21 90/16 95/23
 99/19 102/19
**individually [1]** 99/4
**individuals [8]** 8/3 44/4 59/4 96/1 97/5
 97/6 97/20 109/2
**induce [2]** 56/3 68/17
**induced [5]** 8/4 32/13 32/14 57/1 68/17
**indulgence [1]** 44/24
**industry [1]** 40/4
**inevitability [1]** 17/9
**infer [1]** 66/9
**inference [1]** 57/21
**inform [1]** 39/7
**information [6]** 4/23 16/16 55/14 66/20
 96/24 107/0
**informed [2]** 39/4 84/1
**infrequent [1]** 99/7
**infringe [1]** 31/11
**inherently [1]** 31/21
**injunction [1]** 46/9
**injured [3]** 8/14 31/17 98/9
**injuries [1]** 108/16
**injury [24]**
**inquiry [2]** 46/2 95/23
**instance [3]** 24/21 101/23 108/21
**instances [1]** 14/18
**instead [1]** 17/18
**institutions [1]** 88/19
**integrity [1]** 35/17
**intelligent [1]** 109/13
**intended [5]** 55/25 56/2 68/10 68/13
 68/20
**intent [3]** 16/10 52/23 58/21
**intentional [3]** 10/25 56/9 58/19
**intentionality [2]** 57/20 57/20
**intentionally [1]** 57/1
**inter [1]** 104/5
**inter/intraparty [1]** 104/5
**interest [1]** 11/2
**interests [3]** 33/22 49/21 75/16
**interference [1]** 36/11
**internal [13]** 7/5 7/16 16/4 16/20 28/7
 33/12 35/6 36/10 37/1 42/23 58/15 97/2
 102/14

## I

**interrupt [2]** 13/9 83/20
**interrupting [1]** 53/25
**intraparty [1]** 104/5
**invade [9]** 33/22 74/9 74/12 74/18
75/15 96/15 96/15 96/17 102/13
**invasion [3]** 18/20 40/7 46/6
**invasive [1]** 75/8
**investment [1]** 106/19
**invoke [1]** 81/19
**invoked [2]** 82/5 92/11
**invokes [1]** 105/21
**involvement [2]** 23/16 24/25
**iPhone [1]** 60/6
**Iqbal [1]** 68/15
**irregularities [2]** 18/1 18/3
**issue [36]**
**issues [69]**
**IV [1]** 14/4

## J

**January [2]** 4/13 4/16
**January 1 [2]** 4/13 4/16
**Jared [2]** 2/2 3/6
**join [1]** 42/20
**joined [2]** 62/16 63/15
**Judge [6]** 1/16 3/2 47/24 48/1 110/1
110/3
**judges [1]** 29/11
**judgment [7]** 19/10 49/4 51/1 51/19
52/10 52/13 52/21
**judicial [4]** 15/5 49/20 52/8 109/1
**July [3]** 4/13 4/16 15/24
**July 13 [2]** 4/13 4/16
**June [1]** 15/23
**jurisdiction [26]**
**jurisdictions' [2]** 92/24 93/15
**justice [1]** 11/17
**justiciability [2]** 31/7 32/7
**justiciable [2]** 8/17 29/2

## K

**keep [4]** 31/4 31/23 72/19 73/22
**keeping [1]** 70/1
**Kemp [1]** 63/7
**Kemp vs. Eiland [1]** 63/7
**kids [2]** 32/20 33/1
**kinds [3]** 24/22 27/18 34/18
**knowing [2]** 52/18 106/21
**knowledge [6]** 42/9 45/16 85/10 85/19
95/24 98/15
**knows [2]** 34/20 82/13

## L

**labor [1]** 52/8
**lack [2]** 5/15 9/17
**LaFollette [2]** 36/8 104/7
**language [6]** 26/24 27/1 31/3 50/20
61/4 69/1
**large [1]** 30/10
**LAUDERDALE [4]** 1/3 1/6 2/7 2/16
**law [69]**
**laws [11]** 38/17 39/10 92/11 92/20
92/25 93/4 93/15 93/18 93/23 94/4
101/12
**lawsuit [10]** 14/3 15/14 44/12 82/10
82/16 84/19 86/13 88/8 98/10 103/12
**lawsuits [2]** 12/10 90/14

**lawyer [1]** 13/21
**lawyers [2]** 29/10 109/12
**leader [2]** 66/18 73/4
**leadership [4]** 23/13 62/15 63/5 88/11
**leading [1]** 60/20
**leaked [1]** 55/14
**leaks [3]** 16/22 17/23 58/17
**lease [1]** 69/4
**leave [2]** 20/5 109/12
**Lee [1]** 2/3
**legal [5]** 53/18 56/15 56/24 109/1
109/17
**legitimacy [1]** 39/3
**leverage [1]** 16/11
**liability [2]** 61/1 73/6
**liable [1]** 73/11
**light [2]** 25/21 58/15
**limit [1]** 38/1
**link [1]** 69/16
**lips [3]** 35/19 35/20 37/16
**list [1]** 78/12
**listen [1]** 13/20
**lists [1]** 46/3
**litany [1]** 26/14
**literally [1]** 24/3
**litigant [1]** 11/19
**litigation [3]** 49/10 74/16 90/6
**local [4]** 23/10 23/19 70/12 71/23
**locations [1]** 18/1
**LoCicero [1]** 2/12
**logical [3]** 68/16 68/19 98/2
**lose [1]** 18/21
**loses [1]** 49/11
**loss [4]** 11/22 11/23 22/14 22/19

## M

**machine [1]** 18/3
**Madigan [5]** 11/4 38/15 38/15 39/1 40/1
**Madigan vs. Illinois [2]** 11/4 38/15
**magnitude [1]** 85/16
**mails [1]** 16/17
**maintain [3]** 11/7 80/23 88/12
**maintaining [1]** 58/1
**maintains [1]** 84/10
**major [3]** 8/11 12/21 107/1
**majority [1]** 21/21
**malicious [1]** 56/9
**manageability [3]** 93/4 94/6 94/15
**manageable [4]** 92/25 99/11 101/12
102/3
**managed [1]** 90/10
**management [1]** 101/15
**manner [9]** 13/6 14/8 17/19 29/25 31/1
37/24 55/5 58/2 59/4
**Mark [2]** 2/11 3/17
**market [7]** 64/21 99/25 105/19 105/22
105/24 105/25 106/3
**Martorella [1]** 79/24
**massive [1]** 101/5
**material [6]** 36/2 37/15 81/12 93/3 93/7
94/5
**materially [1]** 11/1
**matter [25]**
**matters [1]** 104/13
**mean [50]**
**meaning [2]** 7/15 91/25
**means [17]** 8/13 11/18 14/1 19/15 20/9
29/22 30/2 30/7 30/15 30/18 30/21
30/24 39/23 47/2 62/5 74/10 87/19

**measure [1]** 27/6
**mechanical [1]** 1/24
**mechanics [1]** 24/3
**mechanisms [5]** 82/14 82/17 82/17
82/22 90/4
**media [11]** 14/14 16/12 16/23 17/10
21/12 30/6 30/19 55/1 57/16 107/3
107/8
**meet [5]** 73/24 78/8 78/10 88/24 102/2
**meeting [1]** 100/19
**member [7]** 8/10 9/13 44/17 74/11
75/22 84/5 96/5
**member's [1]** 75/3
**members [32]**
**membership [2]** 46/3 108/17
**memo [1]** 16/9
**memorandum [2]** 16/5 16/14
**Mercedes [1]** 33/3
**Mercedes-Benz [1]** 33/3
**merchant [4]** 59/9 69/20 69/22 70/13
**merit [1]** 89/6
**merits [1]** 49/18
**merits-type [1]** 49/18
**message [1]** 24/19
**Mexico [1]** 46/25
**Miami [4]** 2/4 2/10 44/23 45/3
**millions [5]** 64/8 72/3 75/7 75/9 96/6
97/19 98/6
**mindful [2]** 6/6 54/1
**minitrial [1]** 75/10
**minor [1]** 67/25
**minority [1]** 28/12
**minute [1]** 108/6
**minutes [2]** 103/3 103/5
**misbehavior [1]** 30/23
**misleading [2]** 11/8 31/16
**misnomer [1]** 71/4
**misrepresentation [7]** 5/3 20/24 38/17
56/6 67/9 91/4 93/21
**misrepresentations [2]** 55/7 108/3
**missing [1]** 31/9
**misused [2]** 22/18 42/8
**mjsfcs [1]** 2/16
**moment [4]** 22/23 58/3 61/6 77/7
**money [54]**
**month [1]** 16/9
**morning [1]** 3/6
**motion [56]**
**motions [2]** 74/23 80/10
**motive [3]** 95/25 96/1 96/1
**moved [1]** 5/12
**moving [1]** 70/18
**Mr. [2]** 9/3 34/16
**Mr. Sanders [2]** 9/3 34/16
**muddy [1]** 15/8
**multiple [1]** 30/11
**mystery [2]** 21/8 21/14

## N

**NAACP [1]** 46/4
**NAACP vs. Button [1]** 46/4
**named [6]** 16/2 44/19 45/16 54/12
77/17 77/17
**narrative [1]** 57/16
**narratives [2]** 16/23 30/19
**narrow [2]** 89/19 99/15
**narrowed [1]** 99/8
**national [10]** 1/9 8/11 13/7 14/14 26/10
30/8 30/15 65/25 66/1 71/6

**N**

**nationwide [4]** 8/10 23/15 70/9 101/22
**nature [3]** 31/6 80/6 90/15
**NE [1]** 2/6
**nebulous [1]** 72/5
**necessary [1]** 59/18
**negligence [5]** 5/11 22/13 22/13 41/21 93/22
**negligent [6]** 5/3 20/24 56/6 67/9 91/4 93/20
**Neither [1]** 10/25
**neutral [2]** 7/6 7/20
**neutrality [5]** 8/6 45/12 57/7 87/14 98/14
**Nevada [2]** 17/18 30/22
**New York [5]** 19/19 19/20 62/18 62/22 62/23
**news [1]** 87/13
**Ninth [4]** 22/17 22/21 42/3 81/16
**nominated [1]** 106/4
**nominating [5]** 13/2 14/9 23/22 30/11 55/15
**nomination [5]** 16/6 17/8 57/25 58/20 95/1
**nominee [2]** 13/2 108/14
**nominees [1]** 43/12
**none [5]** 73/1 73/2 99/12 100/24 108/22
**note [5]** 3/5 70/20 71/21 72/10 72/12
**noted [2]** 67/10 68/1
**notice [1]** 21/7
**notification [1]** 82/17
**notion [2]** 99/25 103/22
**notwithstanding [1]** 81/24
**nowhere [1]** 68/11
**number [11]** 3/4 4/9 5/13 19/22 19/23 20/4 24/14 38/8 41/11 85/21 85/22
**Number 16-61511-Civil [1]** 3/4
**number 160 [1]** 41/11
**Number 8 [2]** 4/9 5/13
**number one [3]** 19/22 38/8 85/21
**number two [2]** 19/23 85/22
**numbers [2]** 53/14 56/25
**numbers 187 [1]** 56/25
**numbers 188 [1]** 53/14
**numeric [1]** 27/25

**O**

**O'Brien [5]** 2/5 2/6 3/8 36/7 104/7
**Obama [1]** 104/7
**objection [1]** 49/1
**objective [2]** 89/21 99/16
**obligation [5]** 7/20 35/8 35/9 37/23 71/19
**obligations [1]** 38/7
**obligor [1]** 69/5
**obtaining [1]** 39/11
**occasions [1]** 10/7
**offer [2]** 27/9 108/2
**offers [1]** 24/19
**Office [2]** 2/8 31/14
**offices [2]** 24/21 84/10
**Official [2]** 2/14 110/24
**officials [4]** 16/17 16/22 55/2 57/16
**oftentimes [2]** 92/10 93/2
**oh [5]** 13/10 29/5 41/13 76/20 85/4
**omission [3]** 55/9 55/18 87/11
**omissions [8]** 31/15 38/22 56/3 81/1

**omitted [1]** 107/21
**online [2]** 4/23 21/22
**open [1]** 11/2
**opening [5]** 5/22 6/1 6/15 19/2 23/2
**operating [1]** 58/1
**operation [1]** 23/6
**operational [1]** 29/20
**operatives [1]** 17/14
**opinion [4]** 10/22 11/5 22/15 42/6
**opportunities [1]** 59/19
**opportunity [3]** 29/8 51/13 80/12
**opposed [4]** 39/14 89/7 90/12 90/24
**opposing [1]** 68/3
**opposite [1]** 98/1
**opt [2]** 82/17 90/4
**opt-out [1]** 82/17
**option [3]** 50/22 50/25 51/18
**order [11]** 16/12 19/15 22/18 44/11 46/18 60/14 80/5 80/7 81/22 104/16 109/15
**orders [1]** 85/16
**organization [14]** 21/12 30/9 32/13 32/16 32/24 39/24 61/17 62/14 63/22 63/22 63/23 73/9 73/11 73/12
**organizing [1]** 30/10
**original [4]** 29/1 50/17 50/20 82/5
**ought [3]** 51/20 52/8 92/16
**outcome [3]** 85/10 106/21 107/6
**outcomes [1]** 33/11
**outlets [1]** 107/3
**outlines [1]** 16/5
**output [1]** 59/17
**outset [2]** 18/13 101/20
**overall [1]** 65/24
**overarching [2]** 75/1 94/24
**overbroad [1]** 89/16
**overreach [1]** 36/1
**overview [1]** 6/15
**owe [4]** 19/25 19/25 64/8 72/2
**owed [3]** 62/20 63/4 88/11
**owes [3]** 19/23 65/12 66/3

**P**

**P.A [2]** 2/3 2/6
**p.m [5]** 1/7 3/1 47/25 47/25 110/4
**page [4]** 39/1 39/1 80/4 80/4
**page 18 [1]** 80/4
**page 2 [1]** 80/4
**page 623 [1]** 39/1
**paint [2]** 12/8 15/9
**papers [3]** 31/9 60/12 92/8
**par [1]** 27/16
**paragraph [21]** 14/10 41/10 41/18 41/18 53/14 54/24 56/1 56/2 56/6 56/8 56/10 56/13 56/25 57/4 57/5 78/22 84/9 84/9 87/5 91/21 91/23
**paragraph 1 [1]** 91/23
**Paragraph 154 [1]** 84/9
**paragraph 159 [2]** 14/10 54/24
**paragraph 160 [1]** 87/5
**paragraph 161 [1]** 57/4
**paragraph 171 [1]** 57/5
**paragraph 187 [1]** 56/2
**paragraph 188 [1]** 41/18
**paragraph 194 [1]** 56/6
**paragraph 195 [1]** 41/18
**paragraph 204 [1]** 56/8
**paragraph 210 [1]** 56/10

**paragraph 216 [1]** 56/13
**paragraphs [15]** 41/19 45/13 53/18 54/11 54/12 54/23 56/14 56/16 57/8 67/7 67/17 67/18 68/12 73/1 84/2
**paragraphs 187 [2]** 56/16 68/12
**paragraphs 188 [2]** 45/13 67/7
**paragraphs 2 [2]** 54/11 67/18
**paragraphs 55 [1]** 84/2
**paraphrase [2]** 26/3 105/20
**paraphrasing [1]** 37/15
**part [12]** 11/25 27/12 34/15 37/13 54/10 54/18 58/14 64/16 82/12 82/16 87/19 94/20
**participate [9]** 44/11 84/19 84/21 85/23 86/13 86/25 87/21 88/7 106/13
**participated [1]** 16/23
**particularized [4]** 42/14 42/25 43/21 103/11
**parties [22]** 8/12 12/22 23/10 23/19 23/21 25/1 25/3 25/6 25/16 26/11 65/11 65/18 66/11 74/15 74/15 74/22 82/25 86/16 104/13 105/8 106/2 107/2
**parties' [2]** 35/6 46/3
**parts [1]** 59/17
**party [100]**
**party's [11]** 7/16 19/24 33/16 36/9 63/5 71/9 74/10 74/13 81/6 88/12 102/14
**pattern [1]** 91/2
**pay [1]** 46/25
**payment [5]** 18/14 19/1 32/4 38/8 108/17
**payments [1]** 59/24
**Pembroke [1]** 84/11
**pending [1]** 38/13
**people [42]**
**people's [1]** 82/9
**perceived [1]** 97/10
**percent [5]** 21/23 24/11 60/4 61/8
**percentage [1]** 60/7
**perfect [1]** 51/2
**perfectly [1]** 65/6
**perhaps [8]** 19/9 19/9 40/25 51/10 64/10 65/15 66/2 89/15
**permits [1]** 50/13
**person [20]** 9/12 22/6 28/1 32/12 32/14 59/14 60/19 61/1 61/4 61/10 69/2 73/13 87/3 87/7 87/13 87/15 98/11 98/14 98/16 108/20
**person/one [1]** 28/1
**personal [3]** 22/24 69/9 69/15
**personally [3]** 15/7 21/15 22/21
**persons [3]** 62/7 88/24 89/21
**perspective [2]** 95/1 95/2
**pertain [1]** 54/7
**pertains [2]** 35/17 78/19
**pervaded [1]** 97/11
**Pharmacy [1]** 10/19
**phonetic [1]** 80/3
**phrase [2]** 96/11 97/11
**phrased [1]** 31/8
**pick [1]** 36/23
**picking [2]** 17/16 30/24
**picture [1]** 51/6
**piecemeal [1]** 49/10
**Pines [1]** 84/11
**place [5]** 10/14 67/4 77/14 87/25 99/25
**plain [2]** 20/19 50/20 50/21
**plaintiff [27]**
**plaintiffs [61]**

**P**

**plaintiffs' [11]** 7/3 25/21 33/25 41/8 70/20 72/13 88/25 90/15 98/18 99/10 101/20
**plan [1]** 43/15
**planning [1]** 50/23
**platform [1]** 12/14
**plausibility [2]** 44/8 68/14
**plausible [4]** 44/22 45/18 86/3 97/24
**plausibly [1]** 28/5
**play [2]** 73/25 104/14
**plead [1]** 61/20
**pleading [6]** 21/9 54/1 64/1 67/11 67/12 67/25
**pleadings [15]** 3/24 5/20 19/11 29/16 44/14 44/15 47/12 48/3 51/1 51/19 51/23 52/10 52/13 52/21 103/17
**pled [10]** 16/21 19/12 20/23 20/23 21/2 21/17 22/11 66/8 80/23 80/24
**pocket [1]** 33/2
**pocketed [1]** 36/17
**point [16]** 4/6 13/25 17/2 17/24 18/11 32/11 47/10 59/18 73/20 79/6 86/10 89/24 90/19 94/22 98/9 100/12
**points [4]** 6/21 20/3 21/16 80/21
**policies [3]** 17/3 66/19 71/11
**policy [2]** 65/24 104/5
**political [64]**
**politically [1]** 107/10
**politics [9]** 27/19 28/7 31/25 37/1 37/2 64/22 64/24 90/12 107/8
**polling [1]** 18/1
**portion [2]** 50/6 78/24
**portions [1]** 91/25
**pose [1]** 46/1
**posed [3]** 37/14 38/20 92/3
**posing [1]** 10/3
**position [22]** 20/22 22/17 26/8 26/21 33/16 41/8 41/15 41/16 41/17 41/23 45/9 49/22 53/12 60/12 64/24 66/16 70/20 85/9 86/4 88/18 92/18 107/3
**positive [1]** 77/6
**possibility [2]** 90/7 109/1
**potentially [3]** 96/22 99/6 99/24
**pouring [1]** 17/6
**power [1]** 107/8
**practice [1]** 69/6
**practices [1]** 59/9
**precede [2]** 10/7 39/21
**precedent [2]** 11/6 105/10
**preclude [1]** 50/24
**predetermine [1]** 57/25
**predetermined [9]** 55/22 58/19 85/20 87/20 97/16 97/18 106/21 106/23 107/7
**predetermining [1]** 85/10
**predicated [1]** 52/11
**predominance [5]** 45/24 75/11 94/15 100/22 101/16
**predominant [1]** 90/19
**predominate [4]** 90/16 95/3 99/12 100/5
**prefatory [1]** 16/1
**prefer [1]** 6/1
**preference [4]** 25/5 25/8 26/5 26/9
**prejudice [6]** 53/10 79/14 79/16 79/20 79/21 105/13
**prejudiced [3]** 53/5 53/7 53/12
**premature [3]** 62/24 80/19 81/13

**premise [1]** 105/9
**prepared [2]** 5/25 29/11
**present [1]** 69/23
**presentation [1]** 97/12
**presented [2]** 93/24 109/15
**preset [1]** 58/14
**presidency [1]** 24/20
**president [7]** 30/11 31/14 35/18 47/2 103/25 104/15 108/22
**President George [1]** 35/18
**President Trump [3]** 47/2 103/25 108/22
**presidential [6]** 4/22 14/8 23/11 25/8 25/14 54/9
**presumed [1]** 100/1
**pretenses [1]** 39/11
**prevail [1]** 94/13
**prevent [4]** 39/8 41/3 46/9 49/10
**prevents [1]** 50/1
**primaries [1]** 16/7 17/1 23/17 23/24 24/2 24/4 24/8 25/9 25/10 25/14 25/14 26/7 30/22 46/25
**primarily [4]** 11/21 23/19 69/9 69/14
**primary [21]** 4/22 13/2 15/23 16/11 18/2 22/7 23/12 24/5 30/23 35/17 37/23 46/24 47/4 60/20 81/7 81/10 90/20 98/7 104/1 104/2 106/21
**principal [3]** 15/5 15/17 77/14
**principle [4]** 26/23 32/17 32/19 82/1
**principles [4]** 18/10 33/7 40/9 105/21
**privacy [2]** 96/16 96/17
**private [5]** 22/19 64/12 104/14 104/16 105/8
**privity [3]** 22/1 60/13 60/13
**problem [8]** 13/12 34/21 34/24 75/19 93/5 96/14 101/15 103/16
**problematic [1]** 35/3
**problems [3]** 74/24 102/19 102/22
**procedural [1]** 45/21
**Procedure [2]** 68/24 71/25
**Procedures [1]** 59/8
**proceed [3]** 45/20 45/21 94/11
**proceedings [3]** 1/24 110/4 110/21
**proceeds [1]** 53/3
**process [48]**
**processing [2]** 21/23 60/4 60/8 62/1
**proclaiming [1]** 87/14
**produced [1]** 1/25
**product [1]** 61/13
**professional [1]** 39/10
**program [2]** 32/21 32/21
**programs [1]** 33/1
**prohibit [1]** 39/10
**promise [11]** 22/8 35/11 35/12 35/16 35/16 35/20 37/16 46/23 47/4 108/21 108/22
**promised [1]** 32/16
**promises [3]** 12/6 12/10 12/11
**promote [1]** 52/24
**prong [3]** 35/3 35/13 35/13
**prongs [1]** 33/24
**proof [2]** 46/19 75/21
**propelling [1]** 17/7
**proper [3]** 70/10 98/21 102/5
**properly [3]** 49/13 63/13 82/5
**proposed [8]** 4/25 62/16 88/25 94/9 98/18 98/22 99/3 102/8
**proposition [1]** 19/6 64/15
**prospective [1]** 80/7

**prospects [1]** 109/2
**protect [7]** 21/19 22/25 59/4 59/8
**protected [3]** 10/21 66/19 97/3
**protection [4]** 12/3 59/7 68/24 72/1
**protects [3]** 39/23 107/25 108/1
**prove [7]** 41/2 45/24 55/10 68/4 68/6 75/20 94/13
**proven [1]** 86/19
**provide [2]** 25/16 69/5
**provides [1]** 23/13
**province [5]** 8/19 9/9 31/12 102/13 103/23
**provision [3]** 33/17 79/2 79/3
**proviso [1]** 79/12
**public [21]** 11/3 16/15 16/16 17/22 21/1 22/24 39/7 41/25 44/9 45/12 45/18 55/14 55/16 57/14 63/18 65/9 90/21 90/22 105/3 107/4 107/21
**publicly [1]** 55/13
**punitive [1]** 46/16
**purchase [4]** 59/4 59/15 69/3 106/18
**purchased [9]** 61/22 61/25 62/1 62/6 69/12 69/13 70/17 106/7 106/7
**purchasing [1]** 62/4
**purging [1]** 18/4
**purport [3]** 34/10 34/11 44/2
**purported [3]** 7/20 9/4 28/18
**purportedly [3]** 7/5 8/6 9/1
**purports [2]** 16/4 61/17
**purposes [2]** 59/11 69/3
**pursuant [1]** 63/20
**pursues [1]** 65/25
**pushed [1]** 17/10
**putative [5]** 4/6 44/4 74/25 77/8 77/17

**Q**

**qualify [1]** 60/1
**quash [1]** 48/25
**query [1]** 96/15
**question [61]**
**questioned [1]** 97/7
**questions [41]**
**quick [1]** 77/25
**quickly [2]** 80/21 95/12
**quote [10]** 4/10 10/19 10/23 39/9 59/6 59/14 59/16 61/1 63/6 78/23
**quoted [1]** 69/1
**quotes [1]** 54/25

**R**

**race [1]** 9/8
**rail [2]** 45/23 75/20
**raise [12]** 9/8 33/23 48/24 49/3 49/19 50/13 50/15 50/16 50/19 51/16 51/17 52/2
**raised [5]** 35/21 49/1 53/1 82/23 83/3
**raises [2]** 24/7 24/23
**raising [2]** 35/22 50/25
**rampant [1]** 82/8
**ran [1]** 43/13
**rare [2]** 101/21 101/25
**reach [1]** 49/24
**reached [1]** 107/9
**read [8]** 35/19 35/20 37/16 59/10 87/13 87/15 88/2 98/12
**readily [2]** 11/20 89/20
**reading [7]** 20/19 38/25 53/25 54/20 61/19 73/22 87/4
**realm [4]** 65/3 85/17 99/23 108/2

**R**

**reasoning** [1] 42/5
**reasons** [6] 39/15 48/13 61/20 74/6
76/15 89/4
**receive** [2] 59/15 69/4
**received** [1] 67/20
**recent** [1] 59/6
**recently** [2] 11/4 81/16
**recess** [4] 47/15 47/22 47/25 110/2
**recognize** [4] 19/20 20/8 22/16 42/2
**recognized** [4] 11/22 39/2 39/20 42/24
**recognizes** [2] 10/5 19/14
**recognizing** [1] 81/23
**recollection** [1] 81/17
**record** [18] 48/7 52/15 52/25 53/25
58/9 62/25 73/22 83/19 83/25 84/8 86/9
86/11 91/11 91/13 92/6 92/17 103/1
110/21
**recorded** [1] 1/24
**redress** [2] 15/5 27/9
**redressability** [2] 34/24 35/13
**redressable** [3] 8/20 8/23 103/11
**refer** [1] 44/22
**referenced** [4] 16/1 21/13 56/15 91/22
**referred** [5] 4/13 26/15 26/19 45/8
45/13
**referring** [3] 25/12 38/14 60/23
**refers** [2] 48/22 52/23
**refiled** [1] 49/16
**refined** [1] 89/16
**reflected** [1] 27/6
**refused** [1] 49/14
**register** [2] 71/8 71/8
**registered** [10] 4/18 42/13 42/20 62/11
63/24 65/10 65/12 77/11 88/6 106/14
**registering** [1] 108/25
**registration** [3] 8/11 71/6 71/7
**reiterate** [1] 43/13
**reject** [1] 75/25
**rejected** [1] 76/4
**rejecting** [1] 76/17
**rejects** [2] 74/2 75/1
**relationship** [15] 19/16 62/11 62/13
62/17 63/10 63/11 63/12 64/4 70/19
71/18 71/24 72/6 88/13 88/14 88/15
**relationships** [1] 17/7
**release** [1] 41/24
**released** [7] 16/2 16/13 16/14 16/17
16/20 17/22 22/24
**relevance** [1] 18/23
**relevant** [1] 102/12
**reliance** [20] 9/15 13/1 14/23 15/4
18/15 21/4 41/19 44/10 45/15 45/17
45/23 54/5 54/18 75/18 75/19 80/24
80/24 95/24 98/15 100/1
**relied** [8] 8/7 34/5 53/20 54/22 55/11
55/18 67/21 68/4
**relief** [8] 15/5 15/17 15/17 78/20 89/8
108/15 108/15 109/2
**rely** [4] 18/25 42/18 56/5 75/3
**relying** [1] 44/7
**remain** [2] 7/6 7/20
**remaining** [2] 48/3 76/12
**remarks** [5] 5/22 6/1 16/1 19/2 34/25
**remedy** [2] 41/3 107/19
**remedying** [1] 108/15
**remember** [1] 87/18
**reminded** [1] 72/21

**remotely** [1] 108/23
**repeated** [1] 56/5
**reporter** [5] 2/14 2/14 47/15 103/2
110/24
**reports** [2] 17/25 18/3
**represent** [3] 4/11 15/13 44/2
**representation** [1] 28/14
**representations** [10] 11/8 21/4 31/15
31/17 31/18 37/17 38/21 38/22 39/24
108/4
**Representative** [1] 8/4
**Representative Sanders** [1] 8/4
**representatives** [5] 28/9 44/5 44/10
77/8 94/18
**represented** [3] 30/4 30/5 101/1
**representing** [1] 91/24
**republic** [2] 10/8 107/25
**republican** [8] 26/18 28/4 28/11 28/13
71/9 103/24 103/25 104/11
**republican/one** [2] 28/4 28/13
**request** [3] 50/18 79/3 79/5
**required** [2] 44/21 73/23
**requirement** [2] 60/16 73/23
**requirements** [7] 21/9 39/9 52/1 54/1
74/1 75/12 100/19
**resale** [1] 69/3
**reside** [1] 70/10
**residence** [2] 54/12 91/17
**resident** [1] 84/5
**residents** [1] 4/10
**resides** [1] 91/24
**resolve** [2] 7/11 7/15
**resolved** [4] 7/13 96/22 99/19 101/9
**resources** [3] 17/7 30/16 74/21
**respond** [3] 37/5 37/8 101/4
**response** [9] 37/12 43/8 43/11 45/8
50/10 54/10 68/11 70/25 103/5
**responses** [1] 109/6
**responsibility** [2] 62/20 66/21
**rest** [1] 92/18
**result** [8] 31/18 41/21 42/14 55/25
61/14 68/10 68/21 85/20
**results** [3] 97/16 97/18 108/12
**return** [4] 40/17 46/15 70/2 70/4
**revised** [1] 90/5
**Reynolds** [1] 28/3
**Reynolds v. Sims** [1] 28/3
**rhetoric** [2] 12/13 85/12
**rifle** [1] 104/25
**rig** [2] 90/20 107/19
**rigged** [8] 85/25 96/10 98/1 98/3 104/1
107/12 107/16 107/17
**rightee** [2] 67/1 95/10
**rights** [16] 8/22 10/7 10/13 11/15 18/20
39/21 39/23 40/7 64/25 74/10 74/13
74/13 82/9 96/16 96/17 102/16
**rise** [2] 40/5 47/23
**RMR** [2] 2/14 110/24
**RMR-CRR** [1] 110/24
**RNC** [1] 27/13
**road** [2] 36/20 107/22
**robust** [1] 11/2
**role** [4] 18/8 21/12 23/11 104/14
**rolls** [1] 18/4
**room** [2] 2/15 43/13
**rooms** [1] 36/23
**rough** [2] 27/18 103/23
**rubric** [1] 12/4
**rule** [55]

**Rule 11** [1] 67/23
**Rule 12** [17] 20/6 20/20 48/10 48/11
48/12 48/17 49/25 50/3 50/11 50/15
50/16 51/13 51/25 52/3 79/2 79/4 89/8
**Rule 23** [12] 73/25 80/10 82/13 82/21
89/9 89/18 90/11 93/9 93/10 93/25 95/4
102/10
**Rule 8** [1] 100/20
**Rule 9** [3] 54/1 67/10 68/1
**rule's** [1] 52/24
**rules** [5] 23/23 33/12 35/6 36/20 104/6
**ruling** [2] 80/16 80/16
**rung** [1] 90/19
**runs** [10] 7/9 9/10 12/16 23/21 28/23
36/4 65/24 82/6 105/9 105/10
**rush** [2] 48/14 48/15

**S**

**sad** [2] 37/20 107/13
**safe** [2] 109/14 109/19
**sake** [1] 10/21
**Salopek** [3] 2/14 110/23 110/24
**Samuel** [1] 80/3
**Sanders** [54]
**Sanders'** [2] 46/6 84/23 106/12
**satisfied** [2] 14/25 21/9
**satisfy** [1] 42/25
**satisfying** [1] 58/21
**save** [1] 74/21
**saw** [2] 42/21 42/22
**scenes** [7] 7/8 55/12 58/13 81/9 87/12
90/20 94/25
**scheduling** [1] 17/4
**school** [1] 33/1
**Schultz** [14] 4/8 7/2 7/4 14/16 17/19
21/11 60/18 62/7 69/20 72/19 84/7
91/18 91/24 97/14
**Schultz's** [3] 66/13 72/23 102/15
**SE** [1] 2/9
**second** [6] 2/9 18/17 40/6 69/12 97/8
102/24
**Secretary** [5] 27/7 34/19 68/17 97/19
98/7
**Secretary Clinton** [5] 27/7 34/19 68/17
97/19 98/7
**Section** [6] 5/5 7/22 14/5 35/23 59/13
59/23
**Section 28-3091** [1] 59/23
**Section 28-3904** [1] 5/5
**Section 28-3905** [1] 59/13
**Section 4** [3] 7/22 14/5 35/23
**Sections** [1] 59/22
**Sections 28-3901** [1] 59/22
**securities** [3] 90/12 99/21 105/19
**seek** [6] 4/11 8/20 12/11 39/7 46/16
97/4
**seeking** [7] 15/17 15/17 40/16 46/8
70/2 108/11 108/12
**seeks** [2] 46/20 87/21
**select** [1] 28/9
**selected** [1] 27/24
**selection** [1] 104/6
**self** [1] 27/1
**self-defining** [1] 27/1
**seminal** [2] 10/22 16/20
**Senator** [11] 8/5 9/3 34/16 34/20 46/6
57/11 57/22 68/18 84/23 97/6 97/20
**Senator Clinton** [1] 57/22
**Senator Sanders** [8] 8/5 9/3 34/16

**S**

**Senator Sanders... [5]** 34/20 57/11 68/18 97/6 97/20
**Senator Sanders' [2]** 46/6 84/23
**sense [15]** 6/22 20/12 28/12 30/10 31/18 40/17 49/8 50/22 51/2 68/16 68/19 69/18 81/11 85/14 85/22
**sensitive [2]** 22/23 41/25
**sentence [1]** 78/21
**serious [1]** 7/2
**serve [1]** 49/20
**served [1]** 49/13
**serves [1]** 81/17
**service [9]** 20/17 21/22 21/24 49/13 51/14 62/1 69/8 69/11 69/13
**services [15]** 1/8 4/7 21/20 24/20 59/5 59/15 59/16 59/20 60/4 61/22 61/25 62/4 62/6 69/4 70/16
**serving [2]** 21/3 32/20
**session [1]** 109/21
**settled [3]** 20/9 38/11 38/11
**Seventh [3]** 22/17 22/22 42/3
**shake [1]** 104/21
**shareholder [2]** 64/16 71/15
**shareholders [5]** 64/14 65/5 66/4 66/4 106/6
**shares [2]** 106/7 106/18
**shifted [2]** 70/21 97/12
**shocked [1]** 29/21
**short [2]** 47/15 61/18
**shot [1]** 99/18
**shots [2]** 66/7 66/9
**shown [1]** 16/22
**sic [5]** 20/13 21/21 60/18 68/24 106/24
**side [15]** 3/25 6/16 13/20 27/5 33/6 36/13 42/10 43/19 47/17 61/2 61/11 62/8 77/1 103/25 106/22
**sides [5]** 3/22 17/16 25/13 27/13 30/24
**sight [1]** 18/21
**similarities [1]** 104/8
**simple [3]** 30/14 50/11 67/25
**Sims [1]** 28/3
**single [6]** 9/12 44/16 75/21 77/8 77/16 102/20
**situation [11]** 35/11 38/12 38/21 63/14 65/8 71/15 79/17 86/9 87/8 100/3 109/11
**sky's [1]** 38/1
**slanted [1]** 85/15
**slow [1]** 96/19
**smoke [2]** 36/23 43/13
**smoke-filled [1]** 43/13
**society [6]** 30/7 59/17 88/18 109/9 109/11 109/11
**society's [1]** 11/1
**solicit [1]** 32/25
**solicitations [1]** 38/18
**someone's [1]** 104/18
**somersaults [1]** 13/18
**sought [3]** 46/15 78/20 89/8
**sound [1]** 33/14
**sounds [1]** 64/11
**source [2]** 71/22 71/24
**sources [1]** 80/19
**South [1]** 2/12
**SOUTHERN [3]** 1/2 79/24 91/25
**special [7]** 18/23 62/11 62/13 62/17 63/12 70/19 71/17

**specific [12]** 21/10 36/17 44/5 45/15 55/1 55/11 66/15 68/5 73/13 79/2 81/2 93/12
**specificity [4]** 20/25 67/12 68/2 68/2
**specified [4]** 54/15 59/13 61/6 92/5
**specifies [1]** 84/10
**specify [1]** 96/24
**spectators [1]** 13/15
**spectrum [1]** 59/9
**speech [9]** 10/9 10/13 10/20 11/13 11/16 12/3 12/4 32/1 39/16
**spend [1]** 32/25
**spirit [1]** 80/10
**spite [1]** 15/8
**Spiva [2]** 2/11 3/15
**split [1]** 42/2
**spoke [1]** 109/9
**sponsor [1]** 24/18
**squabbles [3]** 26/20 27/8 104/5
**stage [10]** 5/21 19/10 59/17 62/25 64/1 65/16 74/21 79/21 92/18 100/20
**stages [1]** 81/14
**standard [5]** 28/5 36/6 36/19 73/6 101/22
**standards [3]** 68/15 94/15 102/3
**standing [79]**
**standing's [1]** 15/11
**standing-type [1]** 108/19
**starting [5]** 31/6 39/1 54/24 57/4 103/9
**state [54]**
**state's [4]** 38/16 71/17 100/17 100/18
**state-level [1]** 23/24
**stated [8]** 14/13 20/18 37/22 40/16 51/24 54/14 90/24 91/15
**statement [5]** 6/16 23/2 67/16 68/5 98/16
**statements [26]**
**states [21]** 1/1 1/16 2/15 4/10 11/7 18/1 24/7 50/12 50/15 53/8 53/8 60/25 63/17 71/6 71/7 78/22 79/25 100/25 101/12 101/19 104/15
**states' [1]** 93/18
**statute [15]** 21/17 21/18 22/5 22/9 22/10 59/3 59/10 60/8 60/15 60/16 61/19 62/5 62/9 65/1 70/9
**stenography [1]** 1/24
**step [2]** 33/5 83/22
**stepping [1]** 26/13
**steps [1]** 22/25
**stock [2]** 106/7 106/18
**stole [1]** 36/17
**stood [1]** 104/10
**stop [1]** 13/21
**stopping [1]** 41/7
**strange [1]** 18/4
**strategic [1]** 25/15
**strategizing [2]** 102/14 104/25
**strategy [4]** 16/5 58/14 58/19 97/2
**street [2]** 2/9 33/2
**strenuously [1]** 64/23
**stress [1]** 82/24
**stretch [2]** 19/21 64/20
**stricken [2]** 5/19 9/20
**strict [1]** 73/6
**strong [1]** 20/8
**strongly [1]** 72/19
**struck [2]** 76/5 76/22
**styled [1]** 78/21
**Sub [4]** 59/13 59/22 59/23 59/23

**subclass [2]** 75/5 75/6
**subclasses [8]** 9/13 34/2 46/1 74/8 82/19 89/11 92/10 97/22
**subject [14]** 6/9 6/10 6/11 7/12 9/18 20/11 20/12 20/21 26/13 48/20 49/23 50/14 51/7 51/16
**subject-matter [13]** 6/9 6/11 7/12 9/18 20/11 20/12 20/21 26/13 48/20 49/23 50/14 51/7 51/16
**subjective [1]** 99/18
**submit [16]** 40/6 75/13 76/14 80/14 80/18 81/13 82/3 88/17 99/22 101/3 101/13 106/17 107/6 107/21 108/10 109/2
**subsequent [3]** 16/14 17/22 20/14
**substantially [2]** 56/5 56/12
**succeed [1]** 104/23
**successive [2]** 48/11 50/14
**sue [3]** 32/14 47/2 69/23
**sued [4]** 21/25 32/18 35/21 100/14
**suffer [1]** 103/16
**suffered [5]** 41/21 42/13 43/24 44/1 44/21
**sufficient [7]** 20/5 20/25 21/6 22/25 42/5 62/21 92/1
**sufficiently [1]** 19/14 42/25
**suggest [2]** 26/15 46/18 79/15 80/22
**suggested [2]** 76/10 92/16
**suggesting [4]** 27/11 27/16 27/17 33/15
**suggestion [1]** 105/20
**suggests [1]** 82/7
**suing [2]** 60/17 60/17
**suit [4]** 4/6 59/12 60/3 96/8
**Suite [1]** 2/4
**sum [1]** 61/6
**summary [1]** 19/10
**sums [1]** 54/23
**Superior [1]** 59/6
**superiority [1]** 94/15
**supply [5]** 22/4 61/2 61/11 61/15 62/7
**support [26]**
**supported [3]** 9/1 26/11 57/4
**supporter [2]** 84/23 97/9
**supporters [2]** 46/7 88/15
**supporting [1]** 57/10
**supports [2]** 23/10 103/22
**suppression [1]** 18/3
**Supreme [7]** 10/5 10/17 11/5 12/2 36/8 38/10 38/25
**surety [1]** 69/5
**surprise [3]** 93/19 93/23 101/17
**surprised [1]** 94/17
**surprising [1]** 19/6
**surrounding [1]** 51/4
**survives [1]** 78/25
**susceptible [1]** 90/9
**suspected [1]** 107/16
**SW [1]** 2/3
**swept [1]** 82/10
**system [8]** 11/16 96/10 96/11 97/25 98/3 104/3 106/2 106/10
**systematic [1]** 94/24

**T**

**take [37]**
**taken [5]** 10/11 22/17 22/20 47/25 52/8
**takes [3]** 10/14 42/7 106/22
**talk [1]** 83/22

**T**

talked [1]  99/24
talking [25]
talks [2]  18/19 40/7
Tampa [1]  2/13
task [1]  46/1
taught [1]  87/17
taxes [4]  35/21 35/21 35/22 37/16
technical [4]  3/23 4/3 6/20 18/13
tell [6]  7/25 26/10 46/12 100/15 104/24
 107/21
telling [1]  17/15
tension [1]  20/8
terms [41]
test [1]  33/24
testify [1]  9/14
textbook [1]  38/10
thank [53]
Thanks [1]  29/9
theme [1]  31/23
theories [1]  108/19
theory [4]  21/8 32/2 47/1 81/12
there'd [2]  27/9 101/15
thicket [3]  33/21 34/9 75/14
think [253]
Thomas [1]  2/12
thought [6]  25/11 34/3 70/23 96/10
 96/24 107/12
thousands [1]  75/8
thread [1]  82/6
threat [1]  10/3
threatened [1]  93/25
threatens [1]  7/2
threshold [2]  73/23 73/24
throw [1]  106/20
throwing [1]  17/18
thrust [3]  25/22 25/23 33/25
tied [2]  108/17 108/18
time [48]
times [4]  24/16 36/13 72/11 81/4
title [1]  21/13
today's [1]  40/25
tools [1]  90/10
top [2]  60/21 64/17
tort [1]  73/8
totally [5]  15/11 100/2 101/2 102/13
 103/17
touched [1]  48/5
towards [2]  27/6 33/6
trade [1]  69/6
tradition [1]  107/23
transaction [9]  58/25 61/3 61/5 61/11
 61/13 62/3 62/8 68/23 70/13
transactions [1]  59/20
transcript [3]  1/14 1/24 110/20
treated [1]  88/4
trial [2]  9/14 99/20
trickles [1]  65/17
tries [1]  108/20
trip [2]  109/14 109/19
trouble [1]  87/22
true [6]  15/11 29/1 37/19 37/19 37/20
 81/8
Trump [4]  47/2 47/3 103/25 108/22
Trump's [1]  96/10
trust [2]  63/13 63/14
trustee [1]  88/18
truth [1]  109/12

**TUESDAY [1]**  3/1
tumble [1]  27/18
two-party [1]  106/2
Twombly [1]  68/15
typical [1]  80/7
typicality [2]  75/11 94/14

**U**

uhm [5]  19/14 21/12 24/3 37/11 42/16
ultimate [1]  61/12
ultimately [11]  32/18 36/7 61/16 66/19
 81/1 87/9 88/16 93/18 95/3 104/2 106/4
umbrellas [1]  5/14
unclear [1]  69/24
uncomplex [1]  51/5
uncontroversial [1]  64/14
underlying [1]  9/5
undermine [1]  16/24
undersell [1]  107/8
understand [2]  33/18 52/9
understanding [10]  13/1 14/2 14/23
 15/4 18/15 75/24 86/21 87/16 90/25
 92/9
understandings [2]  32/5 38/9
Understood [2]  54/2 54/4
undertaking [1]  106/16
undertook [1]  54/18
undo [1]  108/12
unfair [2]  85/15 96/11
unfairness [1]  105/5
unified [1]  94/24
uniform [4]  81/1 81/12 90/25 91/2
uninhibited [1]  11/2
union [1]  30/12
UNITED [4]  1/1 1/16 2/15 104/15
unjust [5]  5/8 56/11 88/5 93/21 100/18
unjustly [1]  88/4
unless [4]  20/15 35/1 41/2 41/2
unlike [1]  65/8
unmanageable [2]  101/3 103/18
unscrupulous [1]  59/9
unsustainable [1]  79/1
Untruthful [1]  10/20
unusual [2]  27/12 64/11
us [8]  15/9 50/11 53/10 61/19 79/14
 80/22 105/17 108/8
usefulness [1]  75/22

**V**

v. [5]  28/3 36/8 36/8 44/23 104/7
vague [2]  46/10 68/11
valid [6]  11/23 18/20 19/13 22/19 62/9
 82/22
value [2]  10/24 52/7 52/24
values [2]  71/11 72/8
varied [2]  93/23 101/18
vary [1]  102/2
vast [1]  21/20
viable [1]  22/11
view [5]  17/11 22/20 42/7 80/18 98/10
viewed [2]  97/25 98/3
vigorously [1]  39/9
violate [2]  8/22 42/22
violated [3]  33/16 100/16 100/18
violation [5]  47/3 57/6 101/4
violations [1]  82/8
Virginia [2]  10/19 71/7
virtue [5]  13/4 35/5 66/20 82/9 105/25
Virues [2]  2/2 3/12

vitiated [1]  65/1
voluntarily [2]  36/21 36/22
vote [6]  28/2 28/4 28/13 71/8 71/10
 72/8
voted [5]  96/2 96/6 97/19 97/19 98/6
voter [2]  18/3 108/18
voters [3]  12/10 46/4 96/6
votes [4]  28/14 34/19 104/1 104/3
voting [4]  18/2 18/3 24/22 106/14
vs. [8]  11/4 38/15 38/15 39/1 46/4
 60/24 63/7 79/24
vs. Deutsch [1]  79/24

**W**

wade [6]  26/17 27/3 30/3 33/21 34/8
 34/13
waiting [1]  74/3
waived [5]  20/7 20/16 20/20 49/1 79/8
waiver [1]  48/18
waiving [1]  92/20
wall [1]  46/25
wanton [1]  56/9
Wassermann [16]  4/8 7/1 14/15 17/19
 21/11 60/18 62/7 66/13 69/20 72/19
 72/23 84/7 91/18 91/23 97/14 102/15
watch [1]  73/5
waters [1]  15/8
we'd [1]  94/12
wealth [2]  16/16 33/8
weapon [2]  6/25 10/3
website [1]  16/4
week [1]  109/20
well-developed [1]  92/7
whatsoever [1]  15/15
whenever [1]  86/18
wherever [1]  101/24
white [1]  13/8
who's [7]  19/4 19/7 19/7 27/2 45/25
 45/25 66/7
who've [1]  107/20
wide [2]  11/2 75/21
wide-open [1]  11/2
widespread [2]  17/25 18/2
wielding [1]  10/2
Wigoda [1]  36/8
WikiLeaks [1]  16/17
WILDING [1]  1/5
wildly [2]  99/22 105/21
willful [1]  56/9
William [1]  1/15
win [1]  104/23
Wisconsin [1]  36/8
Wisconsin v. LaFollette [1]  36/8
wishes [1]  47/17
WJZ [1]  1/4
won [2]  34/20 49/15
word [2]  106/23 109/10
worded [1]  21/18
words [6]  22/12 35/18 55/20 57/23
 109/10 109/10
work [3]  26/6 68/7 94/25
working [2]  58/13 107/2
workings [2]  87/22 102/14
works [2]  24/18 104/3
world [1]  64/13
worry [1]  29/16
worse [1]  12/21
write [1]  86/25
written [2]  52/24 81/22

**W**

**wrong [2]**  15/21 69/25
**Wymbs [4]**  26/18 27/19 36/7 104/10

**Y**

**yield [2]**  94/8 102/7
**yields [1]**  10/6
**York [5]**  19/19 19/20 62/18 62/22 62/23

**Z**

**Zloch [1]**  1/15