UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 0:16-cv-61511-WJZ

CAROL WILDING; STANLEY RIFKEN;
SHARON CRAWFORD; WILLIAM SCOTT
FRANZ; DAVID PULASKI; MARY
JASMINE WELCH; JOSE ALBERTO
GONZALEZ; JANE ELLEN PLATTNER;
KIM MARIE HOULE; TIMOTHY BINGEN;
SUSAN REED; ANGELA MONSON;
AIMEE R. COLEMAN; ELESHA SNYDER;
MATTHEW SHAW; ZACHARY JAMES
HANEY; ESTRELLA GONZALEZ;
CATHERINE G. CYKO; LAURA GENNA;
MARIANNE BLAIR; TAMARA L.
JOHNSTON; VALERIE ELYSE RASCH;
BRETT TEEGARDIN; DANIEL O'MEARA;
PEGGY LEW; DANIEL J. REYNOLDS;
BRENDA LEE SMITH; MARLOWE ST.
CLOUD PRIMACK; PATRICIA D.
CASSIDY; BRITTANY R. MUSICK;
HARRIS BIERHOFF; FELICIA MICHELLE
TAYLOR; SUSAN L. SINGER; KYLE G.
BRAUND; LAUREN HALE; WILLIAM
CRANDALL; KIRSTEN HURST; DUFFY
ROBERT WEISS; CONNIE ANDERSON;
GREGORY WITKOWSKI; ELIZABETH
FIGUEROA; BRANDY KINCAID;
KIMBERLY ALBERTS; RACHEL
RODERICK; LAURA MICHELLE
VAUGHN; LISA GALE; TAMMY DEITCH-
COULTER; KAYITE ASHCRAFT; ALECIA
R. DAVIS; DOMINIC RONZANI; LUKE
GRIM; ROSALIE CONSIGLIO; EDWIN
LUGO; HEATHER DADE; MICHAEL S.
REED; RHIANNON CRANDALL; RYAN
GHAN; LISA SETTLE; YALONDA DYE
COOPER; DANIEL S. COOPER;
MATTHEW JOSEPH BRADY; ANDREW
ROUSSEAU; SUSAN CATTERALL; JULIE
HAMPTON; CHRIS BUBB; ERIK
FURREBOE; ZEKE SHAW; BENJAMIN

ILARRAZA; LUCILLE GROOMS;
CHRISTINE MAIURANO; LEWIS L.
HUMISTON, IV; JOHN LYNCH; JAMES
SIMON; LESTER JOHN BATES, III;
JEFFREY GOLDBERG; RICK WASHIK;
RICHARD BOOKER; KARLIE COLE;
ERICH SPARKS; PRABU
GOPALAKRISHNAN; CARLOS
VILLAMAR; CAROLYN JACOBSON;
DAN ELLIS DUDLEY; LISA ANNE
MENEELY; D.J. BUSCHINI; RAYMOND
D. MAXWELL; DAVID L. MEULI;
KENNETH E. PUCKETT; DAVID N.
PYLES; CYNTHIA T. CHAN; STEFANIE
BIRDSONG; AMBER RAE KNOWLTON;
TIMO A. JOHANN; JEFF ROGERS;
HEATHER JORDAN; RANA KANGAS-
KENT; SUSAN FRISBIE; BAKH INAMOV;
THEDA LARSON-WRIGHT; KIRSTEN
HOFFMAN; ANTHONY GRUDIN; BRUCE
BUSTO; SUZANNE M. CORK; EMMA L.
YOUNG; SEAN LYNCH; SHERRY DAVIS;
NANCY BERNERS-LEE; PHYLLIS
CRIDDLE; MELISSA LIANG; JOSEPH
GLEASON; GRETA MICKEY; DIANE
EMILY DREYFUS; KATHLEEN L.
DODGE; CATHERINE WILLOTT;
TRISTAN BURGENER; ERIK MICHAEL
FERRAGUT; VINCENT CAUCHI; JOSEPH
CALLAN; MARK BEDARD; BARBARA
BOWEN; STEVE PHILIPP; SUSAN
PHILLIPS; RICHARD J. BOYLAN; TERI
MONACO; TUKOI JARRETT; ANNMARIE
WILSON; ANDREW ORRINO; CRAIG
CURRIER; JARATH HEMPHILL; GEORGE
THOMAS; REBECCA WHITE-HAYES;
ALAINA TALBOY; SARAH LOPEZ;
ELIZA FEERO; REBECCA HOHM; GAYLE
A. HARROD; ERIKA SITZER; STEPHEN
HOUSEKNECHT; DIANE ROBINSON; JEN
BETTERLEY; AMALIE DUVALL; JOHN
CROWE; CARL MILLER; SUSAN
ROPPEL; DIANA FLORES; JULIANNA
SEYMOUR; MELISSA MARCOTTE;
DANIELLE INGRASSIA; ALETTE
PRICHETT; and TORSHA CHILDS,

individually, and on behalf of all those
similarly situated,

      Plaintiffs,

vs.

DNC SERVICES CORPORATION, d/b/a
DEMOCRATIC NATIONAL COMMITTEE,
and DEBORAH "DEBBIE" WASSERMAN
SCHULTZ,

      Defendants.

---

### NOTICE OF APPEAL

All Plaintiffs file this notice of appeal to the 11th Circuit Court of Appeals of the District Court's Final Order of Dismissal granting Defendants DNC Services Corporation d/b/a Democratic National Committee and Deborah "Debbie" Wasserman Schultz's Motion to Dismiss Plaintiffs' First Amended Complaint, signed and docketed on August 25, 2017 [Dkt. No. 62] (attached hereto as **Exhibit A**), which is titled as a "Final Order," [*id.* at p. 1], and which constitutes a final decision for the purposes of appeal.  *See* 28 U.S.C. § 1291; *see also Hertz Corp. v. Alamo Rent-a-Car, Inc.*, 16 F.3d 1126, 1133 n.14 (11th Cir. 1994) (quoting 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2376 (1971)) ("A dismissal is a final order, and appealable as such, whether it is with or without prejudice.").

This notice of appeal of the final order draws "in question all prior non-final orders and rulings. . . ." *Toomey v. Wachovia Ins. Servs.*, 450 F.3d 1225, 1228 n.2 (11th Cir. 2006).  Thus, Plaintiffs are appealing, in its entirety, the order signed and docketed on August 25, 2017 [Dkt. No. 62], and are appealing all prior orders and other rulings.

*~signature page follows~*

DATED: September 8, 2017

/s/ Elizabeth Lee Beck
By: Elizabeth Lee Beck

**BECK & LEE TRIAL LAWYERS**
JARED H. BECK
Florida Bar No. 20695
ELIZABETH LEE BECK
Florida Bar No. 20697
BEVERLY VIRUES
Florida Bar No. 123713
Corporate Park at Kendall
12485 SW 137th Ave., Suite 205
Miami, Florida 33186
Telephone:      (305) 234-2060
Facsimile:      (786) 664-3334
jared@beckandlee.com
elizabeth@beckandlee.com
beverly@beckandlee.com

**CULLIN O'BRIEN LAW, P.A.**
CULLIN O'BRIEN
Florida Bar No. 597341
6541 NE 21st Way
Fort Lauderdale, Florida 33308
Telephone:      (561) 676-6370
Facsimile:      (561) 320-0285
cullin@cullinobrienlaw.com

**ANTONINO G. HERNANDEZ P.A**.
ANTONINO G. HERNANDEZ
Florida Bar No. 164828
4 SE 1st St., 2nd Floor
Miami, Florida 33131
Telephone:      (305) 282-3698
Facsimile:      (786) 513-7748
Hern8491@bellsouth.net

Counsel for Plaintiffs and the Proposed Classes

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 8, 2017, I electronically filed the foregoing

>  *NOTICE OF APPEAL*

with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document(s) are being served this day on all counsel of record or pro se parties identified on the following Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


<u>/s/ Elizabeth Lee Beck</u>
Elizabeth Lee Beck

**SERVICE LIST**
*Wilding et al. v. DNC Services Corporation, D/B/A Democratic National Committee et al.*
**CASE NO. 0:16-cv-61511-WJZ**
**United States District Court, Southern District of Florida**
**Fort Lauderdale Division**

| | |
|---|---|
| Gregg Thomas, Esq.<br>Mark R. Caramanica, Esq.<br>Thomas & Locicero PL<br>601 South Blvd.<br>Tampa, Florida 33606<br>Telephone: (813)  984-3060<br>Facsimile: (813) 984-3070<br>gthomas@tlolawfirm.com<br>mcaramanica@tlolawfirm.com<br><br>***Attorneys for Defendants***<br><br>(via CM/ECF) | Marc E. Elias, Esq.<br>Graham Wilson, Esq.<br>Elisabeth C. Frost, Esq.<br>Ruthzee Louijeune, Esq.<br>Perkins Coie LLP<br>700 13th St., N.W., Suite 600<br>Washington, D.C. 20005<br>Telephone: (202) 654-6200<br>Facsimile: (202) 654-9959<br>melias@perkinscoie.com<br>gwilson@perkinscoie.com<br>efrost@perkinscoie.com<br>rlouijeune@perkinscoie.com<br><br>***Attorneys for Defendants***<br><br>(via CM/ECF) |

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-61511-CIV-ZLOCH

CAROL WILDING, et al.,

　　　　Plaintiffs,

vs.                                    **FINAL ORDER OF DISMISSAL**

DNC SERVICES CORP., d/b/a/
Democratic National Committee
and DEBORAH WASSERMAN SCHULTZ,

　　　　Defendants.
_____/

　　　　THIS MATTER is before the Court upon Defendants' Motion To
Dismiss Plaintiffs' First Amended Complaint (DE 44).  The Court has
carefully reviewed said Motion, the entire court file, and, with
the benefit of oral argument, is otherwise fully advised in the
premises.

　　　　In the 2016 presidential election's Democratic primaries,
Bernie Sanders and others vied against Hillary Clinton for the
Party's nomination.  This case, in short, involves allegations that
the Democratic National Committee[1] was in cahoots with the Clinton
campaign and sought to tip the scales in her favor in the
Democratic primaries, all at the direction of, and under the
leadership and watchful eye of, its then-chair, Deborah Wasserman
Schultz, despite the DNC's and Wasserman Schultz's promise to

_____

[1] The Court will refer to Defendant DNC Services Corp. as
the "DNC."

remain impartial.  Plaintiffs discovered what they believe is evidence of that bias after the DNC's computer servers were penetrated by hackers.  Shortly thereafter, they brought this putative class action against the DNC and its former chair.

In evaluating Plaintiffs' claims at this stage, the Court assumes their allegations are true——that the DNC and Wasserman Schultz held a palpable bias in favor Clinton and sought to propel her ahead of her Democratic opponents.  Plaintiffs assert several fraud-type claims.  But they do not allege they ever heard or acted upon the DNC's claims of neutrality.  Plaintiffs also assert a tort claim on behalf of all registered Democrats, even though the harm they allege impacted all Democratic-primary-eligible voters——and under their theory, the entire body politic——the same way.  And finally, Plaintiffs claim that donors to the DNC are at an increased risk of identity theft as a result of the computer hack.  But they do not allege that the DNC regularly keeps the type of information necessary to facilitate identity theft or that the hackers targeted, much less obtained, that information.  The Court must now decide whether Plaintiffs have suffered a concrete injury particularized to them, or one certainly impending, that is traceable to the DNC and its former chair's conduct——the keys to entering federal court.  The Court holds that they have not, which

means the truth of their claims cannot be tested in this Court.

I.

According to the First Amended Complaint (DE 8), the DNC is the formal governing body for the Democratic Party in the United States. Its role is to coordinate strategy in support of Democratic Party candidates in local, state, and national elections. With respect to the presidential election, the DNC organizes the Democratic National Convention in order to nominate and confirm a Democratic candidate for the presidency. At the time Plaintiffs filed the First Amended Complaint (DE 8), Deborah Wasserman Schultz served as the DNC's Chairperson and presently serves as a member of the United States House of Representatives.

Through its Charter and Bylaws, the DNC has obliged itself to a policy of neutrality among Democratic presidential candidates. To that end, as it pertains to the "Presidential nominating process, the Chairperson shall exercise impartiality and evenhandedness as between Presidential candidates and campaigns. The Chairperson shall be responsible for ensuring that the national officers and staff of the Democratic National Committee maintain impartiality and evenhandedness during the Democratic Party Presidential nominating process." DE 8, ¶ 159 (emphasis supplied in Complaint). Wasserman Schultz and other DNC officials touted

3

this policy in public statements during presidential primaries. Plaintiffs attribute the following quotes to Wasserman Schultz or other DNC staff:

- "I count Secretary Clinton and Vice President Biden as dear friends, but no matter who comprises the field of candidates it's my job to run a neutral primary process and that's what I am committed to doing."

- "the DNC runs an impartial primary process."

- "the DNC runs an impartial primary process, period."

- "the Democratic National Committee remains neutral in this primary, based on our rules."

- "even though Senator Sanders has endorsed my opponent, I remain, as I have been from the beginning, neutral in the presidential Democratic primary."

DE 8, ¶ 160.

Plaintiffs allege that despite the DNC's Charter and Bylaws, and these public statements of neutrality and impartiality, the DNC devoted its resources to supporting Hillary Clinton over other Democratic Party candidates. The DNC's bias, according to Plaintiffs, came to light after computer hackers penetrated the DNC's computer network. An individual identified as "Guccifer 2.0" took credit for the hack and posted several documents purportedly taken from the DNC's servers on a publically accessible website.

4

Those documents include: excel spreadsheets containing information of DNC donors; spreadsheets containing information of donors to Hillary Clinton's campaign; research regarding Hillary Clinton's campaign, including vulnerabilities, attacks, rebuttals, policy positions, and opposition research on other Democratic candidates; and various other documents regarding Hillary Clinton's presidential campaign. DE 8, ¶¶ 165 & 169.

Also included in the documents released by "Guccifer 2.0" was a memorandum dated May 26, 2015, addressed to the DNC. That memorandum provides "a suggested strategy for positioning and public messaging around the 2016 Republican presidential field," including use of "specific hits to muddy the waters around ethics, transparency and campaign finance attacks on HRC." DE 8-1. It states, "Our goals in the coming months will be to frame the Republican field and the eventual nominee early and to provide a contrast between the GOP field and HRC." Id. The memorandum observes that "the right wing attack machine has been building its opposition research on Hillary Clinton for decades. HRC's critics have been telegraphing they are ready to attack and do so with reckless abandon." Id. As a tactical response, the memorandum suggests "[w]orking with the DNC and allied groups" to "help pitch stories with no fingerprints and utilize reporters to drive a

message" and "insert our messaging into [Republican] press."  Id.
The memorandum closes with an invitation for further discussion,
"to answer the question of who do we want to run against and how
best to leverage other candidates to maneuver them into the right
place."  Id.  Plaintiffs do not allege who authored this
memorandum, but as of May 26, 2016, the Democratic presidential
field already included both Clinton and Sanders.

    As a result of the information "Guccifer 2.0" released,
Plaintiffs conclude that "the DNC was anything but 'impartial,'
'evenhanded,' or 'neutral' with respect to the Democratic
nominating process."  DE 8, ¶ 171.  And all while Wasserman Schultz
was the DNC's chair.  Plaintiffs bring six causes of action on
behalf of three proposed classes.  The first class comprises "[a]ll
people or entities who have contributed to the DNC from January 1,
2015 through the date of this action ('DNC Donor Class')."  DE 8,
¶ 175.  The second, "[a]ll people or entities who have contributed
to the Bernie Sanders campaign from January 1, 2015 through the
date of this action ('Sanders Donor Class')."  Id. And the third,
"[a]ll registered members of the Democratic Party ('Democratic
Party Class')."  Id.  The DNC Donor Class and the Sanders Donor
Class each assert causes of action for fraud, negligent
misrepresentation, and violation of § 28-3904 of the District of

Columbia Code (Counts I, II, and III, respectively). The Democratic Party Class asserts a cause of action for breach of fiduciary duty (Count V). And the DNC Donor Class also asserts causes of action for unjust enrichment and negligence (Counts IV and VI, respectively).

The apparent theories for each of these causes of action merit further discussion. The DNC Donor Class and Sanders Donor Class Plaintiffs' fraud and negligent misrepresentation causes of action are premised on the theory that Plaintiffs, as well as putative class members, donated either to the DNC or Senator Sanders's campaign in reliance on the DNC's promise of neutrality in the presidential primaries. According to Plaintiffs, the DNC knew or should have known that those promises of neutrality were false and intended to induce members of the DNC Donor Class and Sanders Donor Class's reliance. The DNC Donor Class Plaintiffs' unjust enrichment cause of action is largely coextensive with these fraud claims. And the DNC Donor Class and Sanders Donor Class Plaintiffs' cause of action for violation of § 28-3904 of the District of Columbia Code presents a similar theory: that the DNC falsely claimed it would remain neutral in the Democratic presidential primaries. The Democratic Party Class Plaintiffs' cause of action for breach of fiduciary duty suggests that the DNC

owes a fiduciary duty to all registered Democrats to comply with the terms of the DNC's Charter and Bylaws. By failing to maintain impartiality and evenhandedness in the Democratic presidential primaries, Plaintiffs believe that the DNC breached this fiduciary duty. Lastly, the DNC Donor Class Plaintiffs' negligence cause of action arises from the DNC's failure to secure from computer hackers Plaintiffs' personal information.

The DNC and Wasserman Schultz have moved to dismiss the First Amended Complaint (DE 8) on various grounds. The DNC and Wasserman Schultz argue that Plaintiffs lack standing to assert their claims, that they have insufficiently pled those claims, and that the class allegations must be stricken as facially deficient.

## II.

This Order does not concern who should have been the Democratic Party's candidate for the 2016 presidential election; it does not concern whether the DNC or Wasserman Schultz generally acted unfairly towards Senator Sanders or his supporters; indeed, it does not even concern whether the DNC was in fact biased in favor of Hillary Clinton in the Democratic primaries. At this stage, the Court is required to construe the First Amended Complaint (DE 8) in the light most favorable to Plaintiffs and accept its well-pled allegations as true. See Stalley ex rel. U.S.

v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1232-33
(11th Cir. 2008). The Court thus assumes that the DNC and
Wasserman Schultz preferred Hillary Clinton as the Democratic
candidate for president over Bernie Sanders or any other Democratic
candidate. It assumes that they stockpiled information useful to
the Clinton campaign. It assumes that they devoted their resources
to assist Clinton in securing the party's nomination and opposing
other Democratic candidates. And it assumes that they engaged in
these surreptitious acts while publically proclaiming they were
completely neutral, fair, and impartial.

This Order therefore concerns only technical matters of
pleading and subject-matter jurisdiction. To the extent Plaintiffs
wish to air their general grievances with the DNC or its candidate
selection process, their redress is through the ballot box, the
DNC's internal workings, or their right of free speech—not through
the judiciary. To the extent Plaintiffs have asserted specific
causes of action grounded in specific factual allegations, it is
this Court's emphatic duty to measure Plaintiffs' pleadings against
existing legal standards. Having done so, and for the reasons that
follow, the Court finds that the named Plaintiffs have not
presented a case that is cognizable in federal court.

IV.

Federal courts are courts of limited jurisdiction, possessing "only that power authorized by Constitution and statute." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). In cases that do not present a federal claim for relief, like this one, that power derives from 28 U.S.C. § 1332. Section 1332 authorizes this Court to exercise its jurisdiction in two circumstances pertinent here. First, this Court has "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between . . . citizens of different states." 28 U.S.C. § 1332(a). Section 1332(a) permits the exercise of jurisdiction only where there is complete diversity—that is, no plaintiff maintains citizenship in the same state as any defendant. See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806); Triggs v. John Crump Toyota, Inc., 154 F.3d 1284, 1287 (11th Cir. 1998). Second, except in circumstances not present here, this Court has "original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any Defendant." 28 U.S.C. § 1332(d)(2) (hereinafter "CAFA jurisdiction"). As the text makes plain, § 1332(d) requires only

minimal diversity——at least one plaintiff must be diverse from one defendant.  See Evans v. Walter Indus., Inc., 449 F.3d 1159, 1163 (11th Cir. 2006).

It is readily apparent that this Court lacks jurisdiction under § 1332(a), for the Parties are not completely diverse. According to the First Amended Complaint (DE 8), two Plaintiffs "reside" in the District of Columbia, where the DNC maintains its citizenship.  Seven "reside" in Florida, where Wasserman Schultz ostensibly maintains citizenship.[2]   But "[c]itizenship, not residence, is the key fact that must be alleged in the complaint to establish diversity for a natural person."  Taylor v. Appleton, 30 F.3d 1365, 1367 (11th Cir. 1994).  Plaintiffs' failure to properly allege their own citizenship is, in itself, sufficient to preclude the exercise of the Court's jurisdiction under 1332(a).  Indeed, this pleading failure makes it impossible for the Court to conclude that the Parties are even minimally diverse for purposes of its CAFA jurisdiction.  See Travaglio v. Am. Exp. Co., 735 F.3d 1266, 1268 (11th Cir. 2013) (the plaintiff "must allege facts that, if true, show federal subject matter jurisdiction over her case exists").  And even if the Court assumed that residence were the

---

[2] As with the Plaintiffs, the First Amended Complaint (DE 8) does not specifically allege Wasserman Schultz's citizenship. Rather, it alleges that she "resides in and is a Congresswoman representing portions of this district."  DE 8, ¶ 1.

equivalent of citizenship——an assumption the Court is not permitted to make——Plaintiffs would still not be completely diverse from Defendants.

Putting aside these pleading deficiencies, it is also apparent that Plaintiffs lack standing to assert each of the causes of action raised in this putative class action. In order to maintain a class action lawsuit, the class representatives——as distinct from the putative class members——must establish their standing to sue, as measured by the standard of <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992). <u>See</u> <u>Allen v. Wright</u>, 468 U.S. 737 (1984) (applying standing inquiry to a class action); <u>Carter v. West Pub. Co.</u>, 225 F.3d 1258, 1263 (11th Cir. 2003). The standing requirement stems from Article III of the Constitution, which limits federal courts' jurisdiction to certain "Cases" and "Controversies." U.S. Const. Art. III; <u>see</u> <u>Clapper v. Amnesty Int'l USA</u>, 133 S.Ct. 1138, 1146 (2013). The Supreme Court has made clear that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." <u>DaimlerChrysler Corp. v. Cuno</u>, 547 U.S. 332, 341 (2006) (internal marks omitted). To effectuate this limitation, <u>Lujan</u> laid out three basic elements of Article III standing: "First, the plaintiff must have suffered an 'injury in fact'——an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or

12

imminent, not 'conjectural' or 'hypothetical.'" <u>Lujan</u>, 504 U.S. at 560 (citations omitted).  "Second, there must be a causal connection between the injury and the conduct complained of . . . ."  <u>Id.</u>  "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" <u>Id.</u>  The class representatives must meet each of these elements to pursue not only their own claims, but the class members' claims as well.  <u>See</u> <u>Prado-Steiman ex re. Prado v. Bush</u>, 221 F.3d 1266, 1279 (11th Cir. 2000).

a.

As to the fraud-type claims Counts I, II, III and IV, Plaintiffs fail to allege any causal connection between their injuries and Defendants' statements.  The Plaintiffs asserting each of these causes of action specifically allege that they donated to the DNC or to Bernie Sanders's campaign.  <u>See</u> DE 8, ¶¶ 2-109.  But not one of them alleges that they ever read the DNC's charter or heard the statements they now claim are false before making their donations.  And not one of them alleges that they took action in reliance on the DNC's charter or the statements identified in the First Amended Complaint (DE 8).  Absent such allegations, these Plaintiffs lack standing.  <u>See</u> <u>Lujan</u>, 504 U.S. at 560.  To be sure, two paragraphs of the First Amended Complaint (DE 8) assert generally that the "DNC Donor Class Plaintiffs, the Sanders Donor Class Plaintiffs, and members of the DNC Donor Class and the

13

Sanders Donor Class, relied on Defendants' false statements and omissions to their injury." DE 8, ¶¶ 188 & 195.[3] But this boilerplate recitation, absent factual content to support it, does not permit the Court to "determine that at least one named class representative has Article III standing to raise each class claim." Prado-Steiman, 221 F.3d at 1279; cf. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'").

Nor do these Plaintiffs' donations to the DNC or to Bernie Sanders's campaign create standing. The act of donating to an organization does not, of itself, create a legally protected interest in the organization's operations. Pearson v. Garrett-Evangelical Theological Seminary, Inc., 790 F. Supp. 2d 759, 763 (N.D. Ill. 2011) ("donating money to a charitable fund does not confer standing to challenge the administration of that fund"); Orient v. Linus Pauling Inst. of Sci. and Med., 936 F. Supp. 704, 707 (D. Ariz. 1996) ("Funding research does not automatically confer a legally protected interest in that organization's assets on a donor"); cf. Leonard v. Campbell, 189 So. 839, 840 (Fla. 1939) (observing that delivery of a gift "divest[s] the donor of all present control and dominion over [the gift], absolutely and irrevocably"). Just as donating to Sanders's campaign would not

---

[3] Paragraph 195 alleges "justifiable reliance" but is otherwise the same as paragraph 188.

entitle the donor to dictate the campaign's platform, donating to the DNC or to Bernie Sanders's campaign does not entitle Plaintiffs to challenge the manner in which the DNC has conducted its affairs. A donor may suffer a cognizable injury from the violation of an independent duty, such as if the donation was procured by fraud. But, for the reasons just explained, Plaintiffs do not allege the causal connection between their donations and the DNC's statements necessary to give them standing to assert that type of claim.

b.

The Plaintiffs who assert the breach of fiduciary duty cause of action in Count V of the First Amended Complaint (DE 8) are simply alleged to be "registered Democrat[s]," residing in nineteen states. Ostensibly this means that they are registered voters who have publically declared allegiance with their state's Democratic Party, which in turn follows guidelines established by the DNC. See DE 8, ¶¶ 156-57. They contend that the DNC owes (and Wasserman Schultz owed) all registered Democrats a fiduciary duty to comply with the DNC's charter, which the DNC and Wasserman Schultz breached by favoring Hillary Clinton during the Democratic primaries. Other than labeling their claim as a common-law tort, these Plaintiffs have done little to make out a concrete injury, particularized to them. See DE 48, 7-8. For their part, the DNC and Wasserman Schultz have characterized the DNC charter's promise of "impartiality and evenhandedness" as a mere political

15

promise——political rhetoric that is not enforceable in federal courts.  The Court does not accept this trivialization of the DNC's governing principles.  While it may be true in the abstract that the DNC has the right to have its delegates "go into back rooms like they used to and smoke cigars and pick the candidate that way," DE 54, at 36:22-24, the DNC, through its charter, has committed itself to a higher principle.  Nevertheless, it is apparent that these Plaintiffs cannot satisfy <u>Lujan</u>'s test, and therefore lack standing to assert Count V of the First Amended Complaint (DE 8).

The Supreme Court has long made clear that "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction."  <u>Warth v. Seldin</u>, 422 U.S. 490, 499 (1975) (<u>quoting</u> <u>Schlesinger v. Reservists to Stop the War</u>, 418 U.S. 208 1974)).  To that end, courts have routinely concluded "that a voter fails to present an injury-in-fact when the alleged harm is abstract and widely shared or is only derivative of a harm experienced by a candidate." <u>Crist v. Comm'n on Presidential Debates</u>, 262 F.3d 193, 195 (2d Cir. 2001); <u>see also</u> <u>Gottlieb v. Fed. Election Comm'n</u>, (concluding that voters' "supposed injury to their 'ability to influence the political process'" was "too vague to constitute an injury-in-fact").  For example, in <u>Crist</u>, a voter sued the sponsor of presidential

16

debates, the Commission on Presidential Debates ("CPD"), contending that the CPD's policy of limiting participation in its debates to candidates with demonstrated popularity violated the voter's First Amendment Rights. <u>Crist</u>, 262 F.3d at 194. The Second Circuit held that the voter's claimed injury was too abstract and generalized to invoke the court's jurisdiction. <u>Id.</u> at 195. Similarly, in <u>Becker v. Fed. Election Comm'n</u>, several supporters of Ralph Nader sued the Federal Election Commission ("FEC"), claiming that FEC regulations permitting corporate sponsorship of presidential debates corrupted the political process. 230 F.3d 381, 383-84 (1st Cir. 2000). Just as in <u>Crist</u>, the <u>Becker</u> Court held that the Nader supporters' alleged harm was not sufficiently concrete or personalized to establish standing. <u>Id.</u> at 389-90.

The Plaintiffs asserting Count V of the First Amended Complaint (DE 8) suffer an analogous standing deficiency. Their association with the DNC is voluntary and their relationship to it indirect. The harm they suffered from the DNC's alleged bias is, as their claim makes explicit, undifferentiated from all other registered Democrats. But it also sweeps more broadly. In states with open primaries, where voters unaffiliated with a political party may vote in the Democratic presidential primary, the harm as between unaffiliated voters and those affiliated with their state's Democratic party is undifferentiated. And under Plaintiffs' theory, "the Democratic Party is a custodian of a fair and impartial election process." DE 54, at 63:15-17. If the DNC

17

failed to take proper care of the election process, as Plaintiffs'
theory goes, then their injury is also undifferentiated from the
voting public at large.  Labeling this type of injury as a common-
law tort does nothing to alter the generalized nature of
Plaintiffs' grievance.  For, if the tort harm is failure to act as
a proper "custodian of this country's democracy," DE 54, at 18:8-9,
then the measure of Plaintiffs' damages must be the extent to which
the DNC's actions corrupted the election process.  But just like a
voter's interest in diverse political discourse (<u>Crist</u>), or in
untainted presidential debates (<u>Becker</u>), "the harm done to the
general public by corruption of the political process is not a
sufficiently concrete, personalized injury to establish standing."
<u>Becker</u>, 230 F.3d at 389.

     The Court also entertains serious doubts about whether it
could redress the harm asserted in Count V.   In addition to
damages, Plaintiffs seek declaratory and injunctive relief that
would bind the DNC to the present iteration of its charter.  But "a
political party's determination of the structure which best allows
it to pursue its political goals is protected by the Constitution."
<u>Eu v. S.F. Cnty. Democratic Cent. Comm.</u>, 489 U.S. 214, 229 (1989)
(internal marks omitted) (quoting <u>Tashjian v. Republican Party of
Conn.</u>, 479 U.S. 208, 224 (1986)).  So, the choice——and attendant
consequences——between "impartiality and evenhandedness" and Tammany
Hall politics lies in the province of the DNC, not the judiciary.
<u>Cf.</u> <u>O'Brien v. Brown</u>, 409 U.S. 1, (1972) ("It has been understood

since our national political parties first came into being as voluntary associations of individuals that the convention itself is the proper forum for determining intra-party disputes as to which delegates shall be seated."). Grave questions regarding the DNC's right of association would undoubtedly arise if this Court were to enjoin the DNC to a particular manner of governance. And those same concerns would arise with respect to any award of damages, which would impose liability for the DNC's alleged decision to associate with a particular standard-bearer in a manner not otherwise prohibited by law.

c.

Finally, with respect to their negligence claim in Count VI of the First Amended Complaint (DE 8), the six named DNC Donor Class Plaintiffs claim they suffered an injury-in-fact from the data breach of the DNC's servers. Two of them, Cridde and Berners-Lee, donated to the DNC "by check." DE 8, ¶¶ 108 & 109. Two others, Lynch and Young, allege they contributed to the DNC "online," but do not specify where. DE 8, ¶¶ 105 & 106. Davis donated money to the DNC in "various ways, including online at www.democrats.org." DE 8, at ¶ 107. And Cork gave to the DNC but does not specify where or how. Their cause of action is premised on a security breach of the DNC's computer servers, which Plaintiffs allege was perpetrated by two Russian hacking groups having "a long history of successfully targeting sensitive government and industry computer networks in both the United States and other countries, often using

19

'sophisticated phishing attacks.'"  DE 8, ¶ 164.  A computer hacker known as "Guccifer 2.0" claimed credit for the security breach and posted several documents from the DNC's servers online.  Those documents include "Excel spreadsheets containing the names and personal information of donors to the Democratic Party" and other "spreadsheets of donors to the DNC . . . containing personal information such as names, email addresses, and phone numbers."  DE 8, ¶¶ 164, 165 & 170.  Although these Plaintiffs do not specifically so allege, their theory is that this security breach of the DNC's servers places them at a heightened risk of identity theft.  According to these Plaintiffs, "data breaches engender injury sufficient to confer Article III standing based solely on increased risk of identity theft in the future."  DE 48, at 8.

Although the Eleventh Circuit has held that a party who has actually suffered identity theft as a result of a data breach has standing, it has expressly left open the question whether the mere threat of future identity theft creates Article III standing. See Resnick v. AvMed, Inc., 693 F.3d 1317, 1323 n.1 (11th Cir. 2012).  The Supreme Court requires that a "threatened injury must be certainly impeding to constitute an injury in fact, and that allegations of possible future injury are not sufficient." Clapper, 133 S. Ct. at 1147 (quoting Whitmore v. Arkansas, 495 U.S. 149, 158 (1990)) (internal quotation marks omitted).  Theories of standing that "rel[y] on a highly attenuated chain of possibilities do[] not satisfy the requirement that threatened injury must be

certainly impending." Id.  To some measure, three circuits have held that a risk of future identity theft can constitute an injury in fact.  Galaria v. Nationwide Mut. Ins. Co., 663 F. App'x 384, 387-89 (6th Cir. 2016); Krottner v. Starbucks Corp., 628 F.3d 1139, 1142-43 (9th Cir. 2010); Pisciotta v. Old Nat'l Bancorp, 499 F.3d 629, 632-34 (7th Cir. 2007).  Three others have held that it does not.  Beck v McDonald, 848 F.3d 262, 274-76 (4th Cir. 2017); Katz v. Pershing, 672 F.3d 64, 80 (1st Cir. 2012); Reilly v. Ceridian Corp., 664 F.3d 38, 40 (3d Cir. 2011).  The cases on both sides of this apparent circuit split are largely reconcilable, and each proves instructive here.

In Krottner, current and former Starbucks employees brought suit after a laptop containing the names, addresses, and Social Security numbers of 97,000 Starbucks employees was stolen from Starbucks.  628 F.3d at 1140.  Following the theft, one of the employees alleged that someone tried to open a bank account in his name, but his bank closed the account before he suffered any loss. Id. at 1142.  The Ninth Circuit held that the employees faced "a credible threat of harm" from the theft of the laptop containing their personal information, constituting an injury-in-fact for purposes of Article III.  Id. at 1343.

In Pisciotta, the defendant operated an online marketing service though which individuals could complete applications for banking services.  499 F.3d at 631.  Upon completion of the applications, the defendant was privy to the individuals' name,

address, Social Security number, driver's license number, date of birth, mother's maiden name, and credit card and other financial account numbers.  Id.  The plaintiffs had provided this type of personal information to the defendant and brought suit after the defendant's online hosting facility suffered a "sophisticated, intentional and malicious" security breach.  Id. at 631-32.  The plaintiffs did not allege "any completed direct financial loss to their accounts" or "that they or any other member of the putative class already had been the victim of identity theft as a result of the breach."  Id. (emphasis in original).  But the Seventh Circuit nevertheless concluded that the plaintiffs had standing, reasoning that "the injury-in-fact requirement can be satisfied by a threat of future harm or by an act which harms the plaintiff only by increasing the risk of future harm that the plaintiff would have otherwise faced, absent the defendant's actions."  Id. at 634.

In Galaria, an insurance company maintained sensitive personal information of current customers, as well as prospective customers who had applied for quotes on insurance products.  663 F. App'x at 386.  The information retained by the insurance company, including names, dates of birth, marital status, gender, occupation, employer, Social Security numbers, and driver's license numbers, was stolen by computer hackers.  Id.  Two plaintiffs brought suit as a result of the breach.  Id.  The Sixth Circuit held that the plaintiffs had standing because they alleged that "their data has already been stolen and is now in the hands of ill-intentioned

22

criminals." According to the Sixth Circuit, "[w]here a data breach targets personal information, a reasonable inference can be drawn that the hackers will use the victims' data for the fraudulent purposes alleged in Plaintiffs' complaints." Id. at 389.

In Beck, a Veterans Affairs Medical Center lost two sets of patient data. 848 F.3d at 266-67. The first data set, stored on a laptop that was misplaced or stolen, held the names, dates of birth, partial Social Security numbers, and physical descriptions of 7,400 patients. Id. at 267. The second, kept in four storage boxes that were misplaced or stolen, contained the names, Social Security numbers, and medical diagnoses of 2,000 patients. Id. at 268. Three patients whose personal information was kept on the laptop or in the storage boxes sued as a result of the Medical Center's mishandling of their data. But the Fourth Circuit rejected as "too speculative" the patients' argument that their risk of future harm constituted an injury-in-fact. Id. at 274. The Fourth Circuit reasoned that the patients' theory of standing relied on an "attenuated chain of possibilities": that the thief targeted the stolen items for the information they contained; selected, from thousands of others, the three patients' information; and attempted successfully to use that information to steal the patients' identities. Id. at 275. The Fourth Circuit also concluded that the patients had not established a "substantial risk" of harm. Id.

In Reilly, a payroll processing firm's systems were penetrated

by a computer hacker, potentially exposing the personal and
financial information of 27,000 employees from 1,900 different
companies.  664 F.3d at 40.  The nature of the payroll processing
firm's business meant that it held information regarding its
customers' employees, including their names, addresses, Social
Security numbers, dates of birth, and bank account information.
Id.  Two employees whose employers utilized the payroll processing
firm's services sued the payroll processing firm based on their
belief that they were at an increased risk of identity theft.  Id.
The Third Circuit held that the employees lacked standing to sue
because they failed to allege an injury that was "certainly
impending."  Id. at 42.  Like in Beck, the Third Circuit reasoned
that the employees' theory of standing rested on a speculative
chain of "ifs"——"that the hacker: (1) read, copied, and understood
their personal information; (2) intends to commit future criminal
acts by misusing the information; and (3) is able to use such
information to the detriment of Appellants by making unauthorized
transactions in Appellants' names."  Id.

    And in Katz, the defendant sold various finance-related
products and services to investment advisers and broker-dealers,
who in turn traded securities on behalf of their clients.  672 F.3d
at 69.  One of the defendant's services was an online platform that
allowed the advisers and broker-dealers to obtain research and
manage brokerage accounts.  Id.  If authorized, end users of that
platform were able to view the clients' private information,

including Social Security and taxpayer identification numbers.  Id.
at 69-70.  Some of the defendant's employees also had access to
that information.  Id. at 70.  The plaintiff maintained a brokerage
account with a firm that used the defendant's platform.  She sued,
concerned   that   the   defendant's   platform   left   her   private
information vulnerable to abuse.  Id.  The plaintiff did not allege
that any specific data breach occurred; only that many must have
occurred.  Id. at 79.  The First Circuit concluded that this claim
fell short of establishing an injury-in fact.  Id.  Because the
plaintiff did not allege that her information had actually been
accessed,  the  court  reasoned  that  "[h]er  cause  of  action  rests
entirely on the hypothesis that at some point an unauthorized, as-
yet unidentified, third party might access her data and attempt to
purloin her identity."  Id.

One common thread runs through each of these cases that is
not present here.   The defendant in each had a practice of
retaining the plaintiffs' sensitive personal information, for one
reason or another.  In Krottner and Reilly, it was for purposes of
employment; in Pisciotta and Katz for financial services; and in
Galaria and Beck for insurance or medical purposes.  There is no
allegation here that the DNC retains private information of its
donors that is not mandated to be disclosed to the Federal Election
Commission   and   thus   publically   available.[4]     That   is,   unlike

---

[4] Federal law mandates that political parties report any
donation over $200.00 to the Federal Election Commission, as well
as the donor's name, mailing address, occupation, name of

Krottner, Pisciotta, Galaria, Beck, Reilly, and Katz, Plaintiffs do not allege that the DNC has access to and stores information from its donors, such as their Social Security or credit card numbers. Without such an allegation, the DNC donor Plaintiffs' claimed threat of injury is too speculative to support an Article III injury-in-fact.  Plaintiffs Young, Lynch, and Davis' threat of injury rests on speculation that the DNC, rather than some third party not before the Court, processed and stored information from their online donations.  Plaintiffs Cork, Berners-Lee, and Criddle's threat of injury is even more attenuated.  For Criddle and Berners-Lee, the Court must speculate that the DNC copied and stored the account and routing numbers from their checks onto the servers that were attacked.  And for Cork, the Court must speculate she provided sensitive personal information to the DNC and that it was stored on the compromised servers.  These "what ifs" push their alleged injury near sheer conjecture.

And even if the Court assumed that the DNC did store the named DNC Donor Class Plaintiffs' sensitive personal information on the hacked servers, Plaintiffs' First Amended Complaint (DE 8) still would not make out an injury that is "certainly impending." Lujan, 504 U.S. at 565.  If Krottner, Pisciotta, Galaria, Beck, Reilly, and Katz represent a sliding scale——arranged from least speculative harm to most——this case falls far closer to Katz than it does

---

employer, and the date of contribution.  11 C.F.R. § 104.8.  The Federal Election Commission in turn makes that information available for public consumption.

<u>Krottner</u>.   Unlike <u>Krottner</u>, none of the DNC donor Plaintiffs have suggested they were the victim of a failed identity theft attempt. And unlike <u>Pisciotta</u> and <u>Galaria</u>, these Plaintiffs do not allege that their personal information was targeted for the purpose of future criminal misuse.  The First Amended Complaint (DE 8) instead paints a picture that hackers were generally rummaging the DNC's files for information pertinent to the presidential election.  The named DNC Donor Plaintiffs do not allege that hackers targeted <u>their</u> information, took it, or would be able to make use of it to inflict some harm in the future.  See <u>Clapper</u>, 133 S. Ct. at 1150 (observing courts' "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors.").   As a result, this case mirrors <u>Reilly</u> and <u>Beck</u>, in which the Third and Fourth Circuits held that the plaintiffs' claimed injury lacked the degree of immediacy necessary to establish an injury-in-fact.  Thus, absent an "actual or imminent" injury, the named DNC Donor Class Plaintiffs lack standing, and this Court lacks jurisdiction over their claim in Count VI of the First Amended Complaint (DE 8).  <u>Lujan</u>, 504 U.S. at 560.

## V. Conclusion

"Federal Courts cannot exercise jurisdiction over cases where the parties lack standing."  <u>Florida Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.</u>, 647 F.3d 1296, 1302 (11th Cir. 2012). Because Plaintiffs do not allege a causal link between their donations and the DNC's statements, they lack standing to assert

the fraud-type claims in Counts I, II, III, and IV of the First Amended Complaint (DE 8).  Their breach of fiduciary duty claim in Count V relies on a harm far too diffuse to constitute an injury-in-fact in federal court.  And their negligence claim in Count VI is buffered by too many layers of speculation and conjecture to create the immediacy of harm necessary to unlock this Court's jurisdiction.  That being so, Plaintiffs have not "present[ed] a live case or controversy," and the Court "must dismiss the case for lack of subject matter jurisdiction."  Id.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion To Dismiss Plaintiffs' First Amended Complaint (DE 44) be and the same is hereby **GRANTED**; and

2. The above-styled cause be and the same is hereby **DISMISSED** without prejudice for lack of subject matter jurisdiction.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this _____25th_____ day of August, 2017.

_____
WILLIAM J. ZLOCH
Sr. United States District Judge

Copies furnished:

All Counsel of Record